# Exhibit 1

```
UNITED STATES DISTRICT COURT
SOUTHERN COUNTY OF NEW YORK
CASE NO. 07-CV-3215
------------------------------------------X
MILAGROS IMPORTS LIMITED,
A NEW YORK CORPORATION,

                    Plaintiff,

    vs.

PROGRESS VANTAGE LIMITED, A FOREIGN CORPORATION,

                    Defendant.
------------------------------------------X
```

DEPOSITION OF:   IRENE-LUISA TORRES

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before ELIZABETH A. WILLESKI, RPR, and a Notary Public, held at the office of STORCH AMINI MUNVES, PC, 2 Grand Central Tower, New York, New York 10017, on January 30, 2008, commencing at 9:30 in the morning.

1  the BETTA outsole. I gave him the artwork for
2  the BETTA I had reduced. It had been reduced
3  already, but you dump it into a croakie. It got
4  increased, so it had to be made smaller, the
5  whole positioning of the outsole, the
6  determination of the outsole was at my
7  dictorate.
8      Q.    When you say the artwork, are you
9  saying BETTA?
10     A.    The graphic work, the design of a
11 floral pattern, which was my choice to be used
12 as well as the placement of the BETTA.
13     Q.    When you were giving directions to
14 Frank Mak, those directions did not include
15 changes to the five letters, BETTA, and the way
16 those five letters appeared, correct?
17     A.    Changes as to whether it would be
18 raised or inverted, yes, that was done. The
19 size of it was, the color, and the outsole of
20 what it is, and that is an injection issue, it
21 is pretty generic on the outsole.
22     Q.    But the style of the letters --
23     A.    It was the style I had chose to use
24 originally for BETTA and it was consistent
25 throughout my packaging. We put it in a

```
 1   croakie.
 2       Q.    We talked a little bit about a
 3   Korean manufacturer, it is true, isn't it --
 4   strike that.
 5             We talked about Sina, a Korean
 6   company, correct?
 7       A.    Um-hum.
 8       Q.    It is true, isn't it, that Progress
 9   assigned a line of credit for Milagros?
10       A.    No.  At the time, because of the
11   amount, it came very quickly for us to have to
12   get the, our bank loan for it, so I had actually
13   called John Lau who was in, who was part of
14   Arda, to ask him would he do the opening of the
15   LC for me, and I would pay him the interest and
16   whatever was the whole entire draft amount, and
17   he was unavailable because he was traveling, so
18   that when I asked William would he open the LC
19   for me, at which I paid them back the interest
20   rate they requested and their draft.
21       Q.    What does LC stand for?
22       A.    Letter of credit.
23       Q.    Letter of credit?
24       A.    Correct.
25       Q.    Progress opened that for you?
```

1    A.    Yes, he did.
2    Q.    Okay. I'm going to direct your
3  attention to Paragraph 14 on page 4, second
4  line, it says. "...Progress made no attempt to
5  defend the mark in which it now claims ownership
6  rights."
7         MR. MORETTI:  I'm sorry, what
8  paragraph?
9         MR. LEAVITT:  Paragraph 14.
10   Q.    You testified earlier about an
11 issue with Neet Feet, remember that?
12   A.    Yes.
13   Q.    And this paragraph is talking about
14 events that occurred around that controversy; is
15 that correct?
16   A.    That's correct.
17   Q.    You say Progress made no attempts
18 to defend the mark. Do you see that?
19   A.    That is correct, um-hum.
20   Q.    Progress directed you to attornies
21 to deal with that?
22   A.    No, that is not entirely correct.
23   Q.    Not entirely correct?
24   A.    No, that is not. At the time I
25 received the letter, the letter was sent to my

Page 87

1  Paragraph 2: "Do we have permission to use the
2  font in the USA. If not, please tell me what it
3  is, because if I can use it indicate -- strike
4  that -- if I can use it, wouldn't mind -- see
5  that?
6       A.   Yes.
7       Q.   That font that you are referring to
8  is the BETTA font that Progress used in China,
9  correct?
10      A.   Yes.
11      Q.   You were asking them if you could
12 use that font, correct?
13      A.   I was, again, trying to -- this was
14 all preliminary stages. I was trying to find
15 out what was the parameter of this BETTA, okay,
16 I referred to it as a license, I mean, it is not
17 a license, if it is not known. It was a name, a
18 mark, that is incorrect that I called it a
19 license, but, basically, this was inquiring,
20 and, again, you can see that the direction here
21 is for me to continue forward, because I'm
22 developing a line. I'm developing packaging.
23 It is all, again, what I'm doing for myself
24 because, again, what I was looking to do with
25 this, and, again, I'm also very clear in the

```
 1    e-mail that where I state in talking with both
 2    Ben and Burt.  This BETTA name can't be
 3    brand-specific or factory brand-specific, and
 4    that's very important, because in that alone, it
 5    says specifically what I have been trying to say
 6    here, that factory brand specific, meaning it
 7    can't have its onus to one factory or be owned
 8    by a factory or brand specific, meaning that it
 9    can't be owned as a brand, okay, by someone
10    else, so to speak, and I do use brand and
11    license interchangeably with name or whatever,
12    so, again, if that is incorrect, I should not
13    have used the term license, but that is an error
14    on my part for saying that.
15         Q.    Okay.  In your opinion -- strike
16    that.
17              You testified that a brand or mark
18    that was associated with one factory would have
19    a very tough time establishing itself in the US
20    market.  Is that a fair characterization of your
21    testimony?
22         A.    Can you be specific?  I don't
23    believe I testified that.
24         Q.    You were testifying that the brand
25    cannot be tied to one factory.
```

