# Exhibit 2

```
              UNITED STATES DISTRICT COURT

             SOUTHERN DISTRICT OF NEW YORK
_____

MILAGROS IMPORTS LIMITED, a   )
New York corporation,         )
                              )
              Plaintiff,      )
                              )
      -against-               )   NO. 07 CV 3215 (SHS)
                              )
PROGRESS VANTAGE LIMITED, a   )
Foreign corporation,          )
                              )
              Defendant.      )
_____

            DEPOSITION UPON ORAL EXAMINATION

                           OF

                        WAI WONG
_____

      10:07 A.M. - 12:27 P.M. & 1:39 P.M. - 5:41 P.M.

              Wednesday, February 20, 2008

            600 University Street, Suite 3600

                   Seattle, Washington
```

Wong, Wai - Vol. 1                              February 20, 2008

Page 70

1   A   I believe it's all the same.
2   Q   (By Ms. Power)  Was this an exclusive or a nonexclusive
3       agreement?
4   A   We didn't specifically discuss about it.
5   Q   Was it transferable or nontransferable?
6              MR. LEAVITT:  Objection to form.
7   A   We didn't discuss it either.
8   Q   (By Ms. Power)  Did you discuss the payment of royalties?
9   A   Yes.
10  Q   And what were the terms regarding the payment of royalties?
11  A   We told her we will support her.  We didn't need her to pay
12      us royalty.
13  Q   Why is that?
14  A   We wanted someone to help us to build up the brand.  And in
15      order for her to re-invest the profit into the business --
16      well, in order for Milagros to make profit and grow, we
17      want her to keep the profit or re-invest it into Milagros
18      and help us to sell more BETTA slippers or BETTA items.
19  Q   What was the geographic term of the alleged agreement?
20  A   United States.
21  Q   Was the alleged agreement only for the use of the BETTA
22      mark or was it for any other mark?
23  A   For our agreement, only the BETTA mark.
24  Q   And under this alleged agreement, what use of the BETTA
25      mark was Milagros allowed?

Page 71

1         MR. LEAVITT: Objection to form. You can
2    answer.
3    A  We allowed Milagros to use the mark to use on socks, which
4    is a supplier we know, and we let her to use -- to sell
5    some other slippers from a manufacturer called Flicker, who
6    we know have fairly high standard and they can make some
7    items that our factories are not very good at. And we also
8    agreed Milagros to use the mark and make small items
9    through Topper.
10   Q  (By Ms. Power) Is there anything in writing that sets
11   forth the scope of what Milagros was permitted to do using
12   the BETTA mark under this alleged agreement?
13   A  No.
14   Q  What was the length of the alleged agreement?
15   A  We didn't discuss it.
16   Q  What did you expect it to be?
17   A  We expect to review it every two years.
18   Q  Did you discuss the circumstances under which this alleged
19   agreement could be terminated?
20   A  No.
21   Q  Did you discuss providing notice to Milagros before this
22   alleged agreement could be terminated?
23   A  No.
24   Q  Were there any terms related to giving notice before
25   terminating the agreement?

1   A   No.
2   Q   Did the alleged agreement provide for assignment of the
3       BETTA mark?
4           MR. LEAVITT: Objection; asked and answered.
5       You can answer.
6   A   I don't understand the question. Sorry.
7   Q   (By Ms. Power) My question is, earlier I asked you if
8       there were discussions about whether the oral license
9       provided for the mark being transferable or
10      nontransferable, and you said that that was not discussed;
11      is that right?
12  A   Correct.
13  Q   And I just want to confirm whether this alleged agreement
14      provided for assignment of the BETTA mark to any other
15      party.
16  A   What do you mean by assignment? Sorry. I don't understand
17      the term assignment.
18  Q   My question is whether Milagros could allow any other party
19      to use the BETTA mark under this alleged agreement.
20  A   Well, we verbally said she can manufacture through Topper,
21      Flicker, and the socks supplier.
22  Q   When did you reach this verbal agreement about allowing
23      Milagros to use other manufacturers or suppliers?
24  A   Just before Milagros incorporated.
25  Q   Was it at the same time that you entered into this alleged

