# POWER DECLARATION

# EXHIBIT 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MILAGROS IMPORTS LIMITED, a<br>New York corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | NO. 07 CV 3215 (SHS) |
| | ) | |
| PROGRESS VANTAGE LIMITED, a<br>Foreign corporation, | ) | |
| | ) | |
| Defendant. | ) | |

DEPOSITION UPON ORAL EXAMINATION

OF

WAI WONG

10:07 A.M. - 12:27 P.M. & 1:39 P.M. - 5:41 P.M.

Wednesday, February 20, 2008

600 University Street, Suite 3600

Seattle, Washington

Wong, Wai - Vol. 1                          February 20, 2008

Page 2

```
 1    APPEARANCES:

 2


 3    FOR THE PLAINTIFF:        VANESSA SORIANO POWER

 4                             Attorney of STOEL RIVES

 5                             600 University Street, Suite 3600

 6                             Seattle, Washington 98101

 7

 8    FOR THE DEFENDANT:        BENJAMIN L. FELCHER LEAVITT

 9                             Attorney of STORCH, AMINI, MUNVES

10                             2 Grand Central Tower

11                             New York, New York 10017

12

13    ALSO PRESENT:            CHUK HUNG LIN

14

15

16

17

18

19

20

21

22

23

24

25
```

Wong, Wai - Vol. 1                    February 20, 2008

Page 3

1                          I N D E X

2   EXAMINATION                                    PAGE

3

4   Ms. Power                                          6

5

6

7

8

9                  I N D E X   E X H I B I T

10

11  EXHIBIT NO.   DESCRIPTION                        PAGE

12

13   1           2-page 2/15/2008 Virtual Exhibition   32

14               document.

15

16   2           2-page 2/15/2008 Virtual Exhibition   36

17               document.

18

19   3           1-page November 7, 1997 letter.       45

20

21   4           17-page Answer And Counterclaim.      62

22

23   5           3-page 10/2/03 letter.                81

24

25

Wong, Wai - Vol. 1                              February 20, 2008

Page 4

1                        I N D E X   E X H I B I T

2

3        EXHIBIT NO.   DESCRIPTION                          PAGE

4

5        6             13-page Defendant and Counterclaim -    82

6                      Plaintiff Progress Vantage Limited's

7                      Reply To The Second Discovery Request Of

8                      Plaintiff - Counterclaim - Defendant Milagros

9                      Limited; 1-page Certification; 1-page Affidavit

10                     of Service.

11

12       7             Document from Christensen, O'Connor,    90

13                     Johnson & Kindness.  (PVL 05714-05737)

14

15       8             10 pages of Invoices.                  104

16                     (PVL 00176-00185)

17

18       9             3-page Invoice.  (PVL 00173-00175)     113

19

20       10            5-page Patent application.             117

21                     (PVL 05819-05823)

22

23       11            1-page Specimen.                       118

24

25

Wong, Wai - Vol. 1                    February 20, 2008

```
                                                    Page 5
 1                    I N D E X   E X H I B I T

 2

 3        EXHIBIT NO.   DESCRIPTION                        PAGE

 4

 5        12            1-page November 22, 2006 e-mail.     133

 6                      (MIL 000091)

 7

 8        13            1-page MIL Order From 2003 - 2006.   142

 9                      (PVL 00171)

10

11        14            2 pages of Invoices.  (PVL 00186-00187) 143

12

13        15            4 pages of photographs.             160

14

15        16            5-page Milagros Imports LTD. Footwear 164

16                      Development Sheet.  (MIL 002979-002983)

17

18        17            1-page August 30, 2004 e-mail with   168

19                      attachments.  (MIL 002674-002681)

20

21

22

23

24

25
```

Wong, Wai - Vol. 1                    February 20, 2008

Page 6

1              BE IT REMEMBERED that on Wednesday, February 20,

2      2008, at 10:07 a.m. at 600 University Street, Suite 3600,

3      Seattle, Washington, before LORRAINE M. MILLAY, Notary

4      Public in and for the State of Washington, appeared WAI

5      WONG, the witness herein;

6              WHEREUPON, the following proceedings were had,

7      to wit:

8

9      WAI WONG,                    having been first duly sworn by

10                                  the Notary, testified as follows:

11

12                          EXAMINATION

13     BY MS. POWER:

14     Q  Can you state your full name for the record?

15     A  Wong Wai.  Or, Wai Wong.  That's my full name.  And William

16        is just the name that we usually use but is not in my

17        passport.

18     Q  And as I mentioned earlier, I'm Vanessa Power.  I represent

19        Milagros in this matter.

20              Have you ever been deposed before, Mr. Wong?

21     A  No.

22     Q  Just for sake of background in this deposition, only one of

23        us can ask or answer a question at a time.

24              You need to answer audibly with either a yes or a no

25        or a full explanation answer, so that the court reporter

Wong, Wai - Vol. 1                    February 20, 2008

1      can take down everything that is said.

2            And if you need a break at any time, as long as

3      there's no question pending, you can ask me for a break.

4   A  Okay.

5   Q  Are you taking any medication today that might interfere

6      with your ability to testify fully and truthfully?

7   A  No.

8   Q  And am I correct that English is not your first language?

9   A  That's correct.

10  Q  Do you have any concerns about your ability to understand

11     or answer my questions in English fully today?

12  A  No.

13  Q  What did you do to prepare for your deposition?

14  A  Well, I spoke to Ben, my lawyer, and went through a few

15     documents.

16  Q  When did you meet with Mr. Leavitt?

17  A  Yesterday.

18  Q  For how long?

19  A  For three, four hours.  Three to four hours.

20  Q  What documents did you look at?

21  A  What do you call those documents?  I'm sorry.  Just a few

22     pages that Ben prepared for me.

23  Q  Do you remember what was on those documents?

24            MR. LEAVITT:  I'm going to object and direct him

25     not to answer on privilege grounds.

