UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MILAGROS IMPORTS LIMITED, a New York corporation,<br><br>   Plaintiff,<br><br>  v.<br><br>PROGRESS VANTAGE LIMITED, a foreign corporation,<br><br>   Defendant. | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>07-CV-3215 (SHS) |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

I.      INTRODUCTION ................................................................................... 1

II.     FACTUAL BACKGROUND .................................................................. 2

    A.  Formation of Milagros in October 2003. ........................................... 2

    B.  Adoption of the "BETTA" Mark by Milagros................................... 3

    C.  Alleged Oral License and Exclusive Distribution Agreement........................ 4

    D.  Milagros and PVL Conducted Business from 2004 to 2006. ........................ 7

    E.  Termination of the Alleged Oral Agreement. ................................... 8

    F.  Both Parties Have Applied to Register the Mark in the United States. ................ 8

III.    LEGAL ANALYSIS................................................................................ 9

    A.  Standard of Review.......................................................................... 9

    B.  The Alleged Agreement Is Void as a Matter of Law Because PVL Could Not License a Mark It Did Not Own. ..................................... 9

    C.  The Alleged Agreement Is Unenforceable Under the Statute of Frauds. ................... 10

    D.  Even if the Statute of Frauds Is Inapplicable, No Contract Existed Between the Parties........................................................................ 17

    E.  In Light of PVL's Admission That Milagros Has Paid All Outstanding Sums, PVL's Breach of Contract and Unjust Enrichment Claims Are Baseless........ 18

    F.  Milagros Is Entitled to Declaratory Judgment on Its Claim to the Mark................... 19

    G.  Milagros's Ownership of the Mark Precludes PVL's Counterclaims for Infringement. ...................................................................... 20

IV.     CONCLUSION..................................................................................... 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alan Skop, Inc. v. Benjamin Moore, Inc.*,
    909 F.2d 59 (2d Cir. 1990)......................................................................11, 14

*Burke v. Bevona*,
    866 F.2d 532 (2d Cir. 1989)..........................................................................14

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).........................................................................................9

*Davis v. Blige*,
    505 F.3d 90 (2d Cir. 2007)..............................................................................9

*Filmvideo Releasing Corp. v. Hastings*,
    668 F.2d 91 (2d Cir. 1981)..............................................................................9

*Gander Mountain Co. v. Cabela's, Inc.*,
    No. 04-CV-3125 (PJS/RLE), 2007 WL 2026751 (D. Minn. July 10, 2007) ..................15

*Ginsberg Mach. Co. v. J & H Label Processing Corp.*,
    341 F.2d 825 (2d Cir. 1965)......................................................................15, 16

*Jillcy Film Enters., Inc. v. Home Box Office, Inc.*,
    593 F. Supp. 515 (S.D.N.Y. 1984) ................................................................12

*Liberto v. D.F. Stauffer Biscuit Co.*,
    441 F.3d 318 (5th Cir. 2006) ........................................................................16

*Lucent Techs. Inc. v. Gateway, Inc.*,
    No. 02-CV-2060-B (CAB), 2007 WL 925364 (S.D. Cal. Mar. 19, 2007) ......................10

*Manis v. CSX Transp., Inc.*,
    806 F. Supp. 177 (N.D. Ohio 1992).............................................................10

*McGuiggan v. CPC Int'l, Inc.*,
    84 F. Supp. 2d 470 (S.D.N.Y. 2000) ............................................................17

*Murray v. National Broadcasting Co., Inc.*,
    844 F.2d 988 (2d Cir. 1988)..........................................................................10

*Nadel v. Play-By-Play Toys & Novelties, Inc.*,
    208 F.3d 368 (2d Cir. 2000)..........................................................................10

*Nifty Foods Corp. v. The Great Atlantic and Pac. Tea Co.*,
 614 F.2d 832 (2d Cir. 1980)..................................................................14

*Paper Corp. of the U.S. v. Schoeller Technical Papers, Inc.*,
 724 F. Supp. 110 (S.D.N.Y. 1989) .........................................................12

*PDL Vitari Corp. v. Olympus Indus.*,
 718 F. Supp. 197 (S.D.N.Y. 1989) .........................................................10

*Roulley v. Inex Co.*,
 677 F.2d 14 (2d Cir. 1982)......................................................................15

*Silverstar Enters. v. Aday*,
 537 F. Supp. 236 (S.D.N.Y. 1982) .........................................................20

*Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*,
 154 F. Supp. 2d 586 (S.D.N.Y. 2001)...............................................19, 20

*The New Kids on the Block v. News Am. Pub'g, Inc.*,
 971 F.2d 302 (9th Cir. 1992) ...................................................................9

## STATE CASES

*In re 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*,
 575 N.E.2d 104 (N.Y. 1991)....................................................................18

*Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.*,
 619 N.Y.S.2d 260 (N.Y.A.D. 1994) ........................................................18

*Crabtree Auto. v. BMW of N. Am.*,
 482 N.Y.S.2d 28 (N.Y.A.D. 1984) ..........................................................11

*Crabtree v. Elizabeth Arden Sales Corp.*,
 110 N.E.2d 551 (N.Y. 1953)....................................................................15

*D & N Boening, Inc. v. Kirsch Beverages, Inc.*,
 472 N.E.2d 992 (N.Y. 1984)....................................................................14

*In re Express Indus. & Terminal Corp. v. N. Y. State Dep. of Transp.*,
 715 N.E.2d 1050 (N.Y. 1999)..................................................................18

*Kobre v. Instrument Sys. Corp.*,
 387 N.Y.S.2d 617 (N.Y.A.D. 1976), *aff'd*, 374 N.E.2d 131 (N.Y. 1978) .........................15

*Martocci v. Greater N.Y. Brewery, Inc.,*
    92 N.E.2d 887 (N.Y. 1950)..................................................................................12

