Steven G. Storch
Benjamin L. Felcher Leavitt
Storch Amini & Munves PC
140 E. 45th St., 25th Floor
New York, New York 10017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
MILAGROS IMPORTS LIMITED, a      :
New York Corporation,            :
                                 :
        Plaintiff,               :      07-CV-3215 (SHS)
                                 :
        v.                       :
                                 :
PROGRESS VANTAGE LIMITED,        :
A Foreign corporation,           :
                                 :
        Defendant.               :
-------------------------------------------------------x

## DEFENDANT AND COUNTERCLAIM PLAINTIFF PROGRESS VANTAGE LIMITED'S RESPONSE TO PLAINTIFF AND COUNTERCLAIM DEFENDANT MILAGROS IMPORTS LIMITED'S STATEMENT OF UNDISPUTED FACT

Pursuant to Local Rule 56.1 of the Southern and Eastern Districts of New York, Defendant and Counterclaim Plaintiff Progress Vantage Limited ("PVL") submits its response to the Statement of Undisputed Facts submitted by Plaintiff and Counterclaim Defendant Milagros Imports Limited (Sep. St.).

    1.     PVL does not dispute paragraph 1 of the Sep. St.

    2.     PVL does not dispute paragraph 2 of the Sep. St., except denies that portion of paragraph 2 that refers to "footwear and spa products" as "its" (Declaration of William Wong, Dated March 31, 2008 ("Wong Dec.") at e.g., ¶¶ 28, 31, 32, 37, 38, 43, 45, 46, 50, 55-125; Declaration of Benjamin F. Leavitt dated March 31, 2008 ("Lev.

Dec.") Ex. 1 at 10:10-18) and insofar as it draws a distinction between the Betta trademark and the "Betta Spa" trademark. (Lev. Dec. Ex.1 at 171:8-15).

  3. PVL does not dispute paragraph 3 of the Sep. St.

  4. PVL does not dispute paragraph 4 of the Sep. St.

  5. PVL disputes paragraph 5 of the Sep. St. (Lev. Dec. Ex. 1 at 59:8-13, Lev. Dec. Ex. 2 at 65:14-17).

  6. PVL does not dispute that Flicker Footwear and Topper Embroidery extended shipments on credit to Milagros, but is unaware of any evidence elicited in this action from representatives of those entities.

  7. PVL does not dispute that Milagros purchased goods bearing the Betta mark from all of the entities listed in paragraph 7 of the Sep. St.

  8. PVL does not dispute paragraph 8 of the Sep. St.

  9. PVL does not dispute paragraph 9 of the Sep. St.

  10. PVL does not dispute paragraph 10 of the Sep. St.

  11. PVL disputes paragraph 11 of the Sep. St. At no time did William Wong indicate that the Betta trademark was "available," but rather at all times made clear that PVL intended to use the Betta trademark in the United States and that PVL was willing to enter into a relationship with Milagros whereby PVL would own the trademark and Milagros would distribute goods bearing the mark. (Wong Dec. at ¶¶37-39, 43-46; 100-108; Lev. Dec. Ex. 1 at 56:5-57:21).

  12. PVL disputes paragraph 12 of the Sep. St. (Id.; Lev. Dec. Ex. 1 at 75:3-74:1, 85:4-86:7).

  13. PVL does not dispute paragraph 13 of the Sep. St.

14. PVL does not dispute paragraph 14 of the Sep. St.

15. PVL does not dispute that Ms. Torres and Milagros currently, in the context of this lawsuit deny that an oral agreement was entered into.

16. PVL does not dispute that the deposition passages referred to in paragraph 16 of the Sep. St. refer to the testimony of William Wong, but dispute that Mr. Wong referred to these as the "terms" of the oral licensing agreement between the parties, Wong Dec. at ¶¶ 44-46, 60, 61, 69-77, and note that the deposition excerpts referred to this in this paragraph do not contain use of the phrase "terms of the agreement."

