Exhibit 2

```
UNITED STATES DISTRICT COURT
SOUTHERN COUNTY OF NEW YORK
CASE NO. 07-CV-3215
-----------------------------------------------X
MILAGROS IMPORTS LIMITED,
A NEW YORK CORPORATION,

                    Plaintiff,

    vs.

PROGRESS VANTAGE LIMITED, A FOREIGN CORPORATION,

                    Defendant.
-----------------------------------------------X
```

DEPOSITION OF:  IRENE-LUISA TORRES

TRANSCRIPT of the stenographic notes of

the proceedings in the above-entitled matter, as

taken by and before ELIZABETH A. WILLESKI, RPR,

and a Notary Public, held at the office of

STORCH AMINI MUNVES, PC, 2 Grand Central Tower,

New York, New York 10017, on January 30, 2008,

commencing at 9:30 in the morning.

1      Q.     So your understanding is Progress

2   is either a successor to Goddess or they are

3   part of the same corporation?

4      A.     That is correct.

5      Q.     So you just testified that you

6   first learned about BETTA through Progress,

7   correct?

8      A.     Yes.

9      Q.     Prior to learning about the BETTA

10  mark from Progress, you had never heard of it?

11     A.     No.

12     Q.     And prior to 2004, Milagros had

13  never sold any goods bearing the BETTA mark?

14     A.     That's correct.

15     Q.     All right.  So you found out that

16  BETTA was available from talking to William

17  Wong?

18     A.     Well, I started to inquire through

19  e-mails regarding what was the status of it,

20  because, basically, I have worked for companies

21  where we are considered the vendor to retailers,

22  to major retailers.  That is my career, and that

23  is exactly what I was looking to set up when I

24  started my own business, i.e., someone who a

25  vendor comes to me as a resource, and I would

Torres, Irene-Luisa

```
 1    have split my company into -- usually, you have

 2    a house brand, which goes to your department

 3    stores, your moderate tier, and then I had an --

 4    I would like to have set up a signature or the

 5    collection which would be for higher end in

 6    different divisions or boutique stores, so I was

 7    looking for a name that I could make my own to

 8    be used totally for myself, my company, and

 9    having worked for various companies where they

10    licensed out a name or a mark.  The problem that

11    you were into is that you are under their

12    control of that particular licensor.  Being a

13    licensee, you are subjected to everything that

14    the licensor wants, and when I started my own

15    company, I didn't want that, I wanted a name,

16    just like my own signature, to be that which I

17    could build and take the time, because when you

18    were a new company, you need the time for the

19    vendors to come back on your reputation, and

20    based on my reputation and my years in the

21    industry, it takes time for them to see if they

22    want to buy what you are selling, so you might

23    need a few years before something launches or

24    takes off or with a license, you have to pay

25    royalties, initial fees, and, sometimes, if you
```

1    don't give the licensor what they want, you are

2    subject to have your name pulled or the brand

3    that you are using.  I didn't want that.  I was

4    looking for something where I could create a

5    store, and turn around and sell it, and I can

6    control it.  So in knowing -- having been

7    friends and in business, and friends with the

8    Wongs, I knew they said they had been using

9    BETTA in China at one point.  I didn't know

10   about a registration until I went to Hong Kong,

11   in November of 2003, and, basically, prior to

12   that, I was looking to see -- I was trying to

13   find out, inquire, what was going on with this

14   name, BETTA, because, again, if it was something

15   that was owned by someone else, in control of

16   someone else, I wanted no part of it, so

17   that's...

18            MR. MORETTI:  Okay.  You have

19   answered.

20            MR. LEAVITT:  I'm going to ask if you

21   cannot instruct the witness.  You can object,

22   but just don't obstruct her testimony.

23            MR. MORETTI:  I'm not obstructing her

24   testimony.  Were you finished with your answer?

25            THE WITNESS:  Yes, I was.

```
 1        Q.      You didn't -- Milagros did not use
 2   the BETTA mark -- strike that.
 3               Before Milagros used the BETTA
 4   mark, you asked Progress's permission to do
 5   that, right?
 6        A.      No, I did not.
 7        Q.      You did not?  So it is your
 8   testimony that you never used the permission?
 9        A.      No, I did not.  I made inquires to
10   what it was, and the Wongs would not answer that
11   in writing, so I was constantly trying to find
12   out, is it a license?  Is it owned by somebody?
13   What is the story with it?  And, basically, they
14   said, we'll talk about it when you come to Hong
15   Kong, and we did have a conversation, and I
16   found out:  A. At that point, I believe they
17   said they had not registered it yet, either in
18   China or began the process in China.  It was not
19   registered in The United States.  It was not
20   used in the US.
21               MR. MORETTI:  I'm going to ask you to
22   slow down.  You are going too fast, just to make
23   sure she can get it.
24        A.      That was basically it.  I was
25   making inquiries in to what the status was.  Had
```

1    it been owned or anything, I would not have

2    touched it.

3        Q.    Well, you understand that the Wongs

4    owned it, as you use that phrase, in China,

5    correct?

6        A.    Maybe I should correct "owned."  I

7    can't say they owned it in China, because I

8    didn't know whether they owned it in China or

9    not.  I know they had claimed to have registered

10   it or be in the process of registering it.

11       Q.    And is it your understanding, in

12   connection with The United States, that a party

13   who registers a trademark is the owner of that

14   trademark?  Is that your understanding?

15       A.    In the US or China?  No, it is

16   based upon your use of it.  You can register it.

17   You have so many years, and if you haven't used

18   it, the registration becomes null and void, and

19   you have to reapply for it.

20       Q.    So your understanding is that the

21   registered owner of a trademark is not

22   necessarily the actual owner of the trademark?

23           MR. MORETTI:  Objection to form.

24       A.    I don't understand what your

25   question is really.  I'm not a legal person.  I

```
 1    company, and I also own the company, so I'm not
 2    quite sure what you mean by an individual.  Yes,
 3    I am an individual.  I am an entity, but I have
 4    the right to testify on behalf of the company.
 5        Q.    You are someone authorized to bind
 6    the corporation, Milagros?
 7        A.    That is correct.
 8        Q.    Okay.  When was Milagros
 9    established?
10        A.    October 1st, 2003, that is when it
11    was incorporated.
12        Q.    Prior to Milagros being
13    incorporated, where did you work, if anywhere?
14        A.    I worked for another company --
15    well, prior to Milagros, I know I was not
16    working at that moment.  I had left a company
17    that I had worked for in, I think it was July or
18    August of 2003.
19        Q.    What company was that?
20        A.    Ben Burger, LLC.
21        Q.    What did Ben Burger do?
22        A.    Ben Burger is in the same capacity
23    as my company.  It is a company that buys --
24    sorry, produces footwear under various
25    manufacturers or slippers or socks in cold
```

```
 1    weather for, you know, a vendor for retailers,

 2    for major retailers.

 3         Q.     Does Ben Burger own any brands or

 4    trademarks?

 5         A.     At the time, this company is

 6    defunct at this moment.

 7         Q.     In 2003?

 8         A.     They had their own house brand

 9    called Ben Burger, and they also had the license

10    for Laura Ashley.

11         Q.     They had a license for that?

12         A.     And various others.

13         Q.     Various other licenses?

14         A.     Yes, whether they are their own

15    license, yes.

16         Q.     And you came to know the Wongs in

17    your work at Ben Burger?

18         A.     No.

19         Q.     How did you come to know the Wongs?

20         A.     I knew Mr. Wong.  I met them early,

21    in the early '90s.  I guess I worked for another

22    company where I was the director of footwear for

23    their production and product development

24    overseas, and Mr. Wong worked as a QC, quality

25    control person, for a company called Splendid
```

