Steven G. Storch (SS 5241)
Benjamin L. Felcher Leavitt (BL 7363)
STORCH AMINI & MUNVES, P.C.
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
(212) 490-4100
Attorneys for Defendant
Progress Vantage Limited

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

MILAGROS IMPORTS LIMITED, a New York  :    **07 Civ. 03215 (SHS) (HBP)**
corporation                          :    **ECF Case**
                    Plaintiff,       :
                                     :
                                     :
        - against -                  :    **DECLARATION OF WAI**
                                     :    **WILLIAM WONG IN**
                                     :    **OPPOSITION TO MILAGROS**
PROGRESS VANTAGE LIMITED, a Foreign  :    **IMPORTS LIMITED'S MOTION**
corporation                          :    **FOR SUMMARY JUDGMENT**
                    Defendant.       :
                                     :
-------------------------------------------------------------x

Wai "William" Wong hereby declares the truth of the following under penalty of perjury,

pursuant to 28 U.S.C. §1746:

1.      My name is William Wong and I, along with my wife Lynn, am the owner of

Progress Vantage Limited ("Progress Vantage").

2.      Progress Vantage is a Hong Kong corporation with its principal place of business

in Kwai Chung, New Territories, Hong Kong.

3.      Since approximately 1994, Progress Vantage, by itself and through affiliated

companies including Goddess Footwear ("Goddess"), has manufactured a variety of footwear for

distribution in the international market.[1]  For example, Progress Vantage supplies such high end

retailers as Mark & Spencer, Clarks, Benetton and Zara in the United Kingdom and Europe.

4.     One of Progress Vantage's customers was an Australian company called Slippers

Unlimited which sold indoor slippers under the trademark Betta.

5.     Slippers Unlimited was owned by Kim Gray and had been owned by Mr. Gray's

family since the late 1920s.

6.     Slippers Unlimited sold indoor slippers under the trademark Betta in Australia

and New Zealand continuously since the company was founded, initially as simply "Betta," in

1927.

7.     In or around November 1997, Progress Vantage was seeking to expand its

business to include its own label and decided that, given its manufacturing capabilities and

experience, indoor slippers would provide the best product with which to initiate this business.

8.     The Betta slipper line had an established history which can be an important

selling point for branded slippers. Customers look favorably on an established brand and are

more likely to purchase a slipper that is associated with such a brand than they would a slipper

that is brand new to the market.

9.     My wife and I became friendly with Mr. Gray through our years of business and I

approached him in Australia to inquire about the possible use of the Betta mark worldwide

(except Australia and New Zealand), including the United States.

10.     Mr. Gray told me that he was in full support of Progress Vantage's plan to launch

Betta worldwide and, even though I did not ask him to, he wrote us a letter authorizing us to use

the Betta brand.

---

[1] Progress Vantage was originally called "Goddess Footwear."  However, in or around 2001, a feng shui advisor told us that we should change the name of our company.  Accordingly, we renamed the company Progress Vantage.  We retained Goddess, however, as a trading division of Progress Vantage.

11.    In the letter he stated that he was "in agreeance [sic] and give my full support to Goddess for the use of the BETTA label in your production for China, and indeed, future expansion to the USA and European markets." A copy of the letter is attached hereto as Exhibit 1.

12.    While our business did not allow us to immediately begin launching Betta around the world, in or around 2001 or 2002, Progress Vantage registered the Betta trademark in Hong Kong. A copy of the Hong Kong Registration is attached hereto as Exhibit 2.

13.    At the same time, I had an associate of mine register the Betta trademark in China (as I was not a citizen of China, I was advised by my lawyers that I could not be the registered holder of the trademark in China).

14.    Since that time, Progress Vantage has been the sole manufacturer and distributor of indoor slippers bearing the Betta trademark in Hong Kong and China.

15.    At around the same time we began manufacturing and distributing slippers bearing the Betta trademark in China, Progress Vantage also shipped slippers bearing the Betta mark to Europe, Dubai and Lebanon. While we did not register Betta in those markets, I am not aware of any company or individual who manufactured, distributed or sold any products bearing the Betta mark in those markets.