1   A.   I'm saying, in my opinion, what I
2   was looking for and what I wanted to go forward,
3   I did not want a factory brand-specific or a
4   brand-specific mark, license, logo.
5   Q.   And you didn't want a factory
6   specific mark because why?
7   A.   Because if it is owned by a
8   factory, you can only produce with one factory,
9   then you are limited to what that factory does,
10  plus, I wasn't interested in -- I'm starting my
11  own business.  I want something I can control,
12  where I can have use of something wherever,
13  whenever, however I wanted, and I would not want
14  to be tied to a factory, a conservative brand,
15  like taking a Laura Ashley license, etc.
16  Q.   Would retailers in the US have any
17  problems in dealing with a factory specific
18  brand?
19  A.   I'm not quite sure what you mean by
20  that.
21  Q.   Strike that.  We'll get to that
22  later.
23       If you look down at Number 6, you
24  see that paragraph?
25  A.   Yes.

1    Q.    See six lines up, it says: "It is
2    the same way we did when we launched the Karen
3    Neuberger and Laura Ashley lines." Do you see
4    that?
5    A.    Yes, I do.
6    Q.    Those brands were launched under
7    licenses, correct?
8    A.    Yes.
9    Q.    If you look at page 2, Number 7.
10   A.    Yes.
11   Q.    It says: "Please advise if there
12   are royalties we would have to pay to BETTA or
13   Goddess." Do you see that?
14   A.    Yes.
15   Q.    Royalties are normally paid under a
16   license arrangement; is that right?
17          MR. MORETTI: Objection. You can
18   answer if you know.
19   A.    Yes.
20   Q.    And at this point in time, on
21   October 2nd, 2003, you under that, you might
22   have to pay royalties to Goddess, right?
23   A.    No, I did not understand that. I
24   was trying to find out whether this name was
25   owned by Goddess, held by Goddess or somebody

Torres, Irene-Luisa - Vol. 1, /0    1/30/2008

Page 124

1    Q.    You used Zack Black?
2    A.    No, I did not use Zack Black.  I
3    produced them for them.
4    Q.    You had labels that said Zack Black
5    or without labels?
6    A.    They said, we want a private
7    program.  They pick from your line and you end
8    up producing that under their label, so they
9    tell you what they want.  They give you the
10   labels or make a label and have it approved, and
11   if they don't have packaging in your area, they
12   will ask you to create the packaging and submit
13   it to them for approval, and when they approve
14   it, you move forward with it, that does not give
15   you the right to use it.  You are producing for
16   them.
17   Q.    The I. Luisa Torres line and the
18   BETTA line were separate lines, correct?
19   A.    When you say separate, do you mean,
20   like, were they sold to different people or
21   different entities?  They are two separate
22   lines.  I consider them two lines.
23   Q.    That was my question.  They were
24   two separate lines?
25   A.    Okay.  They are two separate lines.

Torres, Irene-Luisa - Vol. 1, /0   1/30/2008

Page 125

1   Q.   There are some customers who you
2   just sold I. Luisa Torres to?
3   A.   There are some that I sold both to.
4   Q.   There are some you just sell I.
5   Luisa Torres to?
6   A.   Yes.
7   Q.   Some you just sell BETTA, yes?
8   A.   Yes.
9   Q.   And some you sell both to?
10  A.   Yes.
11  Q.   They are separate lines?
12  A.   Yes.
13  Q.   Now, I want to talk to you a little
14  bit about other factories. It was your
15  testimony that Progress was well aware that
16  other factories were producing goods with the
17  BETTA mark on it for use in commerce in The
18  United States; am I right?
19  A.   That is correct.
20  Q.   And Progress also knew that the
21  BETTA mark would appear on products other than
22  slippers, right?
23  A.   Yes.
24  Q.   Did you have conversations with
25  William or Lynn where -- strike that.

LiveNote World Service 800.548.3668 Ext. 1

Torres, Irene-Luisa - Vol. 1, /0    1/30/2008

Page 126

1          (Defendant's Exhibit-17 was marked
2  for identification.)
3          Q.    I place before you a document
4  marked for identification as Defendant's
5  Exhibit-17.  Do you see that document?
6          A.    Yes, I do.
7          Q.    This is an e-mail chain where in
8  there are some e-mails between you and Lynn,
9  correct?
10         A.    No, Raymond and Lynn.
11         Q.    We talked about a letter of credit
12 that Progress sent for you to a Korean company.
13         A.    That's correct.
14         Q.    And that's what this e-mail refers
15 to, correct?
16         A.    That is correct.
17         Q.    And the Korean company, what sort
18 of products did they produce?
19         A.    For me, socks.
20         Q.    And by opening, by sending this
21 letter of credit, Progress actually supported
22 your use of this Korean company; am I right?
23              MR. MORETTI:  Objection to form.  You
24 can answer the question.
25         Q.    I'll rephrase.  By sending the