1  Q  And if I recall correctly, you testified that there was not
2     a discussion between you and Irene as to the duration of
3     that agreement --
4  A  Correct.
5  Q  -- is that right?
6        But you also testified that you expect to review it
7     every two years; correct?
8  A  Correct.
9  Q  Did you ever tell Irene that?
10 A  No.
11 Q  Was it ever written anywhere?
12 A  No.
13 Q  Did you, in fact, review this alleged agreement within two
14    years?
15 A  Well, I think it was more than three years -- or more than
16    two years after I actually reviewed it. I only review the
17    year -- that was 2006? What was the date I sent her an
18    e-mail?
19 Q  Are you referencing the e-mail that was November 2006?
20 A  Yeah. I told her that I was terminating her contract.
21    That was later that year I sent her the e-mail, yeah. That
22    was 2006. So I was reviewing her in early months of 2006,
23    and then I realized Milagros wasn't doing a good job.
24 Q  What did you review?
25 A  The sales figure.

1   Q   What did you find?
2   A   It is a lot lower than our expectation.
3   Q   What was your expectation?
4   A   We were expecting they can do approximately a million U.S.
5       dollar of sales in two years.
6   Q   I'm sorry.  You were expecting that Milagros could sell --
7   A   Generally meeting U.S. dollar sales by the time of 2000 --
8       end of 2005.
9   Q   I'm going to have to walk backwards then.  So your
10      expectation was that within two years Milagros would be
11      able to generate a million dollars in U.S. sales?
12  A   Yes.
13  Q   So you were looking at the end of 2005?
14  A   Mm-hm.
15  Q   So am I correct in understanding that this oral license
16      agreement was in effect at some point by the end of 2003?
17  A   Well, as I said earlier, there's no exact date when it was
18      in effect.  It has always been talked about that I thought
19      Irene understood when she sent me the e-mail before these
20      licensing problems regarding royalty and license fee.
21  Q   Can you turn back to what was marked as Exhibit 5?
22  A   Yes.
23  Q   Is that the e-mail that you're referencing dated October
24      2003?
25  A   Yes.

```
 1  Q  So was the license agreement in place at the time of this
 2     e-mail?
 3              MR. LEAVITT:  Objection.  You've asked that
 4     question five times.
 5  A  There's no specific date.  But through this e-mail I
 6     understood that she fully understand our position, who was
 7     the owner of the brand and who was doing the
 8     distributionship.
 9  Q  (By Ms. Power)  So as of this date of October 2003, you
10     felt that there was an understanding regarding the
11     agreement; is that right?
12  A  Even before that, just confirming it.
13  Q  All right.  So at least as late as October 2003, this
14     alleged license agreement was in place; is that right?
15  A  Yes.
16  Q  Okay.  Is it true that the name Progress never appeared on
17     any of the products bearing the BETTA mark that were sold
18     in the United States?
19  A  Goddess appeared in the back of the insole.
20  Q  If I can back up then.  Is it true that the name Progress
21     never appeared on any product bearing the BETTA mark --
22  A  Correct.
23  Q  -- that were sold in commerce in the U.S.; correct?
24  A  Correct.
25  Q  But you said that Goddess appeared?
```

1   A   Yes.
2   Q   And can you explain where the name Goddess appeared?
3   A   In the back of the insole -- I mean, back of the outsole.
4                           (EXHIBIT NO. 15 MARKED)
5   Q   (By Ms. Power)  Mr. Wong, if you can look at what's been
6       marked as Exhibit 15 and let me know if you recognize
7       what's been shown in the photographs in these exhibits.
8   A   Mm-hm.  Yes.
9   Q   So when you're referencing that the name Goddess appears on
10      the inside of the outsole, is that what is shown in these
11      photos?
12  A   Yes.
13  Q   Is this first photo of a generic or a brand name sole?
14  A   This is generic.
15  Q   Do you sometimes put brand names on the outside of the
16      soles as well?
17  A   Yes.
18  Q   Is it your belief that because the name Goddess appears on
19      the inside of the outsole of footwear bearing the BETTA
20      mark that were sold in the U.S. that that's the basis for
21      ownership of the mark in the U.S.?
22          MR. LEAVITT:  Objection.  You can answer.
23  A   We believe we own ownership because we were registering the
24      brand name through COJK.
25  Q   (By Ms. Power)  My question, though, is whether it's your