Wong, Wai - Vol. 1                          February 20, 2008

Page 11

1   Q   What do you remember, as you sit here today?  What damages
2       are you seeking?
3   A   The loss of profit over last two years, I guess, over the
4       period that Irene start the lawsuit.  And all the expense,
5       all the damage that Irene's running BETTA is causing us.
6   Q   What is that?
7   A   Again, lost sales and lost profit.  We believe we can do
8       much better if we had the brand back at the time.
9   Q   What do you mean lost sales?
10  A   We had agreement with another person in the States that we
11      will start to distribute the brand ourself instead of using
12      Irene, and we had a few customers very interested in the
13      brand and in our product which can generate significant
14      amount of sales and profit, but we have to give that up
15      because Irene just wouldn't give up.
16  Q   Who was your agreement with?
17  A   The person's name is Tom Williams.
18  Q   Who is Tom Williams?  What does he do?
19  A   He's one of the senior partner at a company called Elan
20      Polo in St. Louis, and he's very experienced, very
21      well-known in the industry.
22  Q   Did you have a -- you said you had an agreement with him;
23      is that right?
24  A   Yeah.
25  Q   Was it a written agreement?

Wong, Wai - Vol. 1                              February 20, 2008

Page 12

1    A   It was a written agreement, but right before we signed

2        agreement we found out that Irene was suing us, so

3        agreement wasn't signed.

4    Q   Was a copy of that agreement provided to your lawyer for

5        production in this case?

6    A   No.  I didn't think that was relevant.

7    Q   You didn't think that it was relevant to who owned the mark

8        in the United States that you maybe had another agreement

9        with someone else to sell under the mark?

10   A   Well, I think right now we are debating the ownership of

11       the brand, that's the most important case at the moment,

12       and how I use the brand later on would be another issue.

13               MS. POWER:  We would ask that a copy of that

14       agreement be produced.

15               MR. LEAVITT:  We'll take it under advisement.

16               MS. POWER:  Thank you.

17   Q   (By Ms. Power)  Mr. Wong, you've mentioned two different

18       companies, Progress and Goddess.  Am I correct that

19       Progress is Progress Vantage Limited?

20   A   That's right.

21   Q   What type of company is that, such as a partnership or a

22       corporation?

23   A   It's a corporation, company registry in Hong Kong.

24   Q   What is your position at Progress?

25   A   Well, I'm joint ownership or 50 percent ownership of that

Wong, Wai - Vol. 1                    February 20, 2008

Page 13

1       company, as well as director of the company.

2    Q  Who is the other 50 percent owner?

3    A  Ms. Lin is.

4    Q  And you're referring to Lynn Wong?

5    A  That's right.  Well, official name just Lin Chuk Hung.

6       Lynn Wong is just name we use.

7    Q  Okay.  So, Lin Chuk Hung?

8    A  Yeah.

9    Q  Okay.  And is Ms. Hung's ownership -- may I call her

10      Ms. Wong today?

11   A  Yeah.

12   Q  Is her ownership also 50 percent?

13   A  That's right.

14   Q  When was Progress started?

15   A  I can't remember the exact date.  I think it's 2000 or '99,

16      but I can go through the document and find that out.

17   Q  But approximately 1999 or 2000?

18   A  Yeah.

19   Q  And who started the company?

20   A  We did.

21   Q  You and Ms. Wong?

22   A  That's right.

23   Q  What was the purpose of the business when you started it?

24   A  What do you mean by purpose?

25   Q  What were you going to do with this business?

Wong, Wai - Vol. 1                              February 20, 2008

Page 56

1   Q   And she told you that she wanted to use the knowledge that

2       she had gained over the years to start her own company;

3       right?

4   A   Correct.

5   Q   And you were supportive of her business plans; right?

6   A   Yes.  We gave her a loan to start her business.  And we

7       help her to find another person to loan the same amount as

8       we loaned her.  And in many ways we help her to get

9       furniture, to get the Empire State Building rental.

10          That's why I was shipping her products that she

11      doesn't have to -- she didn't have to pay us until she

12      received payment from customers, and some orders or some

13      invoices was up to 120 days that we made shipment before we

14      get payment.

15  Q   Why did you do all this?

16  A   We wanted to have somebody help us to build up the brand in

17      the States.

18  Q   What brand?

19  A   BETTA.

20  Q   Did you tell Irene that?

21  A   Yes.

22  Q   When?

23  A   That's when she was putting the company together.

24  Q   When was that?

25  A   I don't remember the time or the date, but before Milagros

Wong, Wai - Vol. 1                              February 20, 2008

Page 57

1     actually incorporated.

2  Q  Did you have discussions in person?

3  A  Yes.

4  Q  Where?

5  A  Well, from time to time she came to Hong Kong when she was

6     still working for Ben Berger, we discussed about it.  And

7     couple of times I came to New York and we talked about it,

8     too.

9  Q  And what did you tell her?

10 A  We told her we want to help her to start a business and we

11    have a brand name we want to distribute in the States, that

12    we got agreement from Mr. Kim Gray who support for me to

13    use the brand and we were going to register the brand in

14    the States.

15 Q  Why did you want to work with Irene?

16 A  She's willing to distribute our brand.  And at that time it

17    was -- we didn't have the knowledge or ability or time to

18    come over to United States to set up a new company and do

19    the distribution, and we trusted her, she has the ability

20    to do that, that's the reason we supported her and help her

21    out.

22 Q  At that time was Progress doing any business in the United

23    States?

24 A  Yes.  That's the time we had significant amount of business

25    from Ben Berger, as well as we got business from other

Wong, Wai - Vol. 1                          February 20, 2008

                                                        Page 58

1    customers which is still going.

2    Q  And at that time, is it correct that it was some time in

3       2003?

4    A  I don't remember exact date.  Sorry.

5    Q  So you don't remember when you spoke with Irene about --

6    A  The time before Milagros set up, incorporated.

7    Q  During that time before Milagros was incorporated was

8       Progress manufacturing any footwear bearing the BETTA mark

9       that was being sold in the United States?

10   A  No.

11   Q  And had Progress ever sold any footwear bearing the BETTA

12      mark in the U.S. before that date?

13   A  Sorry?

14   Q  Had Progress ever, before Milagros was incorporated, sold

15      footwear bearing the BETTA mark in the U.S.?