*Morris Cohon & Co. v. Russell,*
    245 N.E.2d 712 (N.Y. 1969)..............................................................................14

*N. Shore Bottling Co. v. Schmidt & Sons, Inc.,*
    22 N.Y.2d 171 (N.Y.A.D. 1968).........................................................................14

*Paz v. Singer Co.,*
    542 N.Y.S.2d 10 (N.Y.A.D. 1989) ....................................................................17

*Ross v Wu,*
    811 N.Y.2d 26 (N.Y. 2006) ...............................................................................18

*United Beer Distrib. Co. v. Hiram Walker,*
    557 N.Y.S.2d 336 (N.Y.A.D. 1990)..............................................................11, 14

*Zimmer-Masiello, Inc., v. Zimmer, Inc.,*
    552 N.Y.S.2d 935 (N.Y.A.D. 1990) ..................................................................13

## STATUTES

Fed. R. Civ. P. 56(c) .......................................................................................................9

U.C.C. 2-201  ................................................................................................................10

N.Y. Gen. Oblig. Law § 5-701 (McKinney 1989).............................................10, 11, 14

## MISCELLANEOUS

3 Samuel Williston, *A Treatise On The Law of Contracts* § 523 at 686-87 ...................11

# I.    INTRODUCTION

Ownership of a trademark in the United States comes down to priority of use.  This case involves a dispute over who first used the "BETTA" mark (the "Mark") in the United States.  The analysis turns on whether a valid license and exclusive distribution agreement existed between Plaintiff Milagros Imports Limited ("Milagros"), a New York company that develops, markets, and controls its own brands of footwear and spa products, and Defendant Progress Vantage Limited ("PVL"), a manufacturer of footwear based in Hong Kong.  Even viewed in the light most favorable to PVL, the uncontroverted facts show that no license and exclusive distribution agreement ever existed.

First, at the time PVL allegedly licensed use of the Mark in the United States to Milagros, PVL had no legal right to the Mark in the United States.  One cannot license what one does not own.

Second, the alleged oral license and exclusive distribution agreement is unenforceable under the Statute of Frauds.  Because the distribution of goods by Milagros involved the purchase of more than $500 of goods from PVL, the alleged agreement needed to be in writing to be enforceable.  Because the alleged agreement depended on the acts of third-party customers, it could not have been performed within one year.  And, because the asserted terms are fatally vague and indefinite as to essential terms, the Statute of Frauds renders the alleged agreement void.

Third, even if the Statute of Frauds does not bar the alleged agreement, PVL cannot establish that a valid contract existed when there was no meeting of the minds on essential terms such as the precise trademark(s) to be licensed and the scope, duration, and termination of the alleged license.

PVL concedes that its only basis for claiming ownership of the Mark in the United States

stems from Milagros's purportedly licensed use as PVL's exclusive distributor. Absent a valid license and distribution agreement, PVL has no basis for claiming a right to ownership of the Mark in the United States. As such, PVL's counterclaim for declaratory judgment must be dismissed. Given that PVL has no right to the Mark, its counterclaims for trademark infringement under state and federal law are without merit. Finally, PVL's admission that Milagros has paid all sums due to PVL preclude its counterclaims for breach of contract and unjust enrichment. Upon this Court's determination that no valid agreement exists, and given the clear evidence of Milagros's first, exclusive, and continuous use of the Mark in commerce in the United States, an order declaring Milagros the owner of the Mark is warranted.

## II.    FACTUAL BACKGROUND

### A.    Formation of Milagros in October 2003.

Building on more than 20 years of experience in the footwear and related industries, Irene-Luisa Torres founded Milagros in October 2003 to produce her own brands of footwear and spa products. (Declaration of Irene-Luisa Torres ("Torres Decl.") ¶ 2.) Milagros grew out of Ms. Torres's long-standing personal interest of developing and selling footwear and spa products to her specifications under brands she could own and control. (*Id.*) Since its inception, Milagros has designed and marketed its footwear and spa products to retailers throughout the United States and Canada, including Macy's, Filene's Basement, Marshalls, and TJ Maxx. (*Id.* ¶ 3.) In addition to the Mark, Milagros sells goods under the "BETTA Spa" mark, the "I. Luisa Torres" mark, as well as generic and private label marks. (*Id.*) There is no dispute that the only use of the Mark in the United States is based on Milagros's use of the Mark in commerce.[1] (Declaration of Vanessa Soriano Power ("Power Decl.") Ex. 1, 97:10-24; Ex. 2, at 12 (Response

---

[1] PVL, however, contends that any use of the Mark by Milagros was a licensed use under the alleged oral license and exclusive distribution agreement. (Dkt. #10 (Counterclaim) ¶ 55.)

to Request for Admission No. 6).)

To jump-start Milagros in the highly competitive U.S. footwear market, Ms. Torres called on friendships developed during her years in the industry. (Torres Decl. ¶ 4.) One of those friends was William Wong, the joint owner of PVL. (*Id.;* Power Decl., Ex. 1, 12:24-13:13.) Among other things, Mr. Wong loaned Ms. Torres $25,000 to help her begin business operations. (Torres Decl. ¶ 4; Dkt. #10 ¶ 56.) That loan has since been repaid. (Torres Decl. ¶ 4, Ex. 1; Power Decl., Ex. 1, 58:17-22.) Another friend was John Lau, the owner of ARDA Industrial LTD, which is a packaging, ticket, and label manufacturer also based in Hong Kong. (Torres Decl. ¶ 5.) Mr. Lau loaned Ms. Torres $50,000. (*Id.*) In addition, other manufacturers including Flicker Footwear and Topper Embroidery provided Milagros with shipments on credit and interest-free, allowing Milagros to send payment once it was received by Milagros's customers. (*Id.*) In turn, Milagros sent business to PVL, ARDA, Flicker Footwear, and Topper Embroidery as the primary manufacturers of Milagros's products and packaging. (*Id.* ¶ 6.) Indeed, during its first three years in business, Milagros paid PVL over $850,000 to manufacture products. (*Id.* ¶ 7; Ex. 1; Power Decl., Ex. 1, 142:14-143:3; 144:8-13; 145:10-17; Ex. 3.)