17. PVL does not dispute paragraph 17 of the Sep. St.

18. PVL does not dispute that an email was sent on November 11, 2006 nor that the email states that PVL was "selling the Betta brand (in the USA) to another company" nor that the email states that Milagros would have to "use a different brand in the future. PVL disputes that Mr. Wong "indicated" to Milagros that PVL had determined in was properly position to begin its own distribution of Betta goods. Answer and Counterclaim at ¶87.

19. PVL does not dispute that paragraph 19 of the Sep. St. accurately reflects the testimony of William Wong.

20. PVL does not dispute paragraph 20 of the Sep. St.

21. PVL does not dispute that on June 15, 2004, it filed an application to register itself as the owner of the trademark Betta.

22. PVL does not dispute that Milagros has made this, and many other baseless and erroneous allegations in opposition to PVL's application for registration of the trademark Betta in the United States Patent and Trademark Office.

23. PVL does not dispute paragraph 23 of the Sep. St.

24. PVL disputes paragraph 24 of the Sep. St. Wong Dec. at ¶¶ 44-46, 60, 61, 69-77; Lev. Dec. Ex. 1 at 51:19-52:2, 56:5-57:21, 65:8-68:10, 70:24-71:9, 73:4-74:1, 80:15-81:4, 85:4-86:7.

### PVL'S Response to Additional Facts Not Referred to in the Separate Statement But Relied Upon in Milagros' Summary Judgment Motion

25. On p. 7 of Milagros' Memorandum of Law in Support of Its Motion for Summary Judgment, Milagros includes statements made in the Declaration of Irene-Louisa Torres.

26. PVL does not dispute that Ms. Torres is not an attorney, but disputes the entire remainder of paragraph 12 of the Declaration of Irene-Louisa Torres.

27. PVL disputes that Ms. Torres understood that Mr. Wong was "helping Milagros find a name that it could develop as its own brand in the United States." Lev. Dec. Ex. 1 at 51:19-52:2, 56:5-57:21, 65:8-68:10, 70:24-71:9, 73:4-74:1, 80:15-81:4, 85:4-86:7.

28. PVL disputes that Ms. Torres did not understand the "legal significance" of the term license that she used in writings to PVL. Lev. Dec. Ex. 2 at 15:15-19:10, 41:21-42:15, 79:1-18, 83:9-85:7, 85:25-88:14, 89:1-91:25, 92:10-93:9.

29. PVL disputes that Ms. Torres was "simply trying to confirm the parameters of Milagros' ability to use" Betta as it is directly contradicted by her own writings to PVL. Wong Dec. Exs. 3-8.

### Additional Facts Submitted by Progress Vantage

30. Progress Vantage is a Hong Kong corporation with its principal place of business in Kwai Chung, New Territories, Hong Kong. Wong Dec. ¶ 2.

31. Since approximately 1994, Progress Vantage, by itself and through affiliated companies, including Goddess Footwear ("Goddess"), manufactures a variety of footwear for distribution in the international market. Progress Vantage was originally called "Goddess Footwear." Wong Dec ¶ 3.

32. However, in or around 2001, a feng shui advisor told W. Wong that it should change the company's name. Accordingly, it was renamed Progress Vantage, but retained Goddess as a trading division of Progress Vantage. Wong Dec. ¶ 3, n. 1.

33. Having decided to expand its business to include its own label and having acquired the authorization of Mr. Kim Gray, the Australian owner of the Betta mark, Progress Vantage registered the Betta trademark in Hong Kong. Wong Dec ¶¶ 3-11; Lev. Dec. Ex. 1 at 45:14-48:4.

34. Since that time, Progress has been the sole manufacturer and distributor of indoor slippers bearing the Betta trademark in Hong Kong and China. Progress Vantage has also shipped slippers bearing the Betta mark to Europe, Dubai and Lebanon. Wong Dec ¶¶ 12-15, Lev. Dec. Ex. 1 at 19:16-20:8; 24:4-8; 49:17-52:2.

**Relationship Between W. Wong and Irene Louisa Torres.**

35. W. Wong first came to know of Torres when he worked for another slipper manufacturer in China called Splendid. Wong Dec ¶¶ 16-24.