Torres, Irene-Luisa                                    1/30/2008

```
 1    that the "them" was retailers.

 2           A.    Correct.

 3           Q.    So that "them" does not refer to

 4    the factories?

 5           A.    No, it does not.

 6           Q.    If you look at the third page, the

 7    top line:  "Please advise if BETTA is usable in

 8    the states as of yet."  See that?

 9           A.    Yes.

10           Q.    You're asking William if it is okay

11    to use BETTA in the US, correct?

12           A.    No, I'm not.  I'm trying to find

13    out what BETTA is, and what is the situation

14    with BETTA, because, as I stated previously, I

15    was looking for a name that I could take and

16    have as my own use, and BETTA -- I liked BETTA.

17    It was outside the country and US people that

18    like things that are new and from foreign

19    countries, and I liked the name, and I was

20    looking for what is the status of it, does it

21    belong to anybody.  I was trying to find out.

22           Q.    You were trying to find out whether

23    it was okay to use BETTA in the US?

24           A.    I was trying to find out what was

25    the status of it.  If it was owned by someone,
```

**Torres, Irene-Luisa**                                                        1/30/2008

```
 1    then I would not have touched it, and that is
 2    what I stated constantly.
 3            Q.      Where did you state that?
 4            A.      Previously, in my testimony here.
 5            Q.      You said I constantly said.
 6            A.      I have constantly stated that.
 7            Q.      Where?
 8            A.      When I went to Hong Kong and I did
 9    speak to William, and even in e-mails prior to
10    my going, I think, in October, again, I had been
11    asking very specific questions, because I needed
12    a name, a brand, whatever you want to call it, I
13    needed a name that I could take and make my own.
14    I had a very short time to develop packaging an
15    entire line and I had to decide where was I
16    going to put my house brand, was I going to have
17    to put my name there for lack of anything better
18    at a moment or was I going to be able to use
19    something.  I had to be able to start to plot
20    what direction I was going in, and I was very
21    specific with him when I said in my
22    conversations with the guys, we can't have
23    something that is factory brand-specific or
24    brand specific, and by that, it means factory
25    brand specific means that it is locked into one
```

1  factory, owned by a factory, or that it is a

2  brand that is specific onto somebody having it.

3  In other words, if I can't have it and control

4  it and do what I want with it, then I would wash

5  my hands of it, and, again, I did not get

6  answers from the Wongs, because they kept

7  telling me, we'll talk about it when you get to

8  Hong Kong.

9      Q.    Please advise if BETTA is useable

10  in the States as of yet is not a request to see

11  if it was okay?  If it is owned by someone?

12          MR. MORETTI:  Don't argue with the

13  witness.  You are asking the same question over

14  and over again.

15      A.    But I --

16          MR. MORETTI:  Irene...

17          THE WITNESS:  Okay.

18          MR. MORETTI:  The record speaks for

19  itself, and at this point, I think it is getting

20  a little argumentative.

21          MR. LEAVITT:  That's fine.  The

22  testimony is what it is.

23      Q.    If you look further down, the

24  paragraph that starts, William, I know that loop

25  shag will really knock the socks off the market.

```
 1    William to you, correct?
 2         A.    Well, I guess it starts off with
 3    Sarah, my answers to Sarah, and then I guess it
 4    starts with William, yes.
 5         Q.    All right.  That is the first
 6    e-mail, August 11, 2003 starting on page 2.
 7         A.    Yes.
 8         Q.    Turn to the last page of that
 9    e-mail.  See where it says re:  BETTA brand?
10         A.    Yes.
11              MR. MORETTI:  I'm sorry, what line?
12              MR. LEAVITT:  A little bit more than
13    halfway.
14              MR. MORETTI:  Got it.  Thank you.
15    Sorry.
16         Q.    It says:  "My friend in Australia
17    still have not yet out sourced out with his
18    partner.  I think there could be some problem."
19    It says:  "I am registering this brand in the US
20    and can be used very soon."  You see that?
21         A.    Yes.
22         Q.    So this was sent on August 11,
23    2003, right?
24         A.    Um-hum.
25         Q.    So as of that date, you knew that
```

1    Progress was going to be registering the BETTA

2    mark in the US?

3         A.    No, I didn't know, outside of him

4    saying that's what he was going to do.  As you

5    can see, in later e-mails, that status seems to

6    change, because there -- there isn't -- he says

7    here that it couldn't be used because he has a

8    problem with his friend in Australia at this

9    time.  I didn't find out who his friend was

10   until later.  It was Kim Gray, he's planning to

11   register it, but I was -- this is simply

12   inquiry.  I was just inquiring.  In fact, this

13   e-mail, I don't even think I inquire about

14   anything.

15        Q.    He told you he was registering it

16   in the US?

17        A.    He said he was planning, but later

18   in my conversations in Hong Kong, which took

19   place in November, he was not planning on it,

20   so.

21        Q.    Further down, my friend is going to

22   Gallery Lafeye to see if he can get a corner

23   especially for BETTA slippers.  Do you have

24   where that is?

25        A.    I have no idea.

Torres, Irene-Luisa

1/30/2008

```
 1          Q.      Progress did loan you some money,

 2    correct?

 3          A.      That is correct.

 4          Q.      What did you use that money for?

 5          A.      I used that money for various

 6    expenses in my business.

 7          Q.      Like what?

 8          A.      Just general operating, various

 9    expenses.  It didn't go to one thing, just

10    day-to-day operations, and, etc., of business.

11          Q.      Start-up cost?

12          A.      It wasn't start-up cost, it was a

13    loan, and it was for my use in my business.

14          Q.      When did they loan it to you?

15          A.      It was sent to John Lau and he sent

16    $25,000 each in January of 2004.

17          Q.      Now, in or around October 2003, you

18    were making arrangements to take a trip to Hong

19    Kong, correct?

20          A.      That's correct.

21          Q.      And where did you stay when you

22    were in Hong Kong?

23          A.      Well, originally, Flicker had

24    booked me a hotel close to their office.

25          Q.      My question is, where did you stay?
```

```
 1    Your testimony is you never asked Progress for

 2    permission to use BETTA in the US; is that

 3    right?

 4         A.    That is correct, I inquired about.

 5         Q.    If you look at Number 3.

 6              MR. MORETTI:  I just want to make

 7    sure her answer is finished, and she said she

 8    inquired about that, and I think you might have

 9    cut her off.  Were you finished?

10              THE WITNESS:  No, I wasn't.

11         A.    I inquired in various shapes and

12    forms as to what was the status of it, because I

13    was trying to get at whether it was something,

14    the name was owned by someone, it was licensed

15    by someone or if it was free, just to take and

16    use that name, because my ultimate goal was to

17    get a name and take it and use it myself and be

18    owned by me.

19         Q.    Are you finished?

20         A.    Yes, I am now.

21         Q.    Look at Number 3, four lines down

22    -- strike that.

23              "Please ask William if the BETTA

24    brand can be used in the US."  You see that?

25         A.    Yes, I see it.
```

```
 1          Q.      The reason I ask if it is, then I

 2   would ask you if you can use it for my line."

 3   Do you see that?

 4          A.      You said midway down?

 5              MR. MORETTI:  I think he said...

 6          Q.      You can read all of the Paragraph

 7   Number 3, you can read it all.

 8              MR. MORETTI:  Once you have read it,

 9   he'll ask you a question.

10          A.      Okay.  I have finished it.

11          Q.      Starting on the fourth line, there

12   is a sentence that says:  "The reason I ask is

13   if it is, then I would ask you if I can use it

14   for my line."  Do you see that?

15          A.      Yes, I do.

16          Q.      And it is still your testimony that

17   you weren't asking permission from Progress to

18   use BETTA in the US?

19          A.      I was not.  I was, again, inquiring

20   as to whether, if he owned it, would I have to

21   ask for its use, but, again, I did not want to

22   ask for that use.  I wanted it for myself.

23          Q.      Is there anywhere where you talk

24   about ownership in this Paragraph Number 3?

25          A.      You're asking me if I talked about
```