**Our Relationship with Irene Torres.**

16.    Prior to starting my own company, I worked for another slipper manufacturer in China called Splendid.

17.    Splendid manufactured slippers and had many customers in the United States. For the most part, Splendid shipped slippers to the United States through importers and wholesalers located in the United States.

3

18.     My responsibilities at Splendid were to arrange for orders to be produced in factories in China.  In that capacity, I did not interact with the American purchasers, but I did come to know some of their names as I saw them on various orders that I had to fill at the factories.

19.     While I was at Splendid, I became aware that a woman named Irene Torres ("Torres") was a purchaser for Wiesner Products, Inc. ("Wiesner").

20.     While I did not meet Torres or interact with her while I was working at Splendid (I was in charge of the factories and had little to no contact with Wiesner), I was aware that she was a buyer for Weisner.

21.     In 1994, when I started Goddess, Wiesner contacted us about manufacturing footwear for them.

22.     Accordingly, Goddess became a supplier to Wiesner.  It was as a supplier to Wiesner that I came to know Torres.

23.     While I am unsure about the exact date, I believe that Torres left Wiesner in or around 1999 and started working for another company called Ben Berger.

24.     From approximately 2000 until 2003, Progress Vantage supplied slippers and other footwear to Ben Berger.  During the majority of that time, the person Progress Vantage dealt with was Torres.

25.     Over the years, Torres and I (as well as my wife Lynn) became friends.

26.     Over the years, I also came to see Torres as very a very experienced person in the United States slipper and footwear business.  She seemed to have a great number of contacts in the business and she seemed very talented at satisfying customers and building customer accounts for Ben Berger.

**The Start of Milagros**

27.     In or around mid-2003, I was approached by Torres, who told me that she was unhappy at her job and proposed that she and Progress Vantage go into business together.

28.     At that point, Progress Vantage had not yet manufactured slippers for distribution in the U.S. under the Betta mark and I concluded that helping Torres establish a business that would be the exclusive distributor of our Betta slippers would be a good way to establish the Betta mark in the United States.

29.     I was proud of Progress Vantage's Betta slippers and I knew that they could be successful in the United States, but I needed someone who had Torres's contacts and market experience to help establish the Betta brand.

30.     In 2003, Progress Vantage had approximately $1 million of sales in the United States and I was not as interested in selling Betta slippers as just another account.

31.     Rather, I wanted to establish my own brand in the United States in order to increase my profits by eventually engaging in direct sales to retailers.

32.     In order to achieve this goal, I wanted Torres's experience and skill in landing clients so that we would establish a wide distribution of Betta and the mark would become well known and in high demand.

33.     Having become friends with Torres and having seen her skills in action at Ben Berger, I believed that she had the skills and contacts I needed in a sales agent who could locate and keep customers for Betta products.

34.     At first, Torres wanted me to a be a full partner in the business.  As I was unfamiliar with business law and practice in the United States, I did not want to take on this added responsibility.

5

35.     I also did not think that I would have much to add to this phase of the business. I wanted Torres to act as the distributor for Betta because of her contacts, skill and knowledge. I needed Torres to handle the distribution for Betta on our behalf because I did not have those contacts, skills or that knowledge.

36.     As Torres was also a friend, I believed I could rely on her to market Betta o nour behalf, identify and land buyers for Betta and facilitate our long term plans for the United States market (the same plans I discussed with Mr. Gray in 1997). Exhibit 1.

37.     The conversations with Torres concerning this new business venture – with Progress Vantage as the owner of the Betta mark and Torres acting as the distributor – began in the spring of 2003. At all times, I was very clear with Torres that Progress Vantage would be the owner of the Betta mark.

38.     I am certain that Torres was aware of this component of our business relationship as she acknowledged that she was getting a license from us and was aware, from the very first day, that Progress Vantage was going to be registering the Betta mark in the United States Patent and Trademark Office.