16   A  No.

17   Q  You said that you loaned Irene money; is that right?

18   A  Yes.

19   Q  You loaned her $25,000; correct?

20   A  Correct.

21   Q  And that loan has been repaid; is that right?

22   A  Correct.

23   Q  What was your understanding of the terms of that loan?

24      What was the purpose of it?

25   A  To help her to set up a company, the initial fund for the

Wong, Wai - Vol. 1                    February 20, 2008

Page 59

1    company.

2  Q  Did you think that you or Progress would have an ownership

3     interest in Milagros because you were loaning her $25,000?

4  A  No.  She asked me to be a partner, I said no.

5  Q  Has Progress made any other loans to Irene or Milagros

6     other than that $25,000 that's been repaid?

7  A  No.

8  Q  Am I correct that John Lau also loaned --

9  A  Correct.

10 Q  -- money to Milagros?

11 A  Correct.

12 Q  Do you know how much that was?

13 A  Same amount, $25,000.

14 Q  Do you know the terms of that loan?

15 A  No.

16 Q  You also testified that you helped Milagros get office

17    space; is that right?

18 A  Correct.

19 Q  What exactly did you do?

20 A  We wrote a guarantee letter to the Empire State Building,

21    telling them we have full support to Milagros, which was

22    request by Empire State Building in order to give them a

23    lease.

24 Q  You also said you helped Milagros acquire furniture; is

25    that right?

Wong, Wai - Vol. 1                    February 20, 2008

Page 65

1   Q  So you did not accept Irene's proposal; is that correct?

2   A  Correct.

3   Q  In paragraph 55 you allege that Progress agreed to license

4      Torres to be the exclusive distributor of its footwear

5      products in the United States bearing its BETTA mark.  Do

6      you see that reference?

7   A  Yes.

8   Q  Who proposed that Irene be Progress' exclusive distributor?

9   A  I did.

10  Q  When did you propose that?

11  A  That's when she was planning to start a business, when it

12     didn't have the name as Milagros.  She was telling us she

13     wanted to start a business, so I proposed to her that we

14     have a brand name registered in Hong Kong and China, then I

15     can manufacture BETTA brand and I can register BETTA brand

16     and she distribute it.

17  Q  When exactly did you propose this?  What date?

18  A  I don't have the date.  That's between the period of time

19     that she was thinking about leaving Ben Berger and some

20     time before that we made the loan before -- well, right

21     before she left.

22         Definitely before she left Ben Berger and she was

23     thinking -- between the time she was thinking leaving and

24     the time she actually left Ben Berger.

25  Q  Was that proposal verbally or in writing?

Wong, Wai - Vol. 1                          February 20, 2008

Page 66

1   A   Verbally.

2   Q   So you admit that there's no written agreement between

3       Progress and Milagros for the distribution of BETTA,

4       products bearing the BETTA mark in the U.S.; correct?

5   A   Correct.

6   Q   Is it your contention that there was an oral license

7       agreement between Progress and Milagros for the

8       distribution of products bearing the BETTA mark in the

9       United States?

10  A   I'm sorry.  I didn't understand exact what contention

11      means, but it was my intention that we register the brand

12      and we own the brand and she help us to distribute it.

13          And actually when we initially discussed it, it was

14      just talking about how we can do.  And later on, when she

15      actually left Ben Berger, she did send an e-mail to us

16      asking about the details of this brand name and clearly see

17      through the e-mail she asked about licensing fees, she

18      asked about royalty, she asked about the details, forms and

19      history of the brand, and asking about who's going to

20      register the brand, and we all answered it, so it was

21      clearly showing that she knew we own the brand.

22  Q   Am I correct, though, that it's your belief that there is

23      an -- or there was an oral license agreement between

24      Progress and Milagros for the distribution of products

25      bearing the BETTA mark in the U.S.?

Wong, Wai - Vol. 1                    February 20, 2008

Page 67

1   A   I don't know how to say it legally.  Do you mean that --
2       well, can you explain me to the term oral licensing?  Is
3       there a term -- you asked me earlier whether it's oral
4       licensing or not.
5           As I said, I didn't have the knowledge of anything
6       about licensing at that time.  All I knew was that we had a
7       gentleman agreement that we own the brand and she
8       distribute for us.
9           And only now, after this case, I get to know the
10      details and the legal requirement for licensing.
11  Q   Earlier you admitted that there's no written license
12      agreement between Milagros and Progress; correct?
13  A   Correct.
14  Q   I'm trying to understand whether you believed that there
15      was an oral license agreement between Milagros and
16      Progress.
17  A   Yes, I do believe in that.
18  Q   On what date did you make that agreement?
19  A   I don't remember date, but based on the e-mail that we talk
20      about it.  There was an e-mail, she specifically asked
21      about the detail of BETTA's license.  And I believe if you
22      said oral agreement or oral licensing, I think that can be
23      the date.
24          Personally, I believe that's the date that we have
25      agreement on that.  We told her she can use it, she doesn't

Wong, Wai - Vol. 1                              February 20, 2008

```
 1        have to pay royalty to us, she doesn't have to pay
 2        licensing fee to us, and I believe that's the date.
 3   Q    You're saying that the date of an e-mail when -- excuse me.
 4              You're saying that the date that Irene sent you an
 5        e-mail --
 6   A    Mm-hm.
 7   Q    -- asking about the terms of a license --
 8   A    Yes.
 9   Q    -- is the date that this oral license agreement was made?
10   A    I believe so.
11   Q    Did the license agreement become effective on that same
12        date?
13   A    Well, it was always our intention to go that way.  So I
14        don't know how to say when the exact date became effective.
15        It's always our intention to help Irene to set up a
16        business and distribute BETTA.
17   Q    Is it your belief that the same date that this alleged oral
18        license agreement was made is the same date that that
19        agreement took effect?
20   A    I believe we started this kind of agreement even before
21        that.
22   Q    On what date?
23   A    I don't remember exact date, but we always discuss about
24        it.  And I only know it was my intention to do that, and
25        she knew we supported her since the beginning.  So as I
```

Wong, Wai - Vol. 1                          February 20, 2008

Page 69

1      said, I didn't have the knowledge about legal contract of

2      licensing.

3              Only we told her we are registering the brand and she

4      will distribute.  And the conversation was going on and on

5      for a long time, even before she left Ben Berger.