**B.    Adoption of the "BETTA" Mark by Milagros.**

Ms. Torres recognized that for Milagros to be successful, it needed its own brands for its products. (Torres Decl. ¶ 8.) When Ms. Torres was establishing Milagros in fall 2003, she was looking for potential names that she could trademark for use in the United States. (*Id.*) Mr. Wong indicated that the "BETTA" mark, for which PVL had manufactured footwear in the 1990s for an Australian company and for which PVL was manufacturing footwear for sale in mainland China, was available for use in the U.S. market. (*Id.* ¶ 9.) Ms. Torres thus chose to adopt the term "BETTA" as one of Milagros's trademarks and use it on a line of products that Milagros has designed, marketed, and sold to retailers in the U.S. (*Id.* ¶ 10.)

C.    **Alleged Oral License and Exclusive Distribution Agreement.**

It is undisputed that no written agreement exists providing that Milagros was to be PVL's

licensee and exclusive distributor of BETTA footwear in the United States. (Torres Decl. ¶ 11;

Power Decl., Ex. 2, at 9 (Response to Request for Admission No. 2); Ex. 1, 66:2-5.) Mr. Wong

contends that, sometime in early 2003, he and Ms. Torres entered into an oral license and

distribution agreement providing that Ms. Torres's company (as yet unformed at that time)

would be the exclusive distributor of BETTA footwear in the United States. Mr. Wong claims

that at some later unknown date, and at the latest by October 3, 2003, the oral agreement between

him and Ms. Torres became an oral agreement, on the same terms, between PVL and Milagros.

(Power Decl., Ex. 1, 65:11-66:1, 69:14-70:1, 82:15-19.) Ms. Torres and Milagros deny that any

oral license and exclusive distribution agreement ever existed between Ms. Torres and Mr. Wong

or between Milagros and PVL (Torres Decl. ¶ 11; Dkt. #15 at ¶ 55), but for purposes of summary

judgment only, the following is an outline of the terms of the alleged oral agreement (the

"Agreement") *as depicted by PVL*:

- **Parties**. The initial parties were Mr. Wong and Ms. Torres; at some later
  unknown date, the alleged oral Agreement with the same terms was
  extended to PVL and Milagros. (Power Decl., Ex. 1, 65:11-66:1, 69:14-
  70:1.)

- **Effective Date**. Unknown but by, at the latest, October 3, 2003. (*Id.* at 67:14-
  69:13, 82:15-19.)

- **Scope**. PVL would "exclusively supply Milagros with footwear bearing the
  BETTA mark and [] Milagros would be the exclusive distributor of the
  BETTA footwear for PVL in the United States." (Dkt. #10
  (Counterclaim) ¶ 52.) In addition, "PVL agreed to license Milagros to
  place the BETTA mark on other goods in the belief that it would help to
  develop the BETTA brand for PVL in the United States." (*Id.* ¶ 67.)

- **Term**. Duration was not discussed, but Mr. Wong intended to review the
  alleged oral Agreement "every two years." (Power Decl., Ex. 1, 71:14-
  17.)

- **Conditions of Performance**. Mr. Wong expected that Milagros would bring
  PVL $1 million in U.S. sales within two years. (*Id.* at 158:2-14.)

- <u>Termination and Notice of Termination</u>. Not discussed. (*Id.* at 71:18-72:1.)
- <u>Royalties</u>. There were to be no royalty payments. (*Id.* at 70:10-12.)

PVL relies on a series of emails between Mr. Wong, his wife Lynn, and Ms. Torres to attempt to show that the parties had reached agreement on the terms of the alleged oral Agreement. In relevant part, those e-mails document the parties' discussions about their prospective business:

<u>Email No. 1 (August 10, 2003)</u>[2]
Ms. Torres notes that she would like to work with PVL and another manufacturer (Flicker) and promote that her business is "an extension of the [factories]." In addition, Ms. Torres asks about the availability of the Mark in the United States.

<u>Email No. 2 (August 11, 2003)</u>[3]
Mr. Wong explains to Ms. Torres that "there could be some problem" with the Mark. Mr. Wong further states that "I am registering this brand in the US, and [it] can be used very soon."

<u>Email No. 3 (September 28, 2003)</u>[4]
Ms. Torres requests that Mrs. Wong ask Mr. Wong "if the 'BETTA' brand can be used in the USA. I know I have already e-mailed him a long time ago and it was in the works. The reason I ask is if it is, then I would ask you if I can use it for my line. I don't have a brand yet and would like to have packaing in the show room and of course have everything packaged as it looks better" . . . "We will also have to think about a cloth covered outsole and a pattern . . . again does BETTA have any parameters?"

<u>Email No. 4 (September 30, 2003)</u>[5]
Regarding the Mark, Ms. Torres wrote:
a. noted it can be used in the USA, but we can't use in Australia since . . . This is great news!!! We now have a license!!!
b. I am not clear on whether we can do a separate color or do we have to use the yellow as used for the chinese domestic market. If we can use a different color, pls adv if there is one in particular and if so what is the pantone#???
c. I will need the font (type) name use in the lettering??? Pls kindly adv asap as I need to get Arnell working on this as fast as possible.

---

[2] Torres Decl., Ex. 4.
[3] Torres Decl., Ex. 5.
[4] Torres Decl., Ex. 6.
[5] Torres Decl., Ex. 7.