36. Over the years, W. Wong and his wife (and co-owner of Progress Vantage), Lynn Wong ("L. Wong") became friends with Torres and came to see her as a very experienced person in the United States slipper and footwear business with a great number of contacts in the business and talented at building customer accounts. Wong Dec ¶¶ 25-26; Lev. Dec. Ex. 2 at 84:14-85:21.

37. In or around mid-2003, Torres told W. Wong that she was unhappy at her job, that she would be leaving to start her own business and she asked the Wongs for help. Wong Dec ¶ 27; Lev. Dec. Ex. 1 at 55:20-56:21.

38. Progress Vantage had not yet manufactured slippers for distribution in the U.S. under the Betta mark and W. Wong concluded that, due to her skills and contacts in the United States, helping Torres establish a business that would be the exclusive distributor of Betta goods would be a good way to promote the Betta mark in the United States. Wong Dec ¶ 28; Lev. Dec. Ex. 1 at 55:20-56:21; 62:19-63:3.

**Correspondence Concerning the Betta Mark.**

39. Prior to learning about it from the Wongs, Torres had never heard of the name "Betta." Lev. Dec. Ex. 2 at 169:3-173:9.

40. During the initial conversations concerning Torres' new business, she was aware that Progress Vantage manufactured and distributed Betta slippers in China. Wong Dec ¶ 42; Lev. Dec. Ex. 2 at 17:1-19:10; 169:3-173:9

41. In August 2003, the parties began exchanging emails specifically concerning the Betta mark. Wong Dec ¶¶47-54.

42. On August 10, 2003, Torres emailed Progress Vantage about her soon to be company, Milagros. In the email, she asked L. Wong to "please advise if 'Betta' is useable in the States as of yet." Wong Dec ¶ 48.

43. On August 11, 2003, W. Wong told Torres that "I am registering this brand in the US, and [it] can be used very soon." Wong Dec ¶ 49, Ex. 5.

44. During August and September, Progress Vantage agreed to provide her with start-up capital and to arrange for another factory owner, John Lau, to loan her

additional money to start the business. During this same time period, Progress agreed to essentially extend Milagros credit by extended the period in which her bills would be due. Wong Dec ¶ 52; Lev. Dec. Ex. 2 at 65:1-16.

45. On September 28, 2003, Torres emailed L. Wong and, after discussing developments in the industry, asked if "the 'Betta' brand can be used in the USA." Wong Dec ¶ 56, Ex. 6.

46. She continued, "I know I emailed [William] a long time ago and it was in the works. The reason I ask is if it is, then I would ask you if I can use it for my line" (emphasis added). Id.

47. Upon learning that Progress Vantage was indeed ready to move forward with the United States registration of Betta, Torres wrote, "This is great news!!!! We now have a license!!!" Wong Dec ¶ 57, Ex. 7.

48. Torres also wrote Progress Vantage and said that she "really need[s] to know the parameters of the License," asking Progress Vantage to "[p]lease advise if there are royalties we would have to pay to Betta or to Goddess." Wong Dec ¶ 58, Ex. 8.

49. In the October 2, 2003 email, Torres also asked if she can use the mark on goods other than Progress Vantage's and reassured Progress Vantage that she would maintain the quality of the goods at all times:

> Betta would be used for my entire line including Spa – slipper socks which David will work with me on etc, etc. I don't see this as a problem, do you???? . . . I know that you will not have a problem with ARDA [another Chinese factory] making all the packaging as I have done in the past – including the printing of ribbons, making woven labels etc???? . . . PLEASE DON'T WORRY! I WILL MAKE THE PACKAGING BEAUTIFUL!!!!!!! YOU KNOW ME!!!!!! BETTA WILL BE PROUD!!!!!!!!!!!!!! Id. at 01411 (capitals and exclamation marks in original).

50. Torres also told W. Wong that it would be very helpful to establishing the Betta brand in the United States to have something more than the slippers it produced. Wong Dec ¶¶ 69-70.