1    ownership?

2         Q.    Yes.

3         A.    No.  No.

4         Q.    Okay.  And I don't want to be

5    argumentative, but I want to be clear.  It is

6    your testimony, that your words, "I would ask

7    you if I can use it," is not asking for

8    permission; is that correct?

9         A.    That is correct.  It is an inquiry.

10   I am inquiring.

11              (Defendant's Exhibit-10 was marked

12   for identification.)

13              MR. LEAVITT:  Please do not confer

14   with the witness while --

15              MR. MORETTI:  I wasn't conferring

16   with the witness.  There was no question

17   pending.  You were thumbing through your

18   exhibits.

19              MR. LEAVITT:  I just want to make

20   sure the record was clear.  I was not thumbing

21   through my exhibit.  I handed you the next

22   exhibit.  I handed you the exhibit and you had

23   the exhibit that was going to be marked.

24              MR. MORETTI:  Excuse me.  I stand

25   corrected.  You were not going through your

1    re:   BETTA?

2         A.     Yes.

3         Q.     Now, this is from you to Lynn,

4    correct?

5         A.     That's correct.

6         Q.     So this is all your writing,

7    speaking as it were?

8         A.     Yes.

9         Q.     It says:  "Noted, it can be used in

10   the USA, but we can't use in Australia since...

11   This is great news.  We now have a license.  See

12   that?

13        A.     Yes.

14        Q.     What did that mean to you?

15        A.     Well, perhaps my use of license is

16   incorrect.  Maybe I meant brand, mark, whatever,

17   and I guess this is in following with William

18   and Lynn, in William's e-mails, where he says

19   his Australian friend is having problems, maybe

20   it can be used or maybe it couldn't be used, and

21   why don't I take Laura Ashley and go for it, and

22   I guess at this point, it is an answer to --

23   maybe I should have said, oh, that's great, I

24   have a brand now to use, but it is not meaning

25   -- maybe it is the wrong term to use, license,

```
 1    brand, but it is basically now I have something

 2    I can use.

 3         Q.    It is your testimony that this is

 4    an incorrect usage of the word license here?

 5         A.    I would say so, because it is not

 6    really a license.  I mean, it is a name or a

 7    brand, if you want to call it a brand.

 8    Basically, it is a name.

 9         Q.    Okay.  Did you ever correct that

10    mistake to William or Lynn?

11         A.    Are you saying did I go back and

12    rewrite this e-mail and say, oh, excuse me, I

13    didn't mean license.

14         Q.    I'm asking if you ever clarified

15    with William and Lynn that you didn't believe

16    you had a license?

17         A.    I think when I met with them in

18    Hong Kong in November, I do believe that it was

19    clear at that point what I was looking for, and

20    if I had not been able to take this and use this

21    name, this mark, this whatever you want to call

22    it, for my own, I would not have used it.  They

23    were what I considered friends in business,

24    because I knew them for many years.  Sometimes,

25    when you write something, you may not write it
```

Torres, Irene-Luisa                                                    1/30/2008

```
 1    correctly, you don't go back and say, I didn't
 2    do that or I didn't do this, you don't do it.
 3    You figure people understand what you mean, and
 4    I'm pretty sure, after my meeting in Hong Kong
 5    and my conversations with them, and my right to
 6    go forward on my own, I believe that was very
 7    clear to me.
 8         Q.    You testified you were friends with
 9    William and Lynn?
10         A.    Correct.
11         Q.    Would you consider your
12    relationship to be more than a business
13    relationship?
14            MR. MORETTI:  When?  At what time?
15         Q.    End of September, beginning of
16    October, 2003?
17         A.    I thought we were pretty friendly
18    and we had a strong business relationship, yes.
19    We were both friends and we also had business
20    dealings.  Business was separate from
21    friendship.
22         Q.    Okay.
23            (Defendant's Exhibit-11 was marked
24    for identification.)
25         Q.    I placed before you a document
```

**Torres, Irene-Luisa**                                             **1/30/2008**

```
 1    marked for identification as Defendant's

 2    Exhibit-11.  Do you see that document?

 3          A.     Yes, I do.

 4          Q.     This is a three-page e-mail string,

 5    correct?

 6          A.     Yes.

 7          Q.     And that, jambi face, that's your

 8    e-mail address?

 9          A.     Yes.

10          Q.     And we start on the first page,

11    October 2nd, 2003:  "Dear William and Lynn."

12    That is you writing to William and Lynn,

13    correct?

14          A.     That's correct.

15          Q.     Okay.  In the second paragraph, it

16    says:  "I'm sorry, but I need to work on the

17    BETTA packaging.  Prior to my arriving, I will

18    working with Arnell on Sunday, but I really need

19    to know the parameters of the license."  Do you

20    see that?

21          A.     Yes, I do.

22          Q.     Is that the same mistake that you

23    made in Exhibit-10?

24          A.     I would say so.

25          Q.     If you look at Number 2, under
```

```
 1     Paragraph 2:  "Do we have permission to use the
 2     font in the USA.  If not, please tell me what it
 3     is, because if I can use it indicate -- strike
 4     that -- if I can use it, wouldn't mind -- see
 5     that?
 6           A.     Yes.
 7           Q.     That font that you are referring to
 8     is the BETTA font that Progress used in China,
 9     correct?
10           A.     Yes.
11           Q.     You were asking them if you could
12     use that font, correct?
13           A.     I was, again, trying to -- this was
14     all preliminary stages.  I was trying to find
15     out what was the parameter of this BETTA, okay,
16     I referred to it as a license, I mean, it is not
17     a license, if it is not known.  It was a name, a
18     mark, that is incorrect that I called it a
19     license, but, basically, this was inquiring,
20     and, again, you can see that the direction here
21     is for me to continue forward, because I'm
22     developing a line.  I'm developing packaging.
23     It is all, again, what I'm doing for myself
24     because, again, what I was looking to do with
25     this, and, again, I'm also very clear in the
```

**Torres, Irene-Luisa**                                    **1/30/2008**

 1    e-mail that where I state in talking with both

 2    Ben and Burt.  This BETTA name can't be

 3    brand-specific or factory brand-specific, and

 4    that's very important, because in that alone, it

 5    says specifically what I have been trying to say

 6    here, that factory brand specific, meaning it

 7    can't have its onus to one factory or be owned

 8    by a factory or brand specific, meaning that it

 9    can't be owned as a brand, okay, by someone

10    else, so to speak, and I do use brand and

11    license interchangeably with name or whatever,

12    so, again, if that is incorrect, I should not

13    have used the term license, but that is an error

14    on my part for saying that.