39.     Until the disagreement underlying this lawsuit arose, in early 2007, Torres never once indicated to me that she believed she owned the rights to the trademark Betta.

**Our Correspondence Concerning Milagros and the Betta Mark.**

40.     The first written discussion I am aware of between Torres and me about the possibility of her starting her own company occurred on April 8, 2003.

41.     Torres emailed me and told me that she knew she would not be at her present job for very long. A copy of the email is attached hereto as Exhibit 3 at 01887. She went on to state that "the only way I will be able to succeed at what I plan to do is that [sic] you guys support

6

me." Id. at 01888. I understood her to be asking that, once she established her business, that I cease selling Progress Vantage products to Ben Berger and her other soon to be competitors.

42.     Our conversations continued sporadically until the summer of 2003. During this time, Torres knew that we manufactured and distributed Betta slippers in China and knew that we did so as the owners of the Betta brand.

43.     During these early conversations, I told Torres that Progress Vantage wanted to use the Betta mark in the United States, but that we did not think Progress Vantage could launch Betta on its own because we did not have the customer contacts that she had and also because American department stores were often reluctant to deal directly with Chinese factory owners.

44.     During this time, we discussed the possibility of Torres' new business distributing slippers bearing the Betta mark on behalf of Progress Vantage which would be established with our financial support.

45.     At no time did I ever tell Torres that Progress Vantage was not interested in owning the Betta brand in the United States.

46.     I also never said to her that I was willing to sell, give away or forgo our chance to use the Betta mark in the United States. At all times I told Torres that Progress Vantage wanted to be the owner of the Betta mark in the United States and that we had the full intention to officially register the mark there.

47.     Torres left Ben Berger in around August 2003. On August 10, 2003, she emailed me about her soon to be company, Milagros. The email made me feel very confident that she understood the terms of our proposed business agreement.

48.     In the email, she asked me to "please advise if 'Betta' is useable in the States as of yet." A copy of the email is attached hereto as Exhibit 4 at 01488. It was clear to me that she

7

believed I would be responsible for taking steps to ensure that Betta was "useable" and protected in the United States.

49.    On August 11, 2003, I confirmed this understanding in writing, telling Torres that "I am registering this brand in the US, and [it] can be used very soon." A copy of the email is attached hereto as Exhibit 5 at 01476.

50.    Torres never asked me to put the Betta trademark in her name or in the name of Milagros. She did not ask me this because it was in direct contradiction to the terms of our proposed agreement and everything we discussed.

51.    During August and September, we continued to discuss the establishment of Torres's new business that would distribute our Betta goods. It was during this time that the terms of the agreement between Torres and Progress Vantage took shape.

52.    During the initial conversations, Torres also told me that she would need money to start the distribution business. I agreed to provide her with start-up capital and to arrange for another factory owner, John Lau, to loan her money to start the business. By late September, we had agreed that Progress Vantage would supply Torres's business with a loan and ensure that Mr. Lau would also loan her money.

53.    During this same time period, Torres also made clear that she would not be able to pay Progress Vantage for initial orders until she receive payment from her customers. Progress Vantage's normal supply terms required payment within 30 days of delivery.

54.    In order to facilitate our agreement with Torres and to help establish Betta in the United States, Progress agreed to extend much longer payment terms to Torres, essentially extending her credit, so that she could have Betta goods to distribute.

55.     Email exchanges that occurred at the end of September and the beginning of October 2003 confirmed my understanding that Torres was absolutely clear on the trademark ownership aspect of our agreement.

56.     On September 28, 2003, she emailed my wife Lynn and, after discussing developments in the industry, asked if "the 'Betta' brand can be used in the USA." A copy of the email is attached hereto as Exhibit 6. She continued, " I know I emailed [William] a long time ago and it was in the works. The reason I ask is if it is, then I would ask you if I can use it for my line." Exhibit 6 at 01421 (emphasis added).