6              So I can't tell you the exact date that it commenced

7      or it become effective.  It's always our intention to

8      support her to set up the business.

9    Q  Would you agree that this alleged oral license agreement

10      became effective the same date that it was entered into?

11   A  Well, the conversation was going on and on for a period of

12      time, so it's always there.  I don't really understand what

13      you mean when the date became effective.

14   Q  Who are the parties to the alleged agreement?

15   A  In the beginning it's more personal between Irene and I.

16      She didn't even have a company name.

17   Q  At some point did that change?

18   A  Yes.  We help her to set up Milagros, then we become

19      Progress Vantage and Milagros.

20   Q  So are you saying that there were two agreements, the first

21      was between you and Irene and the second agreement was

22      between Milagros and Progress or is this all the same

23      agreement?

24              MR. LEAVITT:  Objection to form.  You can

25      answer.

Wong, Wai - Vol. 1                    February 20, 2008

Page 70

```
 1    A   I believe it's all the same.
 2    Q   (By Ms. Power)  Was this an exclusive or a nonexclusive
 3        agreement?
 4    A   We didn't specifically discuss about it.
 5    Q   Was it transferable or nontransferable?
 6              MR. LEAVITT:  Objection to form.
 7    A   We didn't discuss it either.
 8    Q   (By Ms. Power)  Did you discuss the payment of royalties?
 9    A   Yes.
10    Q   And what were the terms regarding the payment of royalties?
11    A   We told her we will support her.  We didn't need her to pay
12        us royalty.
13    Q   Why is that?
14    A   We wanted someone to help us to build up the brand.  And in
15        order for her to re-invest the profit into the business --
16        well, in order for Milagros to make profit and grow, we
17        want her to keep the profit or re-invest it into Milagros
18        and help us to sell more BETTA slippers or BETTA items.
19    Q   What was the geographic term of the alleged agreement?
20    A   United States.
21    Q   Was the alleged agreement only for the use of the BETTA
22        mark or was it for any other mark?
23    A   For our agreement, only the BETTA mark.
24    Q   And under this alleged agreement, what use of the BETTA
25        mark was Milagros allowed?
```

Wong, Wai - Vol. 1                    February 20, 2008

Page 71

1              MR. LEAVITT:  Objection to form.  You can

2        answer.

3   A  We allowed Milagros to use the mark to use on socks, which

4        is a supplier we know, and we let her to use -- to sell

5        some other slippers from a manufacturer called Flicker, who

6        we know have fairly high standard and they can make some

7        items that our factories are not very good at.  And we also

8        agreed Milagros to use the mark and make small items

9        through Topper.

10  Q  (By Ms. Power)  Is there anything in writing that sets

11       forth the scope of what Milagros was permitted to do using

12       the BETTA mark under this alleged agreement?

13  A  No.

14  Q  What was the length of the alleged agreement?

15  A  We didn't discuss it.

16  Q  What did you expect it to be?

17  A  We expect to review it every two years.

18  Q  Did you discuss the circumstances under which this alleged

19       agreement could be terminated?

20  A  No.

21  Q  Did you discuss providing notice to Milagros before this

22       alleged agreement could be terminated?

23  A  No.

24  Q  Were there any terms related to giving notice before

25       terminating the agreement?

Wong, Wai - Vol. 1                                February 20, 2008

                                                            Page 82

1    Q   (By Ms. Power)  When were the terms of this alleged oral

2        agreement confirmed?

3                    MR. LEAVITT:  Objection to form.  You can

4        answer.

5    A   That's the -- do you have a copy of the answer we gave?  We

6        replied this e-mail with all the details.  I believe that's

7        the details we confirmed.

8    Q   (By Ms. Power)  Other than this e-mail that's been marked

9        as Exhibit 5 and your response to this e-mail, are there

10       any other written communications that you believe explain

11       the terms of this alleged oral license?

12   A   There are lots of e-mails that we talk about the license,

13       and I do think there somewhere in the document that you can

14       see that we discuss about the license.

15   Q   What I'm trying to understand is the date of this license.

16       So am I correct in understanding that this license that

17       you're alleging was entered into before October of 2003;

18       correct?

19   A   Yes.  Correct.

20   Q   Mr. Wong, you're aware that Milagros used other

21       manufacturers to manufacture products for it bearing the

22       BETTA mark; correct?

23   A   Correct.

24                    MS. POWER:  This is six, I believe.

25                        (EXHIBIT NO. 6 MARKED)

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    (206)622-6661 * (800)657-1110   FAX: (206)622-6236

Wong, Wai - Vol. 1                    February 20, 2008

Page 83

1    Q   (By Ms. Power)  Mr. Wong, you've been handed what's been

2        marked as Exhibit 6.  I'll give you a moment to review the

3        document.  When you're finished, please let me know if you

4        recognize it.

5    A   Yes.

6    Q   Am I correct that this is a document that was prepared in

7        response to discovery requests from Milagros in this

8        lawsuit?

9    A   Right.

10   Q   On the second to last page of this exhibit there's a

11       certification.  Is that your signature on the

12       certification?

13   A   Yes.

14   Q   Turn to page 8 of Exhibit 6.  In response to Request For

15       Admission No. 1, there's a reference to knowledge of

16       Milagros' licensed use of manufacturers other than PVL.

17   A   Sorry.  You mean the response?

18   Q   Mm-hm.  I'm looking at the response to Request For

19       Admission No. 1.

20   A   Mm-hm.

21   Q   And there's a sentence that starts on the fourth line of

22       that response, it starts with "Subject to the foregoing

23       objections."

24   A   Mm-hm.  Yes.

25   Q   And so, I'm asking about this reference that follows that

Wong, Wai - Vol. 1                        February 20, 2008

Page 84

1    where Progress admits that it possessed knowledge of

2    Milagros' licensed use of manufacturers other than PVL.  Do

3    you see that reference?

4    A   Yes.

5    Q   What do you mean by licensed use of manufacturers?

6    A   Well, that means Milagros allowed to use people we list

7        earlier, Flicker, Topper, et cetera, manufacturers other

8        than PVL to produce products carrying BETTA name and sell

9        in the States.

10   Q   So you're saying that Milagros had a license to use other

11       manufacturers?