*Email No. 5 (October 2, 2003)[6]*
I am sorry but I need to work on the BETTA packaging prior to my arriving. I will work with Arnel on Sunday but I really need to know the parameters of the License:

1) The font that you have used for your own woven labels??? what is it???
2) Do we have to use this font in the USA. If not pls tell me what it is, because if I can use it would'nt mind.
3) I understand that the color of yellow was used in China so I guess I don't have to use the same in the USA??? pls reclarify this??
4) Is there a registered trademark sign to attach to the name??? Something to indicate that it is registered in the USA, or international trademark. pls kindly let me know.
5) If I am able to use the colors of my choice for the USA market, are there any parameters?? In other words, what colors we can't use if any?? Or anything that can't be done?? . . .

7) Please advise if there are royalties we would have to pay TO BETTA or GODDESS??
8) Betta, would be used for my entire line including Spa – slipper socks which david will work with me on etc, etc. I don't see this as a problem, do you?

I would rather put all my eggs in BETTA and pushing it to take off I don't have a problem with sticking with it rather than going after another American brand (which it seems people are tired of here and very few are worth anything anymore). I have talked to Ben and Burt and they agree as well. Both have been very worried about not having a brand as packaged items sell and we need to show our items in packaging to make an impression!!! They have warned me that it can't be a factory specific brand or it will never work. I told them there should not be a problem but I would of course clarify all details. I know that you will not have a problem with ARDA making all the packaging as I have done in the past --- including the printing of ribbons, making woven labels etc??? This way everyone can buy from him its centralized etc...

Email No. 6 (October 3, 2003)[7]
Ms. Torres and Mrs. Wong corresponded. Mrs. Wong responds to Ms. Torres's email noting:

I will have Frank to email you the Betta art & logo. It is very simple. However, for the color, William will need to think about it or you can give him some suggestion . . .

---

[6] Torres Decl., Ex. 8.
[7] Torres Decl. Ex. 9.

The original background on Betta is very simple and it doesn't attractive at all. However, we do have our own catalogue and we can show you when you get here. It has more details introduction for our comfort slippers range. I will get Frank to email you the package for you later.

In addition, Ms. Torres asked further questions, including:

1) I can choose my own colors. I will of course use only one label to be set for the line which co-ordinates back to the packaging. Spa will be different. As time is an issue, I would like to put the packaging together or I will never get in time for the market. I would show it to you both and if you don't like it we can make changes but at least leave the smpls for purpose of the market …???

2) It is well noted that the "font" or "type" of BETTA must remain as is. I have the font, in the artwork but need to know the "name" or it is very hard to minipulate. Is there any record of this???

3) Noted that we can't put the[i]r trademark or TM as the process is not complete in the USA. Hv you filed the paper work yet??? If not pls let me know as I am hv'g Raymond to help me see if it can be done quicker?

At the time she was starting her business, Ms. Torres understood that, as her friend and in light of their business relationship, Mr. Wong was helping Milagros find a name that it could develop as its own brand in the United States. (Torres Decl. ¶ 12.) As an industry person who had never before owned a business, Ms. Torres admits that she did not understand the legal significance of the term "license" as she used it in her email with the Wongs. (*Id*.) Ms. Torres explains that she was simply trying to confirm the parameters of Milagros's ability to use the mark in the United States to ensure that she would be able to develop and control Milagros's chosen brands. (*Id.)*

**D.      Milagros and PVL Conducted Business from 2004 to 2006.**

Between February 2004 and December 2006, PVL invoiced Milagros for the sale of over $850,000 in footwear with various marks, including the Mark, the "I. Luisa Torres" mark, and others. (Power Decl., Ex. 1, 142:14-143:3; 144:8-13; 145:10-17, Ex. 3; Torres Decl. ¶ 7, Ex. 1.) Milagros has paid all invoices in full. (*Id*.)

### E.    Termination of the Alleged Oral Agreement.

On November 22, 2006, Mr. Wong sent Ms. Torres an e-mail stating that he was "selling the Betta brand (in the USA) to another company." (Power Decl., Ex. 1, 133:10-17; Torres Decl., Ex. 10.) According to PVL, it had determined that it was "properly positioned to begin its own distribution of footwear bearing the BETTA mark." (Dkt. #10 ¶ 87.) Mr. Wong indicated that PVL would "have to use a different brand for you in the future." (Torres Decl. Ex. 10.) Mr. Wong testified that it was "open for discussion" whether Milagros could continue to sell footwear bearing the Mark for the remainder of 2006 and through fall or winter 2007. (Power Decl., Ex. 1, 141:12-24.) In fact, PVL continued to fill Milagros's orders for BETTA footwear through the remainder of 2006. (Torres Decl. ¶ 13; Power Decl., Ex. 1, 140:24-141:11; Ex. 4 56:6-19.)

### F.    Both Parties Have Applied to Register the Mark in the United States.

PVL applied to register the term "BETTA" as a trademark in the United States (U.S. Application Serial No. 76598013) for use on "house slippers" only. (Power Decl. Ex. 1, 90:15-91:5, 93:18-20, 117:3-12; Exs. 5, 6.) To protect its rights in its Mark, Milagros timely opposed PVL's U.S. trademark application, asserting fraud on the U.S. Patent and Trademark Office, among other grounds. (Torres Decl. ¶ 14, Ex. 2.) Milagros simultaneously filed its own application to register the Mark for use on "footwear, slippers, socks, sandals, booties, gloves, robes; shower wrap sets comprised of shower wraps, slippers, and head wraps; slipper sets comprised primarily of slippers and one or more of socks, pumice stones, toe separators, therapeutic eye masks, and head wraps" in Class 25 as shown in U.S. Application Serial No. 77170813. (*Id.* ¶ 15, Ex. 3.) All proceedings before the Trademark Trial and Appeal Board have been suspended pending resolution of this case. (Power Decl. ¶8.)