51. Relying on Torres' skills and knowledge of the United States market, Progress Vantage agreed that Milagros could use other manufacturers to produce goods bearing the Betta mark. Wong Dec ¶ 71; Lev. Dec. Ex. 1 at 70:24-71:9; 73:3-74:1; 85:4-86:12.

52. All of the factories from whom Milagros obtained goods were fully known to Progress Vantage. Initially Progress Vantage, through W. Wong and L. Wong, reviewed the styles and goods produced by these factories. Wong Dec. ¶¶ 73-76; Lev. Dec. Ex. 1 at 70:24-71:9, 72:18-74:1.

53. As the relationship with Torres continued, Progress grew to trust Torres and relied on her more and more to maintain the quality of goods obtained from other factories. Wong Dec. ¶ 76.

54. Accordingly, by the beginning of October, 2003, W. Wong understood that the parties had agreed that Progress Vantage would be the registered owner of the Betta trademark in the United States, that Milagros (which Progress Vantage would help get on its feet) would develop the customer base for the Betta products, would distribute goods bearing the Betta mark in the United States on behalf of Progress Vantage (including those made by other manufacturers approved by Progress Vantage) and would and would not have to pay royalties for the Betta mark (the "Oral Agreement"). Wong Dec. ¶¶ 61, 67, 68, 71-77; Lev. Dec. Ex. 1 at 65:1-68:10.

55.     Pursuant to the terms of the Oral Agreement, in or around June 15, 2004, Progress Vantage filed an application for registration of the Betta trademark. Wong Dec. ¶ 78.

56.     From October 2003 until March 2006, Torres never once asked about the trademark registration. Wong Dec. ¶¶ 118-120; Lev. Dec. Ex. 2 at 232:13-236:9.

57.     Progress Vantage expended significant time and effort in pursuit of the trademark registration. Wong Dec. ¶¶ 82-86.

58.     In addition to attorney's fees, Progress Vantage undertook a good deal of expense and effort to resolve an initial denial by obtaining a consent letter from the owner of Mo Betta, Maury Tate. Id, Ex. 12.

59.     At no time did Milagros undertake any efforts at all in connection with this issue. Wong Dec. ¶ 87, Lev. Dec. Ex. 2 at 39:3-21.

**The Neet Feet Controversy**

60.     In or around March 2006, Neet Feet Pty Ltd. ("Neet Feet"), an Australian company wrote Milagros demanding that Milagros cease distributing footwear bearing the mark. Wong Dec. ¶ 88.

61.     On March 29, 2006, Torres emailed L. Wong and W. Wong and informed them of Neet Feet's demand. Wong Dec. ¶ 89.

62.     Torres wrote that she had never seen any trademark registration in the United States for Betta by Neet Feet, but that she "found yours [Progress Vantage's] which I am attaching a copy of." Wong Dec. ¶ 90, Ex. 13 at 04520.

63.     The registration application clearly shows Progress Vantage as the applicant for ownership of the trademark. Wong Dec. ¶ 91.

64. At no point did Torres ever ask why the registration was in Progress Vantage's name. Wong Dec. ¶ 91, Lev. Dec. Ex. 2 at 151:15-156:23; 161:16-163:8; 232:13-236:9.

65. Torres worked in conjunction with Progress Vantage's US counsel who told her that they would need documentation of what Kim's agreement was or whatever legal documents he has as to the stipulation to the use of betta. Wong Dec. ¶¶ 92-93.

66. On April 14, 2006, the law firm working on Progress Vantage's trademark application wrote a response to Neet Feet explicitly stating the use of the Betta mark had express authorization from Mr. Gray. Wong Dec. ¶ 95, Ex. 14.

67. Neither Torres nor anyone at Milagros had any interactions with Mr. Gray concerning permission to use the Mark in the United States. Wong Dec. ¶ 96; Lev. Dec. Ex. 2 at 168:1-169:15; 190:12-191:10; 196:1-9.

68. All of the references in the in the April 14, 2006 letter to Mr. Gray and his assent to use of the Betta mark refer unequivocally to interactions Progress Vantage had with him. Wong Dec. ¶ 96.