15         Q.    Okay.  In your opinion -- strike

16    that.

17               You testified that a brand or mark

18    that was associated with one factory would have

19    a very tough time establishing itself in the US

20    market.  Is that a fair characterization of your

21    testimony?

22         A.    Can you be specific?  I don't

23    believe I testified that.

24         Q.    You were testifying that the brand

25    cannot be tied to one factory.

```
 1            A.      I'm saying, in my opinion, what I

 2    was looking for and what I wanted to go forward,

 3    I did not want a factory brand-specific or a

 4    brand-specific mark, license, logo.

 5            Q.      And you didn't want a factory

 6    specific mark because why?

 7            A.      Because if it is owned by a

 8    factory, you can only produce with one factory,

 9    then you are limited to what that factory does,

10    plus, I wasn't interested in -- I'm starting my

11    own business.  I want something I can control,

12    where I can have use of something wherever,

13    whenever, however I wanted, and I would not want

14    to be tied to a factory, a conservative brand,

15    like taking a Laura Ashley license, etc.

16            Q.      Would retailers in the US have any

17    problems in dealing with a factory specific

18    brand?

19            A.      I'm not quite sure what you mean by

20    that.

21            Q.      Strike that.  We'll get to that

22    later.

23                    If you look down at Number 6, you

24    see that paragraph?

25            A.      Yes.
```

1    Q.    See six lines up, it says:  "It is

2    the same way we did when we launched the Karen

3    Neuberger and Laura Ashley lines."  Do you see

4    that?

5    A.    Yes, I do.

6    Q.    Those brands were launched under

7    licenses, correct?

8    A.    Yes.

9    Q.    If you look at page 2, Number 7.

10    A.    Yes.

11    Q.    It says:  "Please advise if there

12    are royalties we would have to pay to BETTA or

13    Goddess."  Do you see that?

14    A.    Yes.

15    Q.    Royalties are normally paid under a

16    license arrangement; is that right?

17        MR. MORETTI:  Objection.  You can

18    answer if you know.

19    A.    Yes.

20    Q.    And at this point in time, on

21    October 2nd, 2003, you under that, you might

22    have to pay royalties to Goddess, right?

23    A.    No, I did not understand that.  I

24    was trying to find out whether this name was

25    owned by Goddess, held by Goddess or somebody

Torres, Irene-Luisa                                        1/30/2008

```
 1    else.  This was simply an inquiry.  I was trying
 2    to get to the bottom of this, to see if this was
 3    what I wanted to use for myself.
 4         Q.    You thought that was possible that
 5    there would be royalty payments?
 6              MR. MORETTI:  Objection.
 7              MR. LEAVITT:  What is the objection?
 8              MR. MORETTI:  To form.  You can
 9    answer.
10         A.    Can you repeat that, please.
11         Q.    Sure.  In Number 7 -- strike that.
12              When you were writing the e-mail,
13    is it fair to say that you believed it was a
14    distinct possibility that royalty payments would
15    have to be made based on US sales of the BETTA
16    mark?
17              MR. MORETTI:  Objection to form.  You
18    can answer.
19         A.    No.  There was nothing established
20    at this point.  I was trying to inquire.  I was
21    trying to find out whether BETTA was with
22    Goddess or it wasn't with Goddess.  It was an
23    inquiry, because if it was owned by someone,
24    then I would not be interested in using the
25    name.
```

 1     Q.    So is it your testimony that if

 2  Progress or Goddess had said to you, yes, there

 3  are royalty payments, you would not have used

 4  BETTA?

 5     A.    That's correct.

 6     Q.    Now, you were talking before about

 7  factory specific brands -- strike that.

 8          MR. MORETTI:  I'm sorry, what

 9  paragraph are you looking at?

10          MR. LEAVITT:  It is Paragraph 8 now.

11     Q.    "BETTA would be used for my entire

12  line."  Do you see that paragraph?

13     A.    That is correct.

14     Q.    "I don't see this as a problem, do

15  you?"  Why were you asking them if it would be a

16  problem?

17     A.    Well, it would be a problem if they

18  owned it, because, therefore, I would be again

19  having a license, which was not what I was

20  looking for, and I'm telling them, again, I was

21  very honest with them and open with them that

22  I'm looking, this particular name, I would be

23  looking to use for the base product of my

24  collection or what I would be selling into where

25  we call or bread and butter, which is like our

1    department store mid-tier chains, etc., so,

2    basically, that is it.  This is what I would be

3    using it for, so I'm being very honest as to my

4    set-up of where I would be using it.

5         Q.    Do you know of anywhere, e-mails,

6    letters, where in writing you asked Lynn or

7    William or Progress if you were the owner of the

8    BETTA mark in the US?

9         A.    No.

10        Q.    Looking further down, Paragraph 8,

11   starting at the end, five lines up, it says:  "I

12   know that you will not have a problem with Arda

13   making all the packaging, as I have done in the

14   past."  Do you see that?

15        A.    Yes.

16        Q.    It ends with question marks, right?

17        A.    Yes.

18        Q.    Were you making an inquiry as to

19   whether William or Lynn or anyone at Progress

20   wanted packaging done for BETTA products in the

21   US by someone other than Arda?

22        A.    No, I'm simply stating what my

23   direction would be, because, in the past, I had

24   used Arda for companies I worked for.   I

25   specialized all the packaging, so everything was

**Torres, Irene-Luisa**                                                           **1/30/2008**

```
 1          A.     It is not identical, but there are

 2    differences.  I did change the spacing where I

 3    put it, how I used it.

 4          Q.     My question is about the font.  Do

 5    you know what a font is?

 6          A.     Yes, I know.  I understand.  There

 7    was no font name on it.

 8          Q.     Did you change the font?

 9               MR. MORETTI:  At any time, did she

10    change the font?

11               MR. LEAVITT:  Did she change the

12    font.

13          A.     If you say, if you are not

14    including spacing, how it is placed, size,

15    etcetera, I guess not.

16          Q.     Okay.  Going back up to Paragraph

17    Number 1, with the parenthesis after it, when it

18    says, "I can choose my own colors."

19          A.     Yes.

20          Q.     On the fourth line down, it says:

21    "As time is an issue, I would like to put the

22    packaging together or I'll never get it in time

23    for the market.  I would show you both, and if

24    you don't like it, we can make changes."  Do you

25    see that?
```

1       A.      Yes.

2       Q.      Why were you going to show them the

3  packaging?