57.     When I confirmed that Progress Vantage was ready to move forward with the United States registration of Betta, Torres wrote Lynn, stating, "This is great news!!!! We now have a license!!!" A copy of the email is attached hereto as Exhibit 7.

58.     Confirming for me that she completely understood that she would not be the owner of the Betta trademark and that she would use it with our permission, on October 2, 2003, Torres wrote me and said that she "really need[s] to know the parameters of the License" and also asked me to "[p]lease advise if there are royalties we would have to pay to Betta or to Goddess." A copy of the email is attached hereto as Exhibit 8, at 01411.

59.     In the October 2, 2003 email, Torres also asked if she can use the mark on goods other than our slippers and described our understanding that her primary responsibilities were to market Betta and promote the brand:

> Betta, would be used for my entire line including Spa – slipper socks which David will work with me on etc, etc. I don't see this as a problem, do you???? . . . I know that you will not have a problem with ARDA [another Chinese factory] making all the packaging as I have done in the past – including the printing of ribbons, making woven labels etc???? . . . PLEASE DON'T WORRY! I WILL MAKE THE PACKAGING BEAUTIFUL!!!!!!! YOU KNOW ME!!!!!!  BETTA WILL BE PROUD!!!!!!!!!!!!!!  Exhibit 8 at 01411 (capitals and exclamation marks in the original).

60.     Prior to receiving this email, I believed that Torres and I had a contract whereby Progress Vantage would own the trademark rights to Betta and her company would distribute Betta products in the United States for us and would help us insure the quality of our products before they reached retailers.  After I received this email, I believed that Torres fully understood these essential terms of our contractual relationship going forward.

61.     Therefore, by the beginning of October, 2003, I believed I had a contract with Torres whereby Progress Vantage would be the owner of the Betta trademark in the United States and Torres's new company distribute goods bearing the Betta mark and would develop the customer base for the Betta products on our behalf.

62.     Immediately after this email, I also told Torres that she would not have to pay royalties for the Betta mark.

63.     I was loaning her money and so I believed that foregoing royalties at this stage would enable Torres to have more money to put back into the business and thereby grow Betta's distribution for us more quickly.

64.     In addition to loaning Torres money, I also sent a letter to Torres' landlord at the Empire State Building.  A copy of the letter is attached hereto as Exhibit 9.  Torres requested the letter and said that the Empire State Building required it.

65.     While I was not a partner in Milagros, given my financial support and the fact that I owned the Betta mark, I felt that terming our relationship as a "joint venture" was a fair characterization.  Torres never objected to this characterization.

66.     As Torres and I were friends, and as I trusted her (based upon what she said to me) to faithfully promote Betta, I did not think we needed a written contract nor did I think of our relationship in an overly formal manner.

10

67.     I was certain, however, that Torres and I (at this point through our companies) agreed that I would help set up her business and she would promote products bearing the Betta brand – a brand that Progress Vantage would own.

68.     This understanding was confirmed both by Torres' oral representations to me and by her emails.

### Progress Vantage Permits Milagros To Use Other Manufacturers

69.     It was also after the October 2003 email, that we began talking to Torres about the potential use of other manufacturers to produce goods bearing the Betta trademark.

70.     At the time, Torres told us that it would be very helpful to establishing the Betta brand in the United States to have something more than the slippers we produced.

71.     As we entered into an agreement with Torres in part because we trusted her knowledge of the United States market, we believed her and agreed that Milagros could use other manufacturers to produce good for Milagros bearing the Betta mark.

72.     As we approved of this arrangement, I did not think that it altered our contract with Milagros at all.

73.     Accordingly, Milagros began obtaining goods from manufacturers other than Progress Vantage.  I was fully familiar with all of these factories and knew that they made products of good quality, matching our own.

74.     In addition to knowing all of these factories and the quality of their products, Progress Vantage signed a letter of credit with a Korean sock manufacturer which enabled Milagros to begin obtaining goods from them.

75.     Initially Progress Vantage, though me and my wife Lynn,  reviewed the styles and goods produced by these factories.