12   A   Yes.

13   Q   Is that also part of this alleged oral license?

14   A   Yes.

15   Q   Was that communicated to Milagros?

16   A   Yes.  That was discussed way before Milagros was set up.

17   Q   Do you recall the date?

18   A   That's the period even before Irene left Ben Berger.

19   Q   So am I correct that this was a nonexclusive license

20       agreement that you're alleging?

21             MR. LEAVITT:  Objection to form.  Exclusive as

22       to what?

23   A   I don't understand.  What do you mean nonexclusive or

24       exclusive?

25   Q   (By Ms. Power)  Earlier I asked you if this alleged license

Wong, Wai - Vol. 1                              February 20, 2008

Page 85

1       agreement was exclusive or nonexclusive and you stated that

2       it was never discussed; is that right?

3    A  That's right.

4    Q  And so, my question is whether this was therefore a

5       nonexclusive agreement, because you're saying that under

6       this alleged agreement Milagros was allowed to use other

7       manufacturers.

8    A  We didn't use the term exclusive during our discussion.  We

9       only say that in order for BETTA brand to take off in the

10      United States, just the product from PVL wouldn't be enough

11      to be full collection for the customer to be interested in.

12          So we agreed that we can use products from Flicker,

13      Topper, as well as some socks suppliers to produce products

14      carrying BETTA brand in order to help with sales and help

15      the market exposure for BETTA.  So that's how we discussed,

16      and we didn't use the term exclusive or nonexclusive.

17   Q  In the same response in Exhibit 6, there's reference to use

18      being made by other manufacturers with the explicit

19      permission of PVL.  Do you see that reference?

20   A  Yes.

21   Q  What is meant by the explicit permission of PVL?

22   A  During our initial discussion that I request Irene to show

23      me all the products made by other manufacturers, that's

24      what I meant.

25          And later on we -- because she has more knowledge

Wong, Wai - Vol. 1                        February 20, 2008

Page 90

1      clarify?  Are you talking about identity of them?

2   A  Can you clarify the question?  You mean learned their

3      existence or learned their name or what?

4   Q  (By Ms. Power)  Yes.  Have you learned more about them?

5      Have you learned who they are?

6   A  I know Flicker, I know Topper.

7   Q  Have you learned any more of them through this lawsuit?

8   A  You mean more manufacturer?

9   Q  Yes.

10  A  Not through this lawsuit.

11  Q  How did you learn about more of them?

12  A  Through my lawyers in China.

13             MS. POWER:  This is seven.

14                         (EXHIBIT NO. 7 MARKED)

15  Q  (By Ms. Power)  Mr. Wong, you've been handed what's been

16     marked as Exhibit 7.  I'll ask you to review the document

17     and let me know if you recognize it.

18  A  Yes.

19                         (Pause in proceedings.)

20  A  Yes.

21  Q  (By Ms. Power)  Is this document -- I'm sorry.  Do you

22     recognize the document?

23  A  Yes.

24  Q  Okay.  What is it?

25  A  It is some invoice -- well, first of all, this is

Wong, Wai - Vol. 1                    February 20, 2008

                                                      Page 91

1      application for the BETTA brand by Cindy.  These are the

2      legal documents between us and COJK, isn't it?

3   Q  Am I correct that this is a copy of Progress' application

4      to register BETTA as a trademark in the United States?

5   A  Yes.

6   Q  Did you speak with Irene before applying to register the

7      BETTA mark in the United States?

8   A  I did.

9   Q  What did you speak to her about?

10  A  I told her we are registering the brand.

11  Q  When did you talk to her about that?

12  A  During the period before she incorporated Milagros.

13  Q  So before Irene incorporated Milagros as a company, you

14     spoke to her --

15  A  Yeah.

16  Q  -- about Progress applying to register the BETTA mark in

17     the United States?

18  A  Right.

19  Q  Is that correct?

20  A  Correct.

21  Q  And am I correct that this application was filed on

22     June 15, 2004?

23  A  Yes.

24  Q  At any time after Milagros was incorporated but before this

25     application was filed, did you speak with Irene about

Page 92

1    applying to register the mark in the U.S.?

2  A  You mean after Milagros incorporated and before this date?

3  Q  Yes.

4  A  Well, we talked about it occasionally, but I don't remember

5     exact date.

6  Q  How many times did you speak with her about it?

7  A  I don't remember.

8  Q  Was it one or was it 50?  Do you have any sense?

9  A  A few times.  I don't remember exactly how many times.

10  Q  Would that be about two to three or five to 10?

11  A  More than two to three.  More than five to 10.  Maybe -- I

12     don't know.  Occasionally, we talked.  We used to talk

13     every day, and especially when she was setting up the

14     incorporating Milagros.

15        I don't remember how many times during that

16     conversation -- during that period of time we discussed it,

17     but definitely we discussed it quite a few times that we

18     will register the brand.

19  Q  Did you agree to register the mark on behalf of Milagros?

20  A  No.

21  Q  Did you ever speak to Irene about registering the mark on

22     behalf of Milagros?

23  A  No.

24  Q  It was never raised by Irene?

25  A  No.

Wong, Wai - Vol. 1                    February 20, 2008

Page 93

1   Q   Am I correct that you hired an attorney to help file your

2       application for registration in the United States?

3   A   Correct.

4   Q   Did you work directly with that attorney to provide

5       information for the application?

6   A   No.  We worked through our attorney in Hong Kong.

7   Q   Was that you who worked through your attorney in Hong Kong

8       or was that Ms. Wong as well?

9   A   Both.  Ms. Wong as well.

10  Q   On this first page of Exhibit 7, under the second line

11      that's across the page it says what the application is for

12      and it reads, "Clothing, footwear, and headgear."  Do you

13      see that reference?

14  A   Mm-hm.

15  Q   Is it your understanding that that is what Progress was

16      applying to register the BETTA mark for use on?

17  A   Yes.

18  Q   Isn't it correct that the application has now been amended

19      to only apply to footwear?

20  A   I think so.

21  Q   On this application it says, "First Use:  March 21, 2003."

22      Do you see that reference?

23  A   Mm-hm.

24  Q   How was the mark first used on March 21, 2003?

25  A   I don't remember now.

Wong, Wai - Vol. 1                    February 20, 2008

Page 96

1              MR. LEAVITT:  Objection.

2     A  -- sitting right now.

3              MR. LEAVITT:  Objection to the form of the

4     question.  You can answer.