### III.    LEGAL ANALYSIS

**A.    Standard of Review.**

Milagros is entitled to summary judgment when, as here, the "pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c). Because PVL cannot make a showing

sufficient to establish a key element essential to its case, namely, the existence of a valid

agreement between the parties for the exclusive distribution of products bearing the Mark in the

United States, summary judgment for Milagros is warranted as a matter of law. *See Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

**B.    The Alleged Agreement Is Void as a Matter of Law Because PVL Could Not**
**License a Mark It Did Not Own.**

PVL claims that the alleged Agreement was entered into by, at the very latest, October

2003. The alleged Agreement includes a license for Milagros to use the Mark in the United

States. Notwithstanding its alleged right to use the Mark in China, PVL claims that its basis for

ownership of the Mark in the United States stems from its "first use" of the Mark in the United

States via Milagros in January 2004. PVL's claims are contradictory at the core.

"A trademark is a limited property right in a particular word, phrase or symbol." *The*

*New Kids on the Block v. News Am. Pub'g, Inc.,* 971 F.2d 302, 306 (9th Cir. 1992). Just as it is

legally impossible to sell that which one does not own, it was legally impossible for PVL to

license the Mark for use when, at the time of the alleged license in October 2003, PVL neither

owned nor had a basis for ownership in the Mark in the United States. *See Davis v. Blige,* 505

F.3d 90 (2d Cir. 2007) (copyright owner may not convey more than he owns); *Filmvideo*

*Releasing Corp. v. Hastings,* 668 F.2d 91, 93 (2d Cir. 1981) ("[T]he proprietor of a derivative

copyright cannot convey away that which he does not own . . ."); *Lucent Techs. Inc. v. Gateway, Inc.,* No. 02-CV-2060-B (CAB), 2007 WL 925364 (S.D. Cal. Mar. 19, 2007) (finding no conveyance of license to Microsoft when alleged patent owner did not own patent); *cf. Murray v. National Broadcasting Co., Inc.,* 844 F.2d 988, 994 (2d Cir. 1988), *abrogated on other grounds, Nadel v. Play-By-Play Toys & Novelties, Inc.,* 208 F.3d 368 (2d Cir. 2000) (in case involving property rights, court found that party "cannot be defrauded of property that he does not own") (citation omitted); *Manis v. CSX Transp., Inc.,* 806 F. Supp. 177 (N.D. Ohio 1992) ("A tired yet valid maxim of the property law is that one cannot sell what one does not own. By extension, if one does not have a right, he may not exchange consideration for his ability to assert that right.") (citation omitted). The alleged Agreement is thus void as a matter of law.

### C.     The Alleged Agreement Is Unenforceable Under the Statute of Frauds.

The alleged Agreement is barred under the Statute of Frauds on at least two separate, independent grounds. First, the Uniform Commercial Code ("U.C.C.") Statute of Frauds (U.C.C. 2-201) requires a signed writing for a contract for the sale of goods of $500 or more. Second, New York General Obligations Law § 5-701(a)(1) provides that, absent sufficient written memoranda, an oral agreement is void if it cannot be performed within one year.[8]

#### 1.     The Alleged Agreement Is Barred Under U.C.C. § 2-201.

Section 2-201(1) of the U.C.C. provides:

> (1)  Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or

---

[8] The Southern District of New York has previously found that licensing and distribution agreements, like the alleged Agreement at issue here, are usually reduced to writing. In *PDL Vitari Corp. v. Olympus Indus.,* 718 F. Supp. 197, 208 (S.D.N.Y. 1989), the court concluded that no contract existed based in part on the fact that "though not based on evidence presented here, . . . licensing and distribution agreements are the type of agreements that are usually reduced to writing. They involve the licensing of exclusive proprietary rights, such as the patent and trademark rights at issue here, and these are usually reduced to writing in most instances."

> defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

The U.C.C. Statute of Frauds applies to exclusive distributorship agreements, like the Agreement alleged here as a license for the exclusive distribution of products bearing the Mark, which "necessarily involve the purchase of more than $500 of goods." *United Beer Distrib. Co. v. Hiram Walker,* 557 N.Y.S.2d 336, 337-38 (N.Y.A.D. 1990); *citing Swerdloff v. Mobil Oil Corp.,* 427 N.Y.S.2d 266 (N.Y.A.D. 1980); *Crabtree Auto. v. BMW of N. Am.,* 482 N.Y.S.2d 28 (N.Y.A.D. 1984); *see also Alan Skop, Inc. v. Benjamin Moore, Inc.,* 909 F.2d 59 (2d Cir. 1990).

There can be no dispute that the alleged license and exclusive distribution Agreement was expected to involve, and in fact did involve, the purchase of more than $500 of goods. *See* 3 Samuel Williston, *A Treatise On The Law of Contracts* § 523 at 686-87 (Walter H. E. Jaeger ed., 3d ed. 1960). PVL expected that Milagros would send it at least $1 million in manufacturing orders during the first two years of the alleged Agreement. Likewise, Milagros had high hopes. Milagros had hoped to send PVL "millions of dollars" in business during the first several years of the parties' business relationship. (Torres Decl. ¶16.) As borne out by the facts, Milagros paid PVL over $850,000 for footwear purchased over the course of three years. As such, the alleged oral Agreement is unenforceable.

### 2. The Alleged Agreement Is Barred Under New York General Obligations Law § 5-701(a)(1) Because It Cannot Be Performed Within One Year.

New York's Statute of Frauds, § 5-701(a)(1) of the General Obligations Law, provides:

> (a) Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

> (1) By its terms is not to be performed within one year from the making thereof . . .

The alleged Agreement is an oral contract of indefinite duration that includes no provision for termination. PVL posits that on these facts, the alleged Agreement was terminable at will and without notice by either party, and could thus be performed within a year. (Power Decl., Ex. 7.) PVL's position, however, fails to account for the "exclusive distributorship" nature of the alleged Agreement and its implied duration, which necessitate application of the Statute of Frauds.