69. The April 14, 2006 letter did not, however, effectuate a complete resolution and it was not until Mr. Gray met with Neet Feet in Australia that the matter was definitively resolved. Wong Dec. ¶ 97.

70. At no point during these events did Torres, ever assert that she or Milagros owned the Mark or file any type of opposition to Progress Vantage's registration of the Mark. Wong Dec. ¶ 98; Power Dec. ¶¶14-15, Exs. 2-3.

71. Torres did not assert that it had any ownership interest in the mark until Progress Vantage informed her that it was terminating the license and Milagros would

not be able to use the Betta mark.  Wong Dec. ¶¶119-120; Lev. Dec. Ex. 2 at 151:15-156:23; 161:16-163:8; 232:13-236:9.

**Milagros' Contentions in This Lawsuit**

72. Milagros contends in this lawsuit that it never had an agreement of any kind with Progress Vantage concerning the Betta Mark.  Lev. Dec. Ex. 2 at 52:6-54:8; 83:9-85:6; 86:15-89:14.

73. Torres testified at her deposition that Progress Vantage told her that it had no plans to use the Betta mark in the United States and that it would register the Betta trademark for her because she had put so much time, money and effort into her new business.  Lev. Dec. Ex. 2 at 101:20-105:3.

74. W. Wong contradicts this statement and, in fact, Torres sent an email two months after this supposed interaction, complaining that W. Wong did not think she had put enough of her own money into Milagros.  Wong Dec. at ¶¶ 105-106, Ex. 15.

75. Torres testified that W. Wong told her that Progress Vantage was not interested in using the Betta mark in the United States and that it was "available" in the United States.  Asked whether W. Wong said she could "have" the mark or if it was a gift, Torres testified that "we didn't talk about in those terms, only that it was available." Lev. Dec. Ex. 2 at 169:25-173:9.

76. W. Wong unequivocally states that he never said to Torres that he was willing to sell, give away or forgo the chance to use the Betta mark in the United States and at all times told Torres that Progress Vantage would own the Betta mark in the United States.  Wong Dec. ¶¶ 46-47.

- 11 -

77. In an email, Torres explicitly asks if she can use the Betta mark in the United States. WW Dec. Ex. 6. At her deposition, she stated that this was not asking for permission. Lev. Dec. Ex. 2 at 52:6-54:8; 79:1-81:10.

78. In several emails, W. Wong told Torres that he would be registering the Betta mark. There is no writing where he says that this registration would be on behalf of Milagros. At her deposition, Torres testified that this promise was made orally during a trip to Hong Kong in November 2003. Lev. Dec. Ex. 2 at 57:16-58:20.

79. In several emails, Torres referred to her use of the Betta mark as being under a license. At her deposition, she testified that it was not a license. Lev. Dec. Ex. 2 at 83:9-85:7; 86:4-88:14.

80. Torres states in her declaration that she is not a lawyer. At her deposition, however, she testified at length about why it was exactly that she would never have agreed to a license. Lev. Dec. Ex. 2 at 15:15-19:10, 41:21-42:15, 79:1-18, 83:9-85:7, 85:25-88:14, 89:1-91:25, 92:10-93:9.

81. She also testified about her experience in the industry and with licenses.

82. In an email, Torres asked if royalties would have to be paid to "Betta or Goddess." At her deposition, she testified that she did not understand that she might have to pay royalties. Lev. Dec. Ex. 2 at 89:23-91:25.

83. In an email, L. Wong told Torres that Progress Vantage did not want to use the Betta mark on an inferior line of slippers. Lev. Dec. Ex. 2 at 212:10-214:4; Lev. Dec. Ex. 3.

84. Despite this email, Torres testified that she did not understand that Progress was requesting a certain use for Betta goods. Id.

Dated: March 31, 2008
    New York, New York

STORCH AMINI & MUNVES PC

_____
Benjamin L. F. Leavitt
140 E. 45th St., 25th Floor
New York, New York 10017
(212) 490-4100
Fax: (212) 490-4208
Attorneys for Defendant and
Counterclaim Plaintiff Progress
Vantage Limited