4       A.      Well, first of all, this is prior

5  to my arriving in Hong Kong.  I needed to move

6  forward with what I was going to do, and a lot

7  of it was contingent upon what would happen in

8  my discussions with them in Hong Kong, and if

9  the discussion should be such that there was

10 something else controlling BETTA and I couldn't

11 take it and use it for my own, whatever the

12 case, maybe I would have taken my signature name

13 and put it into the packaging and use it for my

14 generic house brand.  At this point, I had to do

15 something.  I wasn't really getting very direct

16 answers from them as far as did they own the

17 rights to BETTA?  Was it actually owned?  What

18 was the story?  So, basically, I had to do

19 something, move forward and take it from there

20 when I got to Hong Kong, and, again, this is a

21 preliminary -- there was nothing -- all you see

22 are my inquires and what was going on and how I

23 have to move forward, and nothing was decided

24 for what I was going to do and take and use

25 until I got to Hong Kong and that is one month

```
 1     later.
 2          Q.     In Paragraph Number 3, midway down.
 3          A.     Yes.
 4          Q.     It says:  "Noted that we can't put
 5     the "R" trademark or "TM" as the process is not
 6     complete in the USA.  Have you filed the
 7     paperwork yet?"  You understand that Progress
 8     was undertaking to file an application for
 9     trademark in ownership at The Us Patent and
10     Trademark Office; is that correct?
11               MR. MORETTI:  Sorry, what portion
12     were you reading from?
13               MR. LEAVITT:  Paragraph 3, on page 2
14     we were looking at Paragraph 3, have you filed
15     the paperwork yet?  Do you see that?
16          A.     Yes, I do.
17          Q.     You understand on October 3, 2003,
18     that Progress was undertaking to file an
19     application for ownership of the BETTA trademark
20     in The Us Patent and Trademark Office, right?
21          A.     He had stated that.
22          Q.     If not, please let me know, as I am
23     having Raymond to help see if it can be done
24     quicker.  Do you see that?
25          A.     Yes.
```

Torres, Irene-Luisa                                          1/30/2008

1          Q.      To your knowledge, did Raymond ever

2    take any action concerning BETTA with the US

3    Patent and Trademark office prior to 2005?

4          MR. MORETTI:   Prior to 2005.

5          A.      He did not, because William --

6    there was another issue that William said, we'll

7    discuss it when you get here.   When I got to

8    Hong Kong, that's when I found out it had not

9    been registered, and, at that point, I did say

10   to him, he had never used it, and that's when I

11   found out he had no intention to use it, because

12   to get into the US market, you had to have

13   connections.   He was too busy with the Europe

14   market.   The US market was slow, too cheap, and

15   he didn't want to be bothered.   And at that

16   time, when I found out I could take the BETTA

17   mark and go and run with it, he asked me if I

18   did certain packaging, and he liked it, could he

19   use it for his BETTA in China.   I said, sure, I

20   don't have a problem unless it shows up

21   someplace else, then I can have an issue with it

22   with my use in the States.   I said, I'm going to

23   take it and register the mark.   He said, you

24   spent a lot of money with all your cost for

25   starting the business.   I'll do the favor for

1    you and I will register it for you.  Okay.  That

2    is why I felt that the mark was mine and I was

3    moving forward with it.

4        Q.    Prior to the Neet Feet controversy,

5    did you ask -- strike that.

6                (A brief recess was taken.)

7        Q.    I just want to clean up a couple of

8    things.  You testified that William Wong had no

9    contacts in the US and that he needed someone to

10   establish BETTA in the US.  Is that a fair

11   characterization of your testimony?

12               MR. MORETTI:  Objection, but you can

13   answer it.

14       A.    My testimony here?

15       Q.    Yeah.

16       A.    I don't recall testifying that he

17   had no contacts here.

18       Q.    All right.  Let me ask the

19   question, if Progress wanted to sell directly to

20   retailers in the US, would that be easy to do?

21               MR. MORETTI:  What time period?

22               MR. LEAVITT:  2003.

23       A.    No, it would not have been, not as

24   a manufacturer.

25       Q.    Why not?

Torres, Irene-Luisa                                    1/30/2008

1    received a cease and desist letter from Neet

2    Feet?

3         A.    Correct.

4         Q.    They were asserting that they had

5    the -- strike that.

6               They asserted that they owned the

7    trademark rights to BETTA in the US?

8         A.    Yes, outside of Australia,

9    including the US.

10        Q.    The first page here is an e-mail

11   from you to Lynn and William.

12        A.    Correct.

13        Q.    In this e-mail, you are informing

14   them about the cease and desist letter and Neet

15   Feet's contentions, correct?

16        A.    Roughly, yes.

17        Q.    And there are some attachments to

18   this, correct?

19        A.    Yes.

20        Q.    Now, if you look at the last page,

21   that is a record from The United States Patent

22   and Trademark Office, correct?

23        A.    Yes.

24        Q.    And that is a record that you

25   personally found in or around March 2006?

Torres, Irene-Luisa                                    1/30/2008

```
 1          A.      Yes.

 2          Q.      Now --

 3          A.      Well, I can't say -- excuse me --

 4    may I say something?

 5          Q.      Sure.

 6          A.      I don't know if this was me finding

 7    this or if the attorney I worked with at

 8    Christensen, when he went to look, he pulled

 9    that up.  I can't really recall.  I do see some

10    strange marks as to where it came from.

11          Q.      If you look at the first page of

12    your e-mail, page 1, see the paragraph that

13    begins "they bought"?

14          A.      Okay.  Um-hum.

15          Q.      Now, look at the last sentence of

16    that paragraph.  It says:  "We have found yours,

17    which I am attaching a copy of."  Do you see

18    that?

19          A.      Okay.  Fine.  That was the one I

20    looked at.

21          Q.      That refreshes your recollection

22    that that is what you attached?

23          A.      Yeah.

24          Q.      Still on that paragraph, the third

25    line down, it says:  "I am not sure if William
```

Torres, Irene-Luisa

1/30/2008

```
 1    will remember, but when we first started this
 2    endeavor, we had a search done and never found
 3    BETTA registered by any Australian company
 4    here."  Do you see that?
 5         A.    Yes.
 6         Q.    Who did that search?
 7         A.    I believe it might have been
 8    Raymond.
 9         Q.    I'm sorry, where were you reading
10    from?
11         A.    Second paragraph, starting third
12    line, I'm not sure.
13         Q.    Now, you testified earlier that you
14    were shocked when you found out that Progress
15    Vantage was registering the BETTA mark in its
16    own name.  Do you recall that testimony?
17         A.    Yes, I did.
18         Q.    Can you explain to me -- strike
19    that.
20               Is there anywhere in this e-mail
21    where you express that shock?
22         A.    Well, I don't express that shock,
23    because at this point, it just shows who
24    actually filed the application.  There is
25    nowhere in this particular page that shows --
```

1    explains that the mark was filed for someone

2    else, and that was later on, you know, this was

3    like a first page.  I didn't know where to look

4    for that, and that was brought out to me by the

5    attorney, and when he checked it fully, this has

6    not been done for anyone, especially me.  The

7    mark was supposed to have been registered for

8    me.

9         Q.    If you look at that last page, you

10   see there is a circled item that says owner?

11        A.    Yes.

12        Q.    That says Progress Vantage,

13   Limited, right?

14        A.    That is correct.

15        Q.    You saw this.  You knew that

16   Progress was registering as the owner of the

17   mark.

18        A.    I just knew they were registering

19   it.

20        Q.    So when you look, if you recall

21   when you looked at that word, owner?