76.    As our relationship with Torres continued, and based upon our knowledge of the factories, our initial review of the goods, our belief in Torres's skills and her representations to us that she would "make Betta proud," we began to rely on her more and more to maintain the quality of goods obtained from other factories.

77.    While at this time I had no immediate plans to terminate the contract with Torres, I did believe that, as our contract left me in full control of the trademark, I had the ability to end my relationship with Torres at any time, for any reason.

**Progress Vantage Files for Trademark Registration**

78.    In or around June 15, 2004, Progress Vantage filed an application for registration of the Betta trademark.  A copy of the acknowledgment of our filing from the United States Patent and Trademark Office is attached hereto as Exhibit 10.

79.    As reflected in the emails above, at all times, Milagros was fully aware that Progress Vantage was registering the trademark.

80.    The trademark included in the application is the exact same mark that we use on all of our Betta products worldwide.

81.    From October 2003 until March 2006, Torres never once asked me about the trademark registration.

82.    Progress Vantage expended significant time and effort in pursuit of the trademark registration.

83.    Through our lawyers in Hong Kong, we retained the firm of Christensen Johnson O'Connor and Kindness to register the Betta trademark for Progress Vantage.

84.    In addition to the attorney's fees we spent time and money responding to concerns of the United States Patent and Trademark Office ("USPTO") initial denial of Progress Vantage's application.

85.    The USPTO initially denied our application because the examiner felt that the Betta mark would cause confusion with the registered mark "Mo Betta." A copy of the denial is attached here to as Exhibit 11.

86.    Progress Vantage undertook a good deal of expense effort, to resolve this denial by obtaining a consent letter from the owner of Mo Betta, Maury Tate. A copy of the consent agreement is attached hereto as Exhibit 12.

87.    At no time did Milagros undertake any efforts at all in connection with this issue.

**The Neet Feet Controversy**

88.    In or around March 2006, Neet Feet Pty Ltd. ("Neet Feet") an Australian company that claimed to own the Betta mark in the United States, wrote Milagros demanding that Milagros cease distributing footwear bearing the mark.

89.    On March 29, 2006, Torres emailed Lynn and I and informed us Neet Feet's demand.

90.    Torres wrote that she had never seen any trademark registration in the United States for Betta by Neet Feet, but that she "found yours [Progress Vantage's] which I am attaching a copy of." A copy of the email is attached hereto as Exhibit 13 at 04520.

91.    The registration application that Torres attached clearly shows Progress Vantage as the applicant for ownership of the trademark and, in fact, this portion showing Progress Vantage as the owner is circled. At no point did Torres ever question this fact or ask why the registration was in Progress Vantage's name.

13

92.     Upon learning of the Neet Feet claims, Progress Vantage instructed COJK, through its Hong Kong attorneys, to formulate and communicate a response to Neet Feet.

93.     Torres worked in conjunction with COJK who told her that they would "need documentation of what Kim's agreement was or whatever legal documents he has as to the stipulation to the use of "betta." Id.

94.     At no point in time did Torres or Milagros ever receive permission to use the Betta mark from Kim Gray.

95.     On April 14, 2006, Progress Vantage's counsel wrote a response to Neet Feet explicitly stating the use of the Betta mark in the United States in fact had express authorization from Mr. Gray.  A copy of the letter is attached hereto as Exhibit 14.

96.     Torres never had any interaction with Mr. Gray concerning permission to use Betta in the United States.  All of the references in the in the April 14, 2006 letter refer unequivocally to interactions Progress Vantage had with him.

97.     The April 14, 2006 letter did not, however, effectuate a complete resolution of the allegations raised in the Neet Feet letter.  It was only through the efforts of Progress Vantage, by having Mr. Gray conduct direct negotiations with Neet Feet in Australia, that Neet Feet withdrew its complaints.

98.     At no point during these events did Torres, or anyone at Milagros, ever assert that any entity other than Progress Vantage owned the Betta mark. At no point during these events did Milagros or Torres file any type of opposition to Progress Vantage's registration of the Betta mark with the United States Patent and Trademark Office.