5     A  I have all the information back in my office that in order

6     for me to say it in here March 21, 2003, first use, I'm

7     sure that we have appropriate information and it's in fact

8     true that we made that first use.  And if you want to ask

9     me specifically what it was, who we sold to, I can't

10    remember every single detail.

11        We made six to eight million pairs of slippers a year

12    and thousands of orders, and I don't remember five years

13    ago this particular order or whatever shipment it was, but

14    all I knew is the true and the fact that we gave the

15    information to the law firm to apply this application.

16    Q  (By Ms. Power)  It also indicates that first use in

17    commerce.  It says, "Use In Commerce:  January 15, 2004."

18    Do you see that reference?

19    A  Mm-hm.  Yes.

20    Q  Can you explain how the BETTA mark was allegedly first used

21    in commerce on January 15, 2004?

22             MR. LEAVITT:  Objection to the form.  You can

23    answer.

24    A  It's the same answer as I answered earlier.

25    Q  (By Ms. Power)  So you don't know; is that correct?

Wong, Wai - Vol. 1                        February 20, 2008

Page 97

1   A  I don't remember.

2   Q  Do you know who made that first use in commerce?

3   A  I don't remember.

4   Q  Do you know what product it was?

5   A  Slippers, definitely.

6   Q  But beyond slippers, do you know any details?

7   A  No.

8   Q  Do you know where that first use was in commerce?

9   A  I don't remember.

10  Q  Isn't it true that you're claiming that Progress' first use

11     of the BETTA mark in commerce in the U.S. was through your

12     shipment of slipper samples to Milagros?

13  A  I don't remember.  So much detail you're talking, and I

14     can't remember such detail.

15  Q  I'm asking --

16  A  And we only -- in the States, we only made shipments to

17     Milagros and that's the first use using BETTA.  And the

18     reason for that was we set up Milagros, financed Irene to

19     set up Milagros so we can start distributing BETTA, and

20     they are the one and only one we distribute BETTA brand.

21  Q  So am I correct then that you're claiming that the first

22     use of the BETTA mark in commerce in the U.S. was through

23     Milagros?

24  A  Correct.

25  Q  Was that through the shipment of slipper samples to

Wong, Wai - Vol. 1                    February 20, 2008

Page 98

1      Milagros?

2    A  I don't remember if it was samples or shipment.

3    Q  So then you don't know if any samples that you sent to

4       Milagros were ever actually ordered; correct?

5               MR. LEAVITT:  Objection.

6    A  That's not the way I said.  I don't remember whether

7       shipment was samples or -- I don't remember the details of

8       that shipment.  All I knew was we made a shipment to

9       Milagros at that time to be distributed.

10   Q  (By Ms. Power)  So is there anything else you can tell me

11      about what you remember, sitting here right now, about the

12      alleged first use of the BETTA mark in commerce in the

13      U.S.?

14   A  Not the details.  It's the facts are here.

15   Q  What are the second and third pages of this exhibit?

16   A  So, what... ?

17   Q  I'm asking you what this is, the second and third pages.

18   A  This is the trademark record for the registered trademark

19      in Hong Kong.

20   Q  And then the remaining pages starting with what's Bates

21      labeled in the lower right corner as PVL 05717, what is

22      that?

23   A  05717?

24   Q  If you look in the lower right corner of the document it

25      says PVL 05717?

Wong, Wai - Vol. 1                    February 20, 2008

Page 117

1   A   No.

2                       (EXHIBIT NO. 10 MARKED)

3   Q   (By Ms. Power)  Mr. Wong, I'll give you a moment to take a

4       look at what's been marked as Exhibit 10.  And once you've

5       had a chance to review it, please let me know if you

6       recognize the document.

7   A   Yes.  This is an application.

8   Q   You said that you recognize the document; is that right?

9   A   That's right.

10  Q   Was this submitted with your application for registration

11      of the trademark in the United States?

12  A   That's right.

13  Q   On the third page of the document, it's PVL 5821, it shows

14      that it's signed by Lin Chuk Hung?

15  A   That's right.

16  Q   And you testified earlier that Lin Chuk Hung is who we've

17      been referring to as Lynn Wong; is that correct?

18  A   Correct.

19  Q   On the first page of Exhibit 10, the second full paragraph

20      states that the applicant, Progress, is using the mark in

21      commerce and that a specimen showing the mark as used in

22      commerce is submitted with this application.  Do you see

23      that reference?

24  A   Yes.

25  Q   If you turn to the last page, it's PVL 5823, is that the

Wong, Wai - Vol. 1                    February 20, 2008

Page 133

1    A   We set up our own company with the help by Tom Williams.

2        He's got all the experience to set up a company and do the

3        distribution.

4    Q   Isn't it true that Progress did not actually plan to

5        distribute products but planned to somehow sell the BETTA

6        mark?

7                     MR. LEAVITT:  Objection.  Go ahead.

8    A   No.

9                              (EXHIBIT NO. 12 MARKED)

10   Q   (By Ms. Power)  Mr. Wong, I'll let you review what's been

11       marked as Exhibit 12, and let me know if you recognize the

12       document.

13   A   Yes.

14   Q   Am I correct that this is an e-mail from you to Irene --

15   A   Correct.

16   Q   -- on November 22, 2006?

17   A   Correct.

18   Q   And in this e-mail you state, "Dear Irene, I am very sorry

19       to let you know that Kim and I are selling the BETTA brand

20       (in the USA) to another company."