### a.    As a Contract for Services, the Alleged Agreement Could Not Be Performed Within One Year.

"A service contract of indefinite duration, in which one party agrees to procure customers or accounts or orders on behalf of the second party, is not by its terms performable within a year – and hence must be in writing – since performance is dependent, not upon the will of the parties to the contract, but upon that of a third party." *Paper Corp. of the U.S. v. Schoeller Technical Papers, Inc.,* 724 F. Supp. 110, 115 (S.D.N.Y. 1989) (*citing Zupan v. Blumberg,* 141 N.E.2d 819, 820 (N.Y. 1957); *accord Martocci v. Greater N.Y. Brewery, Inc.,* 92 N.E.2d 887 (N.Y. 1950); *Jillcy Film Enters., Inc. v. Home Box Office, Inc.,* 593 F. Supp. 515 (S.D.N.Y. 1984).

*Paper Corp. of the United States* involved an alleged contract for the distribution of a manufacturer's paper products in the United States so long as the distributor's customers purchased the manufacturer's products. The distributor argued that the Statute of Frauds did not apply because the alleged contract could conceivably be performed within one year if its customers ceased their purchases within one year. This Court disagreed, finding that the alleged contract could be fully performed within one year only if the distributor's customers, "who themselves are not parties to the contract," stopped buying the manufacturer's products. The Court held that the Statute of Frauds applied to bar the alleged contract. *Paper Corp. of the United States,* 724 F. Supp. at 115.

The nature of the Agreement asserted here is dispositive. By its terms, the alleged Agreement called for Milagros to procure customer accounts to develop the Mark in the United States as PVL's exclusive distributor of footwear bearing the Mark. In addition, PVL agreed to license Milagros to place the Mark on other goods – through Milagros's use of other manufacturers – in the belief that it would help to "develop the BETTA brand for PVL in the United States." (Dkt. #10 (Counterclaim) ¶¶ 52 & 67.) The alleged Agreement was thus dependent on both the demands of third-party customers and the production of BETTA products by other manufacturers, not simply the will of the parties. This was proven true by Mr. Wong's purported "termination" of the alleged Agreement in November 2006 when the Wongs conceded that immediate termination of the alleged Agreement would not have been realistic given then-current and pending shipments to third parties for the sale of BETTA products in the following year. (Power Decl., Ex. 1, 139:24-140:13; Ex. 11, 55:11-56:13.)

**b.    The Ability to Terminate the Alleged Agreement Within One Year Does Not Mean the Alleged Agreement Could Be Performed Within One Year.**

Mr. Wong testified that he planned to review the alleged Agreement every two years, and that he expected to receive at least $1 million in sales related to the alleged Agreement within the first two years. (Power Decl., Ex. 1, 158:2-14.) Although the parties never discussed the duration of the alleged Agreement, it could not have been *performed* within one year when, by necessary implication, it was an agreement for the satisfactory distribution of BETTA products that was to last at least two years. *Zimmer-Masiello, Inc., v. Zimmer, Inc.,* 552 N.Y.S.2d 935, 939 (N.Y.A.D. 1990) (contract action involving exclusive distributorship barred by Statute of Frauds when court found "[t]hat the agreement here was intended to continue well beyond a year is emphasized by the requirement that plaintiff show increasing sales volume *annually.*")

This matter is different from cases in which one or both parties are permitted, by a contract's express terms, to terminate the contract within one year. *N. Shore Bottling Co. v. Schmidt & Sons, Inc.,* 22 N.Y.2d 171 (N.Y.A.D. 1968). Here, the alleged Agreement was to continue indefinitely and, by implication, could be terminated upon Milagros's failure to meet sales expectations after two years. Terminations that are merely implied, however, are insufficient to take an oral contract out of the Statute of Frauds. *Burke v. Bevona,* 866 F.2d 532, 538 (2d Cir. 1989); *Nifty Foods Corp. v. The Great Atlantic and Pac. Tea Co.,* 614 F.2d 832, 837 (2d Cir. 1980) ("termination provision must be express . . . in order to excuse a contract from the writing requirement of the Statute of Frauds.").

Further, even if PVL or Milagros could potentially *terminate*, or Milagros could potentially *breach*, the alleged Agreement within one year, such actions do not equal *performance* under the Statute of Frauds. *Alan Skop,* 909 F.2d 59 (2d Cir. 1990) (although agreement could be terminated within one year by dealer's breach, it could not be fully performed within one year); *D & N Boening, Inc. v. Kirsch Beverages, Inc.,* 472 N.E.2d 992 (N.Y. 1984) (franchise contract running "for as long as [the franchisees] satisfactorily distributed the product, exerted their best efforts and acted in good faith" must be in writing); *United Beer Distrib. v. Hiram Walker,* 557 N.Y.S. 2d 336 (alleged oral distribution agreement unenforceable under Statute of Frauds because agreement called for performance of indefinite duration and could only be terminated within one year by its breach during that period). As such, the alleged oral Agreement is unenforceable.

### 3. There Is No Sufficient Writing to Remove the Alleged Oral Agreement from the Statute of Frauds.

A contract within the Statute of Frauds must be memorialized in a writing "subscribed by the party to be charged." N.Y. Gen. Oblig. Law § 5-701 (McKinney 1989); *see also Morris*

*Cohon & Co. v. Russell,* 245 N.E.2d 712, 71 (N.Y. 1969). To satisfy the Statute's writing requirement, the "memorandum must, on its face and without the addition of parol evidence, contain the essential terms of the agreement . . . ." *Ginsberg Mach. Co. v. J & H Label Processing Corp.,* 341 F.2d 825, 828 (2d Cir. 1965); *Roulley v. Inex Co.,* 677 F.2d 14, 15 (2d Cir. 1982) (if writing is to prove existence of agreement, it must "designate the parties, identify and describe the subject matter, and state all the essential and material terms of the agreement" (*quoting Read v. Henzel,* 415 N.Y.S.2d 520, 522 (N.Y.A.D. 1979)). A term is essential and must appear in the writing "if it seriously affects the rights and obligations of the parties and there is significant evidentiary dispute as to its content." *Id.* The writing requirement may be satisfied by several writings which, taken together, may be construed as a single enforceable contract. *Crabtree v. Elizabeth Arden Sales Corp.,* 110 N.E.2d 551 (N.Y. 1953).