22        A.    Well, my understanding is that

23   there is another place, and when you file for

24   registration, that expresses that even though

25   someone files for the initial registration or

1   owns it, puts themselves in an as the owner,

2   there is a place where they say they where

3   actually registering on behalf of someone.  That

4   is a separate issue, and I didn't know where to

5   locate that, and, like I said, it wasn't on this

6   page.  I didn't think it was anything out of the

7   ordinary.

8        Q.     I understand about this, now being

9   able to register for someone else.  Did you know

10  that in March 2006?

11       A.     Yes, I did.  He said he was

12  registering for me, and that goes back to

13  November of 2004, 2003, when we spoke.

14       Q.     I'm talking about the space on the

15  application that says, you are registering for

16  someone else.

17            MR. MORETTI:  What about it?

18            MR. LEAVITT:  Of that in 2006.

19            MR. MORETTI:  Of what?

20       Q.     This space on the application that

21  says you are registering for someone else.

22       A.     At this particular point, when this

23  e-mail came there?

24       Q.     Yes.

25       A.     No.

1    Q.    So you didn't know that there was a

2    space where you can say, I am applying for

3    someone else?

4    A.    I didn't know that you could put

5    that, someone -- where it went -- I did not have

6    any clue as to where it went.  I would not have

7    thought anything out of the ordinary anywhere on

8    this.

9    Q.    Going back to the e-mail, that last

10   sentence of the second paragraph.  Is there any

11   reason you used the word "yours," as opposed to

12   ours?

13        MR. MORETTI:  What are you referring

14   to?

15        MR. LEAVITT:  This last sentence.  We

16   have found yours, which I have a copy of that,

17   that refers to the registration at the trademark

18   office.

19   A.    Well, I would -- I would mean it as

20   I found yours, because he was the person who

21   registered it.  The end call of that was that he

22   registered it for me, that was just the term,

23   that was the one I found with your name on it.

24   Q.    If you look at the next paragraph,

25   the second sentence.  "I have a call in to my

1    1927, which was -- had to do with his company, I

2    guess, which didn't belong the Neet Feet anyway,

3    and he said it didn't matter whether I used it

4    or I didn't use it.

5         Q.    You say he explained to you guys.

6    "He" refers to Kim and Progress?

7         A.    That was BETTA in China.

8         Q.    The only thing he explained to you

9    was about China?

10        A.    Correct.  He vaguely said what they

11   did in China, which I don't really totally know

12   100%.  He looked at the chips and said the

13   packaging is very pretty.  We had a discussion,

14   and I asked what's BETTA, and he said it was his

15   grandmother's name or something to that effect.

16        Q.    Now, you didn't ask anywhere in

17   this e-mail if Milagros' name appeared in the

18   trademark application, right?

19        A.    No.

20        Q.    You didn't ask why Progress

21   Vantage's name was listed as the owner, right?

22        A.    No, I did not.  My prime objective

23   after being hit with this was to try to get to

24   the bottom of what was happening and resolve it,

25   because this was sent to the president of

1    Macy's, and being a first time vendor with them,

2    I could suffer ramifications based on that I was

3    selling fraudulent goods.  That was my prime,

4    real concern, was to really head that off and

5    solve my problem.

6            Q.    You didn't, anywhere in this

7    e-mail, say that Milagros owns the mark, right?

8            A.    No.

9            Q.    If you look further down, there is

10   an e-mail from Lynn.  She says:  "Enclosed with

11   our law firm agent in the USA."  That was

12   Christensen, O'Connor, Johnson, and Kindness,

13   correct?

14                MR. MORETTI:  This is on the first

15   page.

16                MR. LEAVITT:  It is.

17                MR. MORETTI:  What are you referring

18   to?

19                MR. LEAVITT:  Two-thirds of the way

20   down, there is, under thanks and regards, Irene,

21   there is a heading, Lynn Wong says:  "Hi, Irene,

22   enclosed with our law firm agent in USA."  I'm

23   sorry.  Strike that.

24                (Defendant's Exhibit-28 was marked

25   for identification.)

**Torres, Irene-Luisa**    1/30/2008

```
 1          Q.     I placed before you a document

 2    marked for identification as Defendant's

 3    Exhibit-28.  Do you see that document?

 4          A.     Yes.

 5          Q.     Did you have a chance to review it?

 6          A.     Yes.

 7          Q.     This is an e-mail string, the last

 8    e-mail on the third page was from you to Lynn

 9    Wong and William Wong, correct?

10          A.     The last page?

11          Q.     The last e-mail, I'm sorry, on the

12    first page.

13          A.     Okay.  Yes.

14          Q.     In Numbered Paragraph 1, there is a

15    reference to Faye Tomlinson.  Do you see that?

16          A.     Yes.

17          Q.     That was an attorney at -- strike

18    that.

19                 You testified earlier that there

20    were -- that there was a different lawyer at

21    Christensen O'Connor that you used.

22          A.     Correct.

23          Q.     That it was not the same person who

24    was registering the mark, correct?

25          A.     That is correct.
```

1          Q.     You never had any agreement with

2     Kim, right?

3          A.     I didn't know Kim.

4          Q.     So the only agreement that you had

5     concerning the use of the BETTA mark was with

6     Progress?

7          A.     I didn't have an agreement with

8     Progress.

9          Q.     You had no agreement with Progress?

10         A.     No, I did not.

11         Q.     Okay.  It was your testimony that

12    in November, you went to Hong Kong and you had a

13    conversation with William concerning the use of

14    BETTA.

15         A.     Concerning what was the -- where

16    did it stand in its evolvement or did it belong

17    to somebody or not belong?

18         Q.     It is your testimony that that

19    conversation involved him saying he was going to

20    register it for you in the US, correct?

21         A.     As part of our conversation, yes.

22         Q.     But that is not an agreement of any

23    kind?

24         A.     No, I don't think so, because he's

25    not doing it for himself, and I'm not -- I'm

```
 1    thankful that he would help me, but we were

 2    friends.

 3         Q.     You had never heard of BETTA as a

 4    brand before you heard about it from Progress?

 5         A.     As a brand?  It wasn't -- it was an

 6    establish brand.  The name I heard from them,

 7    the name of it, the name BETTA.

 8         Q.     You learned of the name BETTA from

 9    Progress, right?

10         A.     Yes.

11         Q.     They were using BETTA in China,

12    correct?

13         A.     Yes, they had told me they were

14    trying to drum up domestic business in China and

15    they were using the BETTA name.

16         Q.     And they told you they were trying

17    to drum up business in Europe as well?

18         A.     Not under BETTA.

19         Q.     Not under BETTA?

20         A.     They were, again, manufacturing.

21    They were to go out to people who had brands to

22    manufacture, and the same way I met him, he

23    produced my goods.  He was doing the same for

24    various people in the European market.

25         Q.     So is it your testimony that
```

```
 1    Progress just said, go ahead, use BETTA?
 2                MR. MORETTI:  Objection to the
 3    characterization or form.
 4                MR. LEAVITT:  I asked a question.
 5                MR. MORETTI:  Is it her testimony
 6    that Progress just said, go ahead and use BETTA.
 7         Q.      Is it your testimony that Progress
 8    just gave you -- strike that.
 9                I'll stick with the question.  Is
10    it your testimony that Progress just said, go
11    ahead, Irene, use BETTA in the US?
12                MR. MORETTI:  Object to the form.
13    You can answer.
14         A.      Read that question back for me.
15                (The question was read back by the
16    court reporter.)
17         A.      That's really not how it came
18    about, in all honesty.  There was, throughout my
19    trying to find out what was the situation with
20    BETTA, I never got a straight answer.  When I
21    went to Hong Kong, I found out the mark wasn't
22    registered.  It was my understanding the Wongs
23    were not going to use it in the US because they
24    had no means in the US to use it.  I found out
25    there was no registration.  Kim Gray had no
```