99.    I did not think much about this at the time because Torres had known for two and a half years that Progress Vantage was taking steps to be the registered owner of the Betta mark in the United States.

**Milagros' Contentions in This Lawsuit**

100.    I understand from my attorney that Torres testified at her deposition that when she travelled to Hong Kong in November 2003, I told her that I would register the Betta brand in her name so that she (or her company) would be the owner of the trademark.

101.    This is completely untrue.

102.    Progress Vantage was the owner of the trademark in China and had distributed Betta products in Europe and the Middle East. As the owner of Progress Vantage, I had no plans to, and never would, intentionally give another person my blessing to own the Betta trademark (much less help them do so).

103.    I also understand that Torres testified that I told her I would register the Betta trademark for her because she had put so much time, money and effort into her new business already and that I wanted to do that favor for her.

104.    This is also completely untrue and is contradicted by at least one email that I sent Torres.

105.    At the time, I actually believed that Torres may have been depending on my financing too much and I told her that I was not sure she had put enough of her own money into Milagros.

106.    She responded by telling me that she had put forth an enormous amount of effort. A copy of the email is attached hereto as Exhibit 15.

107.    I put my trust into Torres and Milagros to faithfully promote my Betta brand.

108.    She represented to me that she fully understood that she would not be the owner of the trademark.  I told her that I would be the registered owner of the mark and she told me that she understood that.

109.    I relied on her representations when I proceeded to provide her goods bearing the Betta mark and allowed her to distribute goods produced by other manufacturers bearing the Betta mark.

110.    If at any point in time, I learned that she would assert ownership over the mark, I would have taken immediate steps to protect my interest in Betta.

111.    I spent six years supplying Betta slippers to Slippers Unlimited in Australia.

112.    I spent another three years manufacturing and distributing Betta slippers in China as the registered trademark owner.

113.    When I believed Progress Vantage (and Betta) were ready to enter the United States market, I relied on a person who I knew to have great experience and knowledge of the U.S. market and who I trusted as a friend.

114.    Not only did I believe that I was taking prudent steps to establish my Betta brand in the United States, I did so under circumstances that I believed would also be helpful to my friend, Torres.

115.    She was tremendously unhappy in her job and I saw an opportunity to help us both.

116.    Rather than reward me by acknowledging the agreement she made with me and Progress Vantage, Torres has used this litigation to try to take from me and Progress Vantage the trademark that she always acknowledged belonged to us.

117.    In October 2003, Torres asked me for permission to use Betta in the United States. I could not imagine a clearer statement that she understood that if I did not own the mark in the United States at that point, I fully intended to take all steps necessary to be the owner of the mark in the United States.

118.    There was never any point in time when Torres made any statement that would challenge my ownership rights in Betta.

119.    She says that I told her I would register the trademark for her, but for over two and a half years, she never once asked me about the status of the trademark application.

120.    Even when a third party came in and claimed that they owned the trademark (Neet Feet), Torres never once said to me that she (or Milagros) owned the trademark.

121.    She sent me a printout from the USPTO that stated, in black and white, that Progress Vantage was applying to be the owner of the trademark and she never questioned that Progress Vantage was, in fact, the owner of the trademark.

122.    Torres asks this Court to believe that I would bestow the Betta trademark rights in the United States to her as a gift. In October 2003, she asked, in writing, for my permission to use Betta in the United States and, she says, in November 2003, I told her "go ahead, it's available."

123.    I understand that a summary judgment motion is not the place where the issue is whether to believe what one person said over what another person says, I never made any such statement to Torres and, in fact, said exactly the opposite.

124.    I also know that Torres understood me when I told her that Progress Vantage would own the trademark in the United States.

125.    I relied on her representation to me that she understood that when I entered into the oral distribution and licensing agreement with her and Milagros.

Dated: March 31, 2008

_____

Wai "William" Wong

18