21              Do you see that reference?

22   A   Yes.

23   Q   Who is the Kim that's referenced here?  Is that Kim Gray?

24   A   Kim Gray.

25   Q   Is that the same Kim Gray that you used to do business

Wong, Wai - Vol. 1                    February 20, 2008

```
                                                    Page 139
 1      what kind of response she may have, so I was trying to do

 2      it in a nice way.

 3   Q  Why were you worried about Irene's response?

 4   A  Well, I was worried that we might hurt her feelings or

 5      something.

 6   Q  What do you mean?

 7   A  Well, she can be, from what I know her, she can be

 8      emotional, so I didn't want to hit her hard saying, 'Hey,

 9      we're going to terminate you,' so I tried to, based on my

10      English level, to say it as nice as possible.

11   Q  Why doesn't it say anywhere in here that this alleged

12      license that she had was terminated?

13              MR. LEAVITT:  Objection; asked and answered.  Go

14      ahead.

15   A  Well, from my knowledge, that was what I meant.

16   Q  (By Ms. Power)  What did you understand your termination of

17      the alleged license agreement to mean for Milagros' sale of

18      products with the BETTA mark during 2007?

19   A  Sorry.  I didn't understand what you asked.

20   Q  Based on this e-mail, you're saying that your attempt was

21      to express that you were terminating the alleged license

22      with Milagros; is that right?

23   A  Correct.

24   Q  What was your understanding of what that would mean for

25      Milagros' sale of products bearing the BETTA mark during
```

Wong, Wai - Vol. 1                                    February 20, 2008

Page 140

1    the remainder of 2006 and during 2007?

2            MR. LEAVITT:  Objection; asked and answered.

3    Prior to the break you asked him these questions.  Go

4    ahead.

5    A  You mean how Milagros sells in 2007?

6    Q  (By Ms. Power)  Mm-hm.

7    A  Well, that's what I put down in the e-mail, I would let her

8       sell the spring, summer item and finish it.

9    Q  Where does it say that?

10   A  That's effective some time in fall and winter, so that

11      means she doesn't have to develop her full winter range.

12   Q  Is that what the e-mail says?

13   A  That's what my intention.

14   Q  But that's not what it says; is that correct?

15           MR. LEAVITT:  Objection.

16   A  It is what I said.

17   Q  (By Ms. Power)  Where does it say that Milagros can

18      continue to sell products bearing the BETTA mark during

19      2007?

20   A  Well, I said they will stop -- they have to stop selling

21      for fall, winter 2007.

22   Q  That's what you believe this says?

23   A  Well, based on my language skill, that's what I expressed.

24   Q  But you understood at the time that you sent this in

25      November 2006 that Milagros had stock of products bearing

Wong, Wai - Vol. 1                          February 20, 2008

Page 141

1     the BETTA mark; correct?

2   A  Yes.  Fall, spring, summer.

3   Q  And at this time you were still manufacturing products for

4      Milagros bearing the BETTA mark; is that correct?

5   A  Yes.  Fall, spring, summer as well.

6   Q  And were those products delivered --

7   A  Yes.

8   Q  -- after the date --

9   A  Yes.

10  Q  -- of this e-mail?

11  A  Yes.

12  Q  So is it my understanding -- is my understanding correct

13     that as of fall and/or winter of 2007, Milagros would no

14     longer be able to sell products bearing the BETTA mark in

15     the U.S.?

16  A  That's what I was saying.

17  Q  What did you understand that to mean for any remaining

18     stock that Milagros may have of products bearing the BETTA

19     mark as of fall or winter 2007?

20  A  We never had a chance to discuss it.

21  Q  But what was your understanding when you sent this e-mail?

22  A  I was open for discussion.

23  Q  Is that what this says?

24  A  That's what I meant.

25  Q  Did you say that here?

Wong, Wai - Vol. 1                    February 20, 2008

Page 142

1    A   No.

2    Q   What did you mean when you said that "we have to use a

3        different brand for you in the future"?

4    A   "We" means Milagros and Progress Vantage's relationship,

5        that either we keep going, ship them I. Torres products or

6        they get orders for private label.

7    Q   So was it your intention to continue manufacturing products

8        for Milagros even though you were terminating the alleged

9        license agreement with Milagros?

10   A   Yes.

11               MR. LEAVITT:  Objection, but that's fine.

12               MS. POWER:  This is Exhibit 13.

13                         (EXHIBIT NO. 13 MARKED)

14   Q   (By Ms. Power)  Mr. Wong, you've been handed what's been

15       marked as Exhibit 13.  Please let me know, after you've

16       reviewed it, if you recognize the document.

17   A   Yes.

18   Q   What is it?

19   A   It is the order detail from between 2003 and 2006.

20   Q   Order detail for whom?

21   A   For Milagros.

22   Q   So am I correct in understanding that this is a listing of

23       invoices for products ordered by Milagros and shipped by

24       Progress between 2003 and 2006?

25   A   Correct.

Wong, Wai - Vol. 1                    February 20, 2008

Page 143

1   Q   The first two invoices listed have a date of February 2,

2       2003, do you see that?

3   A   Yes.

4   Q   Do you believe that those dates are accurate?

5   A   I didn't prepare them, so...

6   Q   Who prepared this document?

7   A   My staff.  My accounting staff.

8   Q   Who specifically?

9   A   My accounting department got a couple of people, so I don't

10      know which one.

11  Q   Did you review this document before it was produced in

12      discovery in this case?

13  A   Yes.

14  Q   And again, is it your belief that this is accurate?

15  A   I believe so.

16              MS. POWER:  This is Exhibit 14.

17                      (EXHIBIT NO. 14 MARKED)

18  Q   (By Ms. Power)  Mr. Wong, if you can look at Exhibit 14

19      side by side with Exhibit 13.  And I'm sorry.  I'll give

20      you a moment to review Exhibit 14, and please let me know

21      if you recognize the document.

22  A   Mm-hm.  Yeah.

23  Q   What is Exhibit 14?

24  A   Our invoice to Milagros.

25  Q   Okay.  At the top of the first page of Exhibit 14 does it

Wong, Wai - Vol. 1                          February 20, 2008

Page 144

1    say Invoice No. MIL 275/03?

2  A  Yes.

3  Q  Does that correspond to Exhibit 13, the first invoice,

4     where it says MIL 275/03?

5  A  Yeah.  It looks like it.

6  Q  What is the date on the invoice which is Exhibit 14?

7  A  2004, February 2nd.

8  Q  So do you believe that Exhibit 13 has an error where it

9     says that Invoice No. MIL 275/03 was in 2003?

10  A  Yeah.  That's a typo because the invoice was generated --

11     the shipment was made in December '03, that's why you carry

12     an invoice -- oops.  Is that all right I scratch on it?