The writings – emails between the Wongs and Ms. Torres between August 8, 2003 and October 3, 2003 – offer evidence of the parties' contemplation of their future business relationship. But none of the writings, taken alone or together, is sufficient to meet the requirement of the Statute of Frauds.

First and foremost, there is no evidence of a writing signed by Milagros. Second, the writings omit numerous terms essential to any agreement for the licensing of intellectual property and the exclusive distribution of products. An omission of even one essential term is "fatal to the contention that the writings satisfy the Statute of Frauds." *Kobre v. Instrument Sys. Corp.,* 387 N.Y.S.2d 617, 619 (N.Y.A.D. 1976), *aff'd,* 374 N.E.2d 131 (N.Y. 1978). Essential terms lacking in the alleged Agreement include, for example, the precise trademarks covered by the license, the term of the license, and the nature of the license. *See Gander Mountain Co. v. Cabela's, Inc.,* No. 04-CV-3125 (PJS/RLE), 2007 WL 2026751 *6 (D. Minn. July 10, 2007)

(identifying same as "presumably the most important terms" of license agreement); *Liberto v.*

*D.F. Stauffer Biscuit Co.,* 441 F.3d 318, 324 (5th Cir. 2006) (noting essential terms of trademark

license include duration of license, grounds for its renewal or termination, and terms of control).

Specific examples of lacking essential written terms include:

- Precise Trademarks.  PVL contends that the alleged Agreement included a license for the use of the Mark.  This is relevant because in addition to BETTA products, Milagros sells "BETTA Spa" products and "I. Luisa Torres" products.  In addition to footwear with the Mark, PVL produced footwear for Milagros with the "I. Luisa Torres" mark.  There is no writing that identifies the precise trademarks covered by the alleged license.

- Royalty Payments.  The emails show that Ms. Torres questioned whether royalty payments would be due, and to whom, but there is no writing confirming PVL's alleged response.

- Term of License.  It is undisputed that the parties never discussed, let alone put in writing, any term regarding the duration of the alleged Agreement.  Duration of an exclusive right to distribute products bearing the Mark, however, is an essential term.  *Ginsberg Machine,* 341 F.2d at 828 (finding oral agreement unenforceable under Statute of Frauds when parties failed to express in writing duration of exclusive manufacture and sale agreement).

- Nature of License.  In its Counterclaim, PVL contends that the alleged Agreement provided that Milagros would be PVL's exclusive distributor of BETTA products in the United States.  The testimony of PVL's owners, however, indicates that there was no discussion of "exclusivity."  (Power Decl., Ex. 1, 84:19-85:16; Ex. 11, 20:4-11.)  Regardless, there is no evidence of a writing setting forth the "exclusive" nature of the alleged license.

- Terms of Control.  "Recognizing the attendant risk in granting any trademark license – the possibility that the licensee will use the mark in a way that undermines its secondary meaning, thereby potentially rendering the mark generic or abandoned – nearly all licensing agreements contain clauses specifying the manner in which the licensed mark may be used." *Liberto,* 441 F.3d at 324-25.  There is no writing before the latest effective date of the alleged Agreement (October 2003) specifying PVL's planned terms to control use of the Mark by Milagros or, for that matter, other manufacturers.

Because PVL can proffer no writings that contain, alone or together, the essential terms of the

alleged oral Agreement granting a license for exclusive distribution of products bearing the

Mark, there is no genuine issue of material fact regarding the existence of an oral contract between the parties. The alleged oral Agreement is void under the Statute of Frauds.

### 4. The Statute of Frauds May Be Raised for the First Time on Summary Judgment.

Milagros properly raises the Statute of Frauds for the first time in this motion.[9] The law in New York is clear that in the absence of prejudice, a defendant may raise an affirmative defense in a motion for summary judgment for the first time. *McGuiggan v. CPC Int'l, Inc.,* 84 F. Supp. 2d 470 (S.D.N.Y. 2000) *citing DeVito v. Pension Plan of Local 819 I.B.T. Pension Fund,* 975 F. Supp. 258, 263 (S.D.N.Y. 1997), *abrogated on other grounds, Romero v. Allstate Corp.,* 404 F.3d 212 (3d Cir. 2005) (finding no prejudice to plaintiff and allowing defendant to raise statute of limitations as affirmative defense for first time on summary judgment). Here, PVL can point to no prejudice resulting from Milagros raising the Statute of Frauds for the first time on summary judgment. All material facts that shed light on whether the alleged Agreement existed were raised during the discovery process. Indeed, Milagros denies that any oral licensing and exclusive distribution agreement ever existed between the parties. (Torres Decl. ¶ 11.) As a result, the only evidence regarding the terms of the alleged Agreement are the allegations of PVL itself. That evidence is viewed in the light most favorable to PVL for purposes of this motion. There can thus be no prejudice.

### D. Even if the Statute of Frauds Is Inapplicable, No Contract Existed Between the Parties.

The party seeking to enforce a contract bears the burden of establishing that a binding agreement was made and proving the terms of the contract. *Paz v. Singer Co.,* 542 N.Y.S.2d 10,

---

[9] On March 5, 2008, Milagros sought leave to amend its Answer to PVL's Counterclaim to assert the Statute of Frauds as an additional affirmative defense. That motion was pending as of the date of this filing. If the Court has already granted Milagros leave to amend its Answer, the issue raised in this section is moot.