Torres, Irene-Luisa                                              1/30/2008

```
 1    registration, according to them, or nobody had

 2    it, and that I could go ahead and use the name,

 3    and I went ahead and used the name.

 4         Q.     So did William say to you, I'm not

 5    going to use BETTA in The United States?

 6              MR. MORETTI:  Objection to form.  You

 7    can answer.

 8         A.     That really wasn't part of the

 9    conversation.

10         Q.     Did William say to you, Progress

11    Vantage is never going to use BETTA in the

12    United States?

13         A.     That was not part of the many

14    conversations.

15         Q.     So did he say it or did he not say

16    it?

17         A.     The issue was, was BETTA was

18    available for use in the US, and that it was not

19    tied to anybody, nor would it have been tied to

20    anybody, and to that answer -- the answer was

21    no.  Nobody has it.  I'm not really going to do

22    much with it, so whatever, and that was

23    basically it, and that was what I felt was my

24    ability to go ahead and run with it for my own,

25    and I would never have asked -- I told him point
```

1    blank, I was going to register it now that I

2    knew I could go ahead, because it met my

3    criteria, and that's when he said, you know

4    what, you spent a whole lot of money on setting

5    up your own business, I will register it for you

6    to help you out, and, at that time, I didn't

7    think anything wrong for a friend to do that for

8    a friend, and I accepted that.  I didn't

9    question it.  I accepted it.  I came back later

10   on, and when I found out it had not been

11   registered, I did ask him.  I was back for

12   development during the summer, and I did ask

13   him, you know, what was the story, and he

14   claimed, well, I'm registering, trying to

15   register in China.  I never knew really whether

16   it was registered or not.  I can't attest to

17   having seen any documents.  In China, everybody

18   does everything, and it is not worth whatever,

19   and so I haven't decided what I'm going to do if

20   it is profitable or whatever.  I said, listen, I

21   can't play around, I have been shipping goods

22   with my mark for the last, I don't know at that

23   time, it was April, May, June, July, maybe four

24   or five months, and I said, I can't run the risk

25   of having any problem, so I will go ahead and

1    proceed to register, and he said, no, no, no,

2    I'll do it for you.  When I returned to the

3    States, sometime later that summer, he rang me

4    up, and he said, I'm going to register.  He

5    wanted to know what I was going to have on it,

6    and he took down the list, and I assumed -- I

7    trusted him -- I assumed that he was going to go

8    ahead and go forward with what he was going to

9    do for me.

10         Q.     You have described a series of

11   conversations over the summer of 2004, correct?

12         A.     A few conversations.

13         Q.     Do you have any documentation,

14   e-mails, letters, diary entries of any of these

15   conversations?

16         A.     No.

17         Q.     Did you ever send -- strike that.

18              You testified that William asked

19   you what kind of -- what you wanted on the

20   application?

21         A.     No.  He didn't ask me what I wanted

22   on the application.  He asked me what kind of

23   products did I want to have listed on the

24   application.

25         Q.     Did he ask you for pictures of

1    recounted conversations between you and

2    attorneys at Christensen O'Connor.  Is that not

3    consultation in your mind?

4         A.    Someone can give me their opinion

5    or what they think I should do.  When a letter

6    needs to be rebutted and it is written, it is

7    written.  I don't understand how you are saying

8    did I confer on this.  I didn't confer.  I gave

9    them the information they requested to draw up a

10   letter, and that's what they did.

11              (A brief recess was taken.)

12        Q.    Looking at the second paragraph of

13   Exhibit-33.  See where it says:  "Milagros'

14   continuous and exclusive use of the name and

15   mark BETTA also enjoys express authorization

16   from the past acting principal of the BETTA Shoe

17   Company, established in Australia in 1927,

18   Mr. Kim Gray."  You see that?

19        A.    I see that.

20        Q.    Did you ever have express

21   authorization from Kim Gray in The United

22   States?

23        A.    I didn't know Kim Gray, so the

24   answer would be no, and when this letter was

25   sent, my conversation after the fact was, you

1    know, this is not necessarily true, because I

2    didn't -- I don't know Kim Gray and you have a

3    position of -- in your position, the letter that

4    Kim Gray wrote before Goddess and the response

5    that I was given by Mr. Walters was okay.  I

6    realize that now, but the point is that the

7    issue here is not that Mr. Gray could give

8    authorization in the US, because Mr. Gray really

9    had no authorization in the US to give, and we

10   let it go at that.  I mean...

11             MR. MORETTI:  I want to caution the

12   witness about disclosing discussions with

13   counsel.  Those are privileged, and you do not

14   have to disclose those, and I only do it because

15   she just discussed a discussion she had with her

16   counsel, so I don't think I'm doing anything

17   improper here.  You can ask the question, but

18   I'm giving her the instruction.

19        A.    Well, I would like to take that

20   back.

21             MR. MORETTI:  That has been already

22   discussed, but going forward, you are not to

23   disclose discussions with your lawyer.

24        Q.    I would like to ask if any of those

25   conversations you had with Mr. Walters were in

Torres, Irene-Luisa

1/30/2008

1    Q.    Can you go to the last sentence of

2    that paragraph, please.

3    A.    Yes, I see the sentence.

4    Q.    "The claims made by Milagros to a

5    connection to the BETTA of Australia are

6    absolutely true as Mr. Gray can confirm."  There

7    are no connections between Milagros and the

8    BETTA of Australia, right?

9    A.    That's correct.

10    Q.    Now, we've gone through some

11    correspondence between you and William and you

12    and Lynn about the Neet Feet controversy, right?

13    A.    Yes.

14    Q.    And they gathered some documents

15    from Mr. Kim Gray to try to resolve the Neet

16    Feet controversy.

17    A.    They supplied information on.

18    Q.    They --

19    A.    -- they supplied background

20    information regarding what the relationship of

21    Neet Feet was to BETTA.

22    Q.    They supplied the 1997 Mr. Kim Gray

23    letter, right?