13     Sorry.

14            MR. LEAVITT:  Can we go off the record for a

15     second?

16            MS. POWER:  Yes.

17                        (Discussion off the record.)

18            MS. POWER:  Back on the record.

19  Q  (By Ms. Power)  So my question was, I believe, just

20     clarifying that there was an error in the date on

21     Exhibit 13 where it references this invoice MIL 275/03 as

22     being February 2, 2003, and in fact it was dated

23     February 2, 2004; is that correct?

24  A  Yes.  That's an error.

25  Q  Okay.  And am I correct that this is an invoice for

Wong, Wai - Vol. 1                          February 20, 2008

Page 145

1      products that were shipped to Milagros on behalf of a

2      customer called Blossom's?  If you see in the marks and

3      numbers column.

4   A  Yes.  Blossom's, yes.

5   Q  If you can turn to the second page of Exhibit 14, which is

6      PVL 187.

7   A  Mm-hm.

8   Q  And this is Invoice No. 304/03.  Do you see that reference?

9   A  Yes.

10  Q  Is that also a reference to what is Invoice No. MIL 304/03

11     on Exhibit 13?

12  A  Mm-hm.

13  Q  Is the date also wrong for that invoice on Exhibit 13?

14  A  Yeah, I think so.

15  Q  So the date should, in fact, be February 2, 2004; is that

16     correct?

17  A  Yeah.

18  Q  Am I correct that this invoice 304/03 was also a shipment

19     to Milagros for Blossom's?

20  A  Yeah.

21  Q  If you can keep Exhibit 13 out.

22  A  Mm-hm.

23  Q  The next invoice that's referenced is September 17, 2004?

24  A  Mm-hm.

25  Q  So am I correct that that would be the next shipment that

Wong, Wai - Vol. 1                    February 20, 2008

Page 146

1     was made to Milagros of products after these first two that

2     we referenced?

3   A  Yes.

4   Q  In between the orders that are referenced here for products

5     that Progress shipped to Milagros, am I correct in

6     understanding that there were ongoing shipments of samples

7     to Milagros?

8   A  Yes.

9   Q  Do you know whether Exhibit 13 includes any shipments of

10    samples to Milagros?

11  A  I don't know.  I didn't prepare the document.

12  Q  As of this date, Milagros has paid all of the invoices from

13    Progress; is that correct?

14  A  Correct.

15  Q  Do you recall that in March 2006 Irene contacted you about

16    a letter that she got from an attorney representing a

17    company called Neet Feet?

18  A  Yes.

19  Q  And Irene asked you to help her figure out how to respond

20    to that letter; is that right?

21  A  Correct.

22  Q  What was the issue that was raised by Neet Feet, to your

23    recollection?

24  A  Neet Feet was claiming that Milagros -- because Milagros is

25    distributor and printed on the packaging, so they sent a

Wong, Wai - Vol. 1                              February 20, 2008

Page 157

1    Q   And if I recall correctly, you testified that there was not

2        a discussion between you and Irene as to the duration of

3        that agreement --

4    A   Correct.

5    Q   -- is that right?

6            But you also testified that you expect to review it

7        every two years; correct?

8    A   Correct.

9    Q   Did you ever tell Irene that?

10   A   No.

11   Q   Was it ever written anywhere?

12   A   No.

13   Q   Did you, in fact, review this alleged agreement within two

14       years?

15   A   Well, I think it was more than three years -- or more than

16       two years after I actually reviewed it.  I only review the

17       year -- that was 2006?  What was the date I sent her an

18       e-mail?

19   Q   Are you referencing the e-mail that was November 2006?

20   A   Yeah.  I told her that I was terminating her contract.

21       That was later that year I sent her the e-mail, yeah.  That

22       was 2006.  So I was reviewing her in early months of 2006,

23       and then I realized Milagros wasn't doing a good job.

24   Q   What did you review?

25   A   The sales figure.

Wong, Wai - Vol. 1                          February 20, 2008

Page 158

1   Q   What did you find?

2   A   It is a lot lower than our expectation.

3   Q   What was your expectation?

4   A   We were expecting they can do approximately a million U.S.

5       dollar of sales in two years.

6   Q   I'm sorry.  You were expecting that Milagros could sell --

7   A   Generally meeting U.S. dollar sales by the time of 2000 --

8       end of 2005.

9   Q   I'm going to have to walk backwards then.  So your

10      expectation was that within two years Milagros would be

11      able to generate a million dollars in U.S. sales?

12  A   Yes.

13  Q   So you were looking at the end of 2005?

14  A   Mm-hm.

15  Q   So am I correct in understanding that this oral license

16      agreement was in effect at some point by the end of 2003?

17  A   Well, as I said earlier, there's no exact date when it was

18      in effect.  It has always been talked about that I thought

19      Irene understood when she sent me the e-mail before these

20      licensing problems regarding royalty and license fee.

21  Q   Can you turn back to what was marked as Exhibit 5?

22  A   Yes.

23  Q   Is that the e-mail that you're referencing dated October

24      2003?

25  A   Yes.

Wong, Wai - Vol. 1                        February 20, 2008

Page 159

1  Q  So was the license agreement in place at the time of this

2     e-mail?

3            MR. LEAVITT:  Objection.  You've asked that

4     question five times.

5  A  There's no specific date.  But through this e-mail I

6     understood that she fully understand our position, who was

7     the owner of the brand and who was doing the

8     distributionship.

9  Q  (By Ms. Power)  So as of this date of October 2003, you

10    felt that there was an understanding regarding the

11    agreement; is that right?

12 A  Even before that, just confirming it.

13 Q  All right.  So at least as late as October 2003, this

14    alleged license agreement was in place; is that right?

15 A  Yes.

16 Q  Okay.  Is it true that the name Progress never appeared on

17    any of the products bearing the BETTA mark that were sold

18    in the United States?

19 A  Goddess appeared in the back of the insole.

20 Q  If I can back up then.  Is it true that the name Progress

21    never appeared on any product bearing the BETTA mark --

22 A  Correct.

23 Q  -- that were sold in commerce in the U.S.; correct?

24 A  Correct.

25 Q  But you said that Goddess appeared?