11 (N.Y.A.D. 1989). To create a binding contract, "there must be a manifestation of mutual

asset sufficiently definite to assure that the parties are truly in agreement with respect to all

material terms." *In re Express Indus. & Terminal Corp. v. N. Y. State Dep. of Transp.,* 715

N.E.2d 1050, 1053 (N.Y. 1999). In addition, a contract must be "sufficiently definite so that a

court can ascertain its terms for the purpose of determining whether it has been breached and

avoid[] imposition of contractual obligation[s] under circumstances where intent to conclude a

binding agreement is not present." *Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.,* 619

N.Y.S.2d 260, 265 (N.Y.A.D. 1994) (*citing Cobble Hill Nursing Home, Inc. v. Henry & Warren

Corp.,* 548 N.E.2d 205, 209 (N.Y.), *cert denied,* 498 U.S. 816 (1990)).

As set forth in Section III(C)(3) above, the record shows that there was no meeting of the

minds between PVL and Milagros on essential terms of the alleged Agreement. At most, PVL

could characterize the alleged Agreement as an "agreement to agree," whereby PVL allegedly

agreed to license, on some future date, an unregistered mark to which it had no ownership right

in the United States. A mere agreement to agree to an unspecified future license, however, is

unenforceable as a matter of contract law. *In re 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd.

Corp.,* 575 N.E.2d 104, 106 (N.Y. 1991) (although plaintiffs presented evidence that negotiating

parties had agreed as to price and quantity, exchange of drafts, further discussion, and the totality

of circumstances clearly showed that there was never meeting of minds on all essential terms);

*Ross v Wu,* 811 N.Y.2d 26 (N.Y. 2006).

### E.    In Light of PVL's Admission That Milagros Has Paid All Outstanding Sums, PVL's Breach of Contract and Unjust Enrichment Claims Are Baseless.

PVL's counterclaims for breach of contract and unjust enrichment rest on the allegation

that Milagros "failed to pay PVL for more than $35,000 worth of goods that PVL has supplied to

Milagros." (Dkt. #10 ¶ 109.) Since PVL filed its Counterclaim in July 2007, however, Milagros

has paid in full all outstanding sums due to PVL. (Torres Decl. ¶ 4.) PVL admits the same. (Power Decl., Ex. 1, 146:12-14.) Because no basis remains for PVL's breach of contract and unjust enrichment counterclaims, they should be dismissed.

### F.    Milagros Is Entitled to Declaratory Judgment on Its Claim to the Mark.

#### 1.    Acquisition of Trademark Rights in the United States.

In the United States, trademark rights are acquired based on priority of use in commerce. *See, e.g., Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 599 (S.D.N.Y. 2001) ("It is well established that the standard test of ownership is priority of use.") *citing* J. Thomas McCarty, 2 *McCarthy on Trademarks and Unfair Competition* § 16.1 (4th ed. 2007) ("[O]wnership of trademark . . . rights in the United States is obtained by actual use of a symbol to identify the goods or service of one seller and distinguish them from those offered by others."). Therefore, "[t]he user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially.'" *Id.* (citations omitted).[10]

#### 2.    Milagros Has Acquired Rights in the Mark Based on First Use.

There is no dispute that first use of the Mark in the United States was through Milagros. (Power Decl., Ex. 2, at 10 (Response to Request for Admission No. 3).) PVL's only basis for alleging use in commerce in the United States was "by the licensed use of the Mark" by Milagros. (*Id.*) As set forth above, no valid license agreement existed between Milagros and PVL. In the absence of a valid agreement, PVL has no claim to the Mark in the United States, and Milagros's use cannot be contested.

---

[10] PVL's use of the term "BETTA" as a trademark in connection with footwear outside of the United States has no bearing on this case. It is well-settled law that use of a mark outside the United States establishes no rights in the mark in the United States. *Tactica*, 154 F. Supp. 2d at 599.

As detailed in its application for registration of the Mark with the U.S. Patent and Trademark Office, Milagros has made continuous and exclusive use of the Mark in the United States on and in connection with footwear and related personal-care goods since at least as early as February 4, 2004. (Torres Decl. Ex. 3.) The products to which Milagros first affixed the Mark were manufactured by Flicker Footwear and Topper Embroidery. (*Id.* ¶ 17.) Milagros's use of the Mark in commerce in the United States has been continuous since at least as early as April 26, 2004. (*Id.*)

**G.    Milagros's Ownership of the Mark Precludes PVL's Counterclaims for Infringement.**

PVL cannot sue Milagros, the owner of the Mark, for infringing the trademark. *Silverstar Enters. v. Aday,* 537 F. Supp. 236, 240-41 (S.D.N.Y. 1982).

## IV.    CONCLUSION

For all the foregoing reasons, PVL's claims fail as a matter of law under the governing legal standards and given the uncontroverted facts. Accordingly, Milagros's motion for summary judgment should be granted, dismissing PVL's counterclaims and declaring that Milagros is the owner of the "BETTA" mark in the United States.

Dated: New York, New York
        March 17, 2008

Respectfully submitted,

LANDMAN CORSI BALLAINE & FORD P.C.

By:    _____
        Daniel S. Moretti (DM 6630)
        Attorneys for Plaintiff
        Milagros Imports Limited
        120 Broadway, 27th Floor
        New York, New York 10271-0079
        (212) 238-4800

STOEL RIVES LLP

By: _____

Vanessa Soriano Power (WSBA 30777)
*Admitted pro hac vice*
Attorneys for Plaintiff
Milagros Imports Limited
600 University Street, Suite 3600
Seattle, WA  98101
(206) 624-0900


To:    Storch, Amini & Munues, P.C.
       Attorneys for Defendant
       140 E 45th Street, 25th Floor
       New York, New York 10017
       (212) 490-4100