24    A.    I don't know whether they supplied

25    it or Kim Gray supplied it.  It was supplied.

```
 1    what you were doing.  Is that what your
 2    testimony is?
 3         A.    I simply made a statement that I
 4    was trying, in a nice way, to more or less say,
 5    don't tell me how to run my business.  I know
 6    how to run my business basically.  That's what I
 7    was saying, in a nice way, that is just a
 8    statement I made, like I said, that was my nice
 9    way of putting it to them.
10         Q.    Now, if you go down on page 2:
11    "Dear Irene..."  That's from Lynn?
12         A.    Um-hum.
13         Q.    You see that?
14         A.    Um-hum.
15         Q.    "By the way, we don't want to use
16    BETTA for discounter, you can work on other
17    alternatives."  Do you see that?
18         A.    Yes, I do.
19         Q.    You understood that Lynn was
20    requesting that a certain -- strike that.
21               What is a discounter?
22         A.    Lower priced store.
23         Q.    And you understand Lynn was saying
24    that Progress didn't want to use BETTA for the
25    lower priced stores?
```

```
 1        A.    No.   I don't understand any such

 2   thing.   I had had a conversation -- this goes

 3   back to a conversation I had with William when

 4   he was in the States, and his question to me was

 5   if BETTA is your brand, why would you want to

 6   put it on somebody who is a mass merchant

 7   discounter, and I explained to him that anybody

 8   who has a brand, more or less, takes and does

 9   that in various tiers, and if you want to do

10   volume business, huge containers of a few

11   styles, few colors, then we would have a lower

12   tier, which is what I created, a better BETTA

13   basic brands that I used for the Ross goods, a

14   Ross order, that we were dancing with Ross for.

15        Q.    And Progress told you they didn't

16   want BETTA to be in the discounter program?

17        A.    I don't see it as that.  As I have

18   already stated, when William came, he asked me,

19   well, BETTA is your BETTA brand, I'm selling it

20   to Macy's, being a friend, he gave me advice,

21   whether I asked for or it or not, as I would

22   give him advice or he would ask my for advice,

23   and that's what friends do.  He says, but why do

24   you want to take BETTA if you are selling it to

25   Macy's and put it on Ross, and I explained to
```

```
 1    him, again, as I repeat, that people have tiers

 2    of their brands, and, therefore, I would make a

 3    lower tier for my brand that would be used for

 4    the Rosses of the world.

 5         Q.    I understand the substance of your

 6    conversations with William.

 7         A.    Yes.

 8         Q.    In this e-mail, the sentence we are

 9    talking about, Progress is telling you that they

10    do not want BETTA used in the discounter

11    program?

12         A.    Right.  It is of no relevance to

13    me.  They don't control my brand.  It means

14    nothing to me.  And I did ship Ross under BETTA

15    Basics.

16         Q.    And, now, this e-mail here, on the

17    first page is your response, correct?

18         A.    No.  This is not a response.  It is

19    actually an order proposal for what they were

20    interested in.

21         Q.    I'm sorry.  Looking at the first

22    page.

23         A.    At the top of the page?

24         Q.    Yes.

25         A.    Yes, that's exactly what this is.
```

Torres, Irene-Luisa                                                    1/30/2008

```
 1    We have the bills that show no work after May

 2    2nd.  I'm wondering if that refreshes your

 3    recollection as to when you gave them the

 4    description to do the further investigation.

 5         A.     Within my conversations with my

 6    attorney that I believe are privileged.

 7              MR. LEAVITT:  I'm just asking a date.

 8              MR. MORETTI:  He's just asking if

 9    these documents refresh your recollection as to

10    any other discussions you may have had with your

11    lawyers.

12         A.     No.  Uh-uh.  They don't.

13         Q.     Prior to November -- strike that.

14                Prior to December 2006 --

15         A.     December 2006.  Okay.

16         Q.     -- did you ever make an oral

17    statement or a written statement to Progress

18    Vantage, William Wong, or Lynn Wong to the

19    effect that Milagros was the legal owner of the

20    BETTA mark in The United States?

21              MR. MORETTI:  Verbal, oral or in

22    writing?

23              MR. LEAVITT:  Yes.

24              MR. MORETTI:  I'll object to the

25    form, but you answer it if you understand it.
```

Torres, Irene-Luisa                                          1/30/2008

```
 1          A.     No.
 2                 MR. MORETTI:   Your answer is no?
 3                 THE WITNESS:   Yes.   What was the
 4     question again?
 5                 (The previous question was read back
 6     by the court reporter.)
 7          A.     Actually, I will retract that now.
 8     December 26 -- that is after William sent an
 9     e-mail to me saying that I couldn't use the mark
10     any longer, and I had already spoke to counsel
11     on whatever, I'm not talking about whatever was
12     privileged.   I did have one conversation with
13     William in which I asked him what was going on,
14     because I'm the one that established the mark.
15     I'm the one that has been using it, and under my
16     understanding, I had the rights to the mark, so
17     that would be probably after, sometime in
18     November, I can't remember the exact date.
19                 MR. MORETTI:   Of what year?
20                 THE WITNESS:   Of 2006.
21          Q.     And that was after you received an
22     e-mail from William telling you that he didn't
23     want you to use the BETTA mark anymore, right?
24          A.     That's correct.
25          Q.     Prior to December 26, 2006, no
```

1    written, no oral statements?

2        A.    Nothing with regards to --

3        Q.    With regards to?

4            MR. MORETTI:  I just -- all I want

5    you to do is -- the question sort of ended as if

6    they never had a discussion, and I'd really

7    appreciate -- I know it is late.  Let the record

8    reflect, we have been here a long time, I just

9    want to make sure the record is still clear.

10           MR. LEAVITT:  I appreciate that.  I

11   apologize for the allusion, which usually is a

12   spot to take out letters as opposed to whole

13   phrases.

14       Q.    Prior to December 26 of 2006, it is

15   your testimony that you never made any

16   statement, oral or written, to William Wong,

17   Lynn Wong or anyone at Progress to the effect

18   that Milagros was the legal owner of the BETTA

19   trademark in The United States?

20       A.    I felt that it was -- I had no

21   reason to discuss it.  I felt that I owned the

22   mark and I could do what I wanted with it.

23       Q.    I'm going to repeat the question

24   until I get an answer to it.

25               (The question was read back by the

1    court reporter.)

2        Q.    I understand you didn't -- you're

3    testifying you didn't think you had a reason to

4    make such a statement, but the fact is, you

5    didn't make such a statement, right?

6            MR. MORETTI:  During the time period

7    that you...

8            MR. LEAVITT:  Related to the question

9    that I just asked.

10        A.    During 2006?

11        Q.    And any --

12        A.    During the whole entire time of --

13    I'm sorry.

14            MR. MORETTI:  Listen to his question.

15        Q.    You testified that on December 26,

16    2006, you made a statement to William to the

17    effect that Milagros was the legal owner of the

18    trademark, BETTA, in The United States?

19        A.    I said that -- I didn't say

20    December -- I said sometime after the receipt of

21    his e-mail in November.  Anyway, after I did

22    have conversations with him in which I did say I

23    had the rights to it.

24        Q.    After you received the e-mail from

25    him?

Torres, Irene-Luisa                                          1/30/2008

```
 1          A.      Correct.

 2          Q.      Prior to receiving the e-mail from

 3    William?

 4          A.      Yes.

 5          Q.      You did not make any such

 6    statements to William, Lynn or Progress Vantage?

 7          A.      I don't believe I did, but I don't

 8    feel that it was necessary to do so.

 9          Q.      Okay.

10                  (Defendant's Exhibit-42 was marked

11    for identification.)

12          Q.      I place before you what has been

13    identified as Defendant's Exhibit-42.  Do you

14    have that document in front of you?

15          A.      Yes.

16          Q.      Do you know -- can you tell me what

17    that series of documents is?

18          A.      I really have no idea.  I have no

19    idea.  Never saw it before.

20          Q.      When Progress would send samples to

21    you, to Milagros --

22          A.      Um-hum.

23          Q.      -- how were those sent?

24          A.      Sometimes via my consolidator or

25    sometimes via Fed-Ex, UPS, whichever way they
```