Steven G. Storch (SS 5241)
Benjamin L. Felcher Leavitt (BL 7363)
Storch Amini & Munves PC
140 E. 45th St., 25th Floor
New York, New York 10017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
MILAGROS IMPORTS LIMITED, a          :
New York Corporation,                :
                                     :
          Plaintiff,                 :          07-CV-3215 (SHS)
                                     :
          v.                         :          **ECF CASE**
                                     :
PROGRESS VANTAGE LIMITED,            :
A Foreign corporation,               :
                                     :
          Defendant.                 :
--------------------------------------------------------x


**DEFENDANT AND COUNTERCLAIM PLAINTIFF PROGESS VANTAGE LIMITED'S
OPPOSITION TO PLAINTIFF AND COUNTERCLAIM DEFENDANT FIRST
MILAGROS IMPORTS LIMITED MOTON TO SUMMARY JUDGMENT**


*Attorneys for Defendant and Counterclaim Plaintiff*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS ....................................................................................5

  Relationship Between W. Wong and Irene Louisa Torres ...........................5

  Correspondence Concerning the Betta Mark .............................................6

  The Neet Feet Controversy .......................................................................8

  Milagros' Contentions in This Lawsuit .....................................................9

LEGAL ARGUMENT.........................................................................................10

 I. Standard on The Summary Judgment..........................................................10

 II. Agreements Setting Forth Trademark Rights Are Enforceable .....................11
  .......................................................................................................

 III. The Statute of Frauds Does Not Bar Enforcement Of the Oral Argument......12

  1. As the Oral Agreement was Predominatley One for Services, the UCC is
   Inapplicable To the Facts of This Case....................................................12
  2. Even if the UCC Applies, the Oral Agreement Was Sufficiently Confirmed
   In Writing...........................................................................................14
  3. The Oral Agreement Was Terminable At Will and Not Within The Amnit
   Of New York General Obligations Law §7-501(1) ...................................16
  4. Milagros is Estopped From Asserting the Statute of Frauds Defense .........17

 IV. The Oral Agreement is Clear, Definite and Enforceable...............................19

  Milagros Cannot Establish Its Ownership of the Betta Mark. ........................23

  1.  Disputes between Manufacturers and Distributers .................................23
  2. Milagros is Estopped from Asserting Ownership Over the Betta Mark..........24
  3. Milagros Has Waived its Right to Assert Ownership Over the Betta Mark............24
  4. Milagros' Claim to Ownership of the Betta Mark is Barred by Laches ...................25


CONCLUSION....................................................................................................27

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                          <u>**Page:**</u>

166 Mamoroneck Ave. Corp. v. 151 East Post Road Corp.,
  78 N.Y.2d 88, 91 (N.Y.1991) ................................................................................20

Alesayi Beverage Corp. v. Canada Dry Corp.,
  947F.Supp.658 (S.D.N.Y. 1996)........................................................................13

Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.,
  206 A.D.2d 166, 169 (1st Dep't 1994).  ..............................................................19

Anderson v. Hertz Corporation,
  507 F.Supp.2d 320 (S.D.N.Y.2007),....................................................................10

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242, (1986)............................................................................................10

Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc., 206 A.D.2d 166, 169
(1st Dep't 1994).  ...................................................................................................19

Baron Phillipe de Rothschild v. Paramount Distillers, Inc.,
  923 F.Supp. 433, 438 (S.D.N.Y. 1996)...............................................................26

Bazak International Corp. v. Mast Industries, Inc.,
  73 N.Y.2d 113, 123 (1989).  ...............................................................................15

Berardi v. Fundamental Brokers, Inc.,
  1992 WL 27169 at *2 (S.D.N.Y. Febr. 5, 1992)..................................................17

Blake v. Voight,
  134 N.Y.69 (1892) ...............................................................................................17

Brockport Developers, Inc. v. 47 Ely Corporation,
  82 Misc. 2d 310, 314 (Monroe Co. 1975)...........................................................18

Bunn-O-Matic Corp. v. Bunn Coffee Service, Inc.,
  88 F.Supp.2d 914, 922 (C.D.Ill. 2000) ..........................................................16, 19

Cobble Hill Nursing Home v. Henry & Warren Corp.,
  74 N.Y.2d 475, 483 (N.Y. 1989). ........................................................................20

Carofino v. Forester,
    450 F.Supp.2d 257, 264 (S.D.N.Y. 2006) ............................................................10

Crabtree Automotive, Inc. v. BMW of North America,
    105 A.D.2d 825 (2d Dep't 1984) ......................................................................14

Cron v. Hargro Fabrics, Inc.,
    91 N.Y.2d 362 (1998) .........................................................................................16

Cruden v. Bank of New York,
    957 F.2d 961 (2d Cir. 1992).................................................................................10

D&N Boeing, Inc. v. Kirsch Beverages, Inc.,
    63 N.Y.2d 449, 454 (1984) ................................................................................16

Department of Parks and Recreation for the State of California v. Bazaar Del Mundo, Inc.,
    448 F.3d 1118 (9th Cir. 2006) ...........................................................................21

DeForest Radio Tel. & Tel. Co. v. U.S.,
    274 U.S.236, 241 (1927)......................................................................................21

Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.,
    847 F.Supp. 18, 20 fn.1 (E.D.N.Y. 1994) ....................................................17, 21

Doebler's Pennsylvania Hybrids, Inc. Doebler,
    442 F.3d 812 (3d Cir. 2006)..........................................................................11, 21

Farm Automation Corp. v. Senter,
    84 A.D.2d 757 (2d Dep't 1981) ..........................................................................13

Fitzpatrick v. Sony-BMG Music Entertainment, Inc.,
    2007 WL 4358471 ..............................................................................................25

Fuddruckers, Inc. v. Fudpucker's Inc.,
    436 F.Supp.2d 1260 (N.D.Fla. 2006),.................................................................11

Fusco Group, Inc. v. Loss Consultants Intern., Inc.,
    462 F.Supp.2d 321 (N.D.N.Y. 2006),............................................................17, 21

Gander Mountain Co. v. Cabela's,
    2007 WL 2026751 ..............................................................................................22

Ginsberg v. Fairfield-Noble Corp.,
    81 A.D.2d 318, 320-21 (1st Dept. 1981) ............................................................19

Grappo v. Alitalia Linee Aeree Italiane,

56 F.3d 427, 432 (2d Cir. 1995)...................................................................18

Heyman v. Commerce & Industry Insurance Co.,
   524 F.2d 1317 (2d Cir. 1975)..................................................................10

Hilord Chemical Corp. v. Ricoh Electronics, Inc.,
   875 F.2d 32, 37 (2d Cir. 1989)................................................................15

Holt v. KMI-Continental, Inc.,
   95 F.3d 123 (2d Cir. 1996). ....................................................................10

Jilcy Film Enterprises, Inc. v. Home Box Office, Inc.,
   593 F.Supp. 515, 518-519 (S.D.N.Y. 1984) ...........................................17

Jordan v. Can You Imagine, Inc.,
   485 F.Supp.493 (S.D.N.Y. 2007) ......................................................10, 25

Korff v. Corbett,
   18 A.D.3d 248, 250 (1st Dep't 2005). ....................................................19

Levin v. Hoffman Fuel Corp.,
   94 A.D.2d 640 (1st Dep't 1983) .............................................................13

Liberto v. D.F. Stauffer Biscuit Co.,
   441 F.3d 318, 324 (5th Cir. 2006) ..........................................................22

Lucent Technologies Inc., v. Gateway, Inc.,
   2007 WL925364 (S.D.Cal. March 19, 2007)..........................................12

Manis v. CSX Transportation, Inc.,
   806 F.Supp.177 (N.D. Ohio 1992)..........................................................12

Marbelite Co. v. National Sign and Signal Co., Inc.,
   2 Fed.Appx.118, 120 (2d Cir. 2001).......................................................13

Opals On Ice Lingerie v. Bodylines, Inc.,
   320 F.3d 362  (2d Cir. 2003)...................................................................10

Paper Corporation of the United States v. Schoeller Technical Papers, Inc.,
   773 F.Supp. 632 (S.D.N.Y. 1991) ................................................12, 14, 18

Satterwhite v. The Image Bank, Inc.,
   2002 WL 31098496 (S.D.N.Y. Sept. 19, 2002).......................................13

Swerdloff v. Mobil Oil Corp.,
   74 A.D.2d 258 (2d Dep't 1980) ..........................................................14, 19

iv

Sugerman v. MCY Music World, Inc.,
    158 F.Supp.2d 316, 321 (S.D.N.Y. 2001) ....................................................................10

TMT North America v. Magic Touch GmbH, 124 F.3d 876, 885 (7th Cir. 1997).
    458 F. Supp. 2d 68 (E.D.N.Y. 2006) ........................................................................21

Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.,
    294 F.3d 383, 395 (2d Cir. 2002).............................................................................11

Trace Minerals Research , L.C. v. Mineral Resources International, Inc.,
    505 F.Supp.2d 1233 (D. Utah 2007).........................................................................17

Tractebel Energy marketing, Inc. v. AEP Power marketing, Inc.,
    487 F.3d 89, 97 (2d Cir. 2007)................................................................................20

Transgo, Inc. v. Ajac Transmission Parts Corp.,
    768 F.2d 1001, 1017-18 (9th Cir. 1985) ...................................................................22

United Beer Distributing Co. v. Hiram Walker (N.Y.), Inc.,
    163 A.D.2d 79 (1st Dep't 1990).   ............................................................................14

United Magazine Co. v. Murdoch Magazines Distribution, Inc.,
    146 F.Supp.2d 385 (S.D.N.Y. 2001).........................................................................12

United States v. Schoeller Technical Papers, Inc. ,
    724 F.Supp. 110 (S.D.N.Y. 1989) ...........................................................................18

Vermont Maple Syrup Co., v. F.N. Johnson Maple Syrup Co.,
    272 F. 478 (D.C. Vt. 1921) ....................................................................................11

Woolley v. Stewart,
    222 N.Y. 347 (1918) .............................................................................................18

Zimmer-Masiello, Inc. v. Zimmer, Inc.,
    159 A.D.2d 363, 367 (1st Dep't 1990) ................................................................13, 18

## Statutes

15 U.S.C. §1055 ................................................................................................15

UCC §2-201 .............................................................................................. *passim*

UCC §2-104 ..................................................................................................*15*

## Other Statutes

McCarthy On Trademarks And Unfair Competition,
   (4th Ed.1999) §18:43.  ...............................................................12,20, 21, 22, 24

## General Obligations Law

§5-701 ..................................................................................................... *passim*

§ 5-703 .................................................................................................... *passim*

Defendant and Counterclaim Plaintiff Progress Vantage Limited hereby submits this Memorandum of Law in Opposition to Plaintiff and Counterclaim Defendant Milagros Imports Limited's Motion for Summary Judgment.

## PRELIMINARY STATEMENT

In late August 2003 and again in October 2003, Irene Louisa Torres ("Torres"), the principle of Milagros Imports Limited ("Milagros"), explicitly asked Progress Vantage for permission to use the Betta trademark ("the Mark"). When William Wong ("W. Wong"), Progress Vantage's principle, gave this permission, Torres wrote, saying "This is great news !!!! We now have a license!!!" (exclamation marks in original). In further writings, Torres asked the parameters of the license, whether she would have to pay royalties and reassured Progress Vantage that she "would make Betta proud." Having denied the explicit meaning of these emails at her deposition, Torres now asks this court to award her summary judgment based largely upon the Statute of Frauds.[1] This attempt to use the Statute of Frauds as a shield from her flatly incredible testimony must fail as a matter of fact and law.

The evidence in this case shows that Progress Vantage and Milagros reached an oral agreement concerning a license with no explicit duration. As such, it was terminable at will and, as a matter of law, outside of New York's Statute of Frauds concerning contracts not performable within one year. The core of the agreement provided that Torres would use her experience and contacts in the United States footwear market to help Progress Vantage establish

---

[1] For example, at her deposition, Torres gave the following testimony: Q. Okay. And I don't want to be argumentative, but I want to be clear. It is your testimony, that your words, "I would ask you if I can use it," is not asking for permission; is that correct? A. That is correct. It is an inquiry. I am inquiring." 81:4-10. And further: "Q. It is your testimony that this is an incorrect usage of the word license here? A.   I would say so, because it is not really a license. I mean, it is a name or a brand, if you want to call it a brand. Basically, it is a name." 84:3-8 See infra at p.9.

the Betta mark in the United States. As a hybrid contract with these services predominating, the Uniform Commercial Code's Statute of Frauds does not apply.

Even if the Statute of Frauds were to apply to the oral licensing agreement, Torres emails are sufficient confirmatory writings to satisfy UCC §2-201. Moreover, Torres' conduct estops her from asserting either Statute of Frauds as a defense. In 2003, Torres asked Progress Vantage for permission to use the Mark and also specifically asked for the "parameters of the license." Despite these written confirmations, Torres now claims that Progress Vantage orally agreed to register the Mark in the United States on behalf of Milagros. Torres admits, however, that for three years she never once inquired as to the status of the registration. Even in the face of a third party challenge to ownership of the Mark, and a cease and desist letter, Torres did not assert ownership rights superior to Progress Vantage's. Torres interacted with the counsel who were registering the Mark for Progress Vantage and personally reviewed Progress Vantage's trademark application. The application clearly shows Progress Vantage as the owner of the Mark (the copy Torres sent to Progress Vantage even has this section circled) and yet Torres made no protest whatsoever, no comment whatsoever, no assertion whatsoever that Milagros was the owner of the Mark. For the three year duration of her relationship with Progress Vantage, Torres never asserted ownership over the Mark in any way. It was only in the face of being told that the license would be terminated that Torres suddenly said that she was not a licensee. Having induced Progress Vantage to distribute goods bearing the Mark through Milagros, to permit other manufacturers to affix the Mark to goods and to expend significant time and resources registering Betta in the United States, Torres cannot equitably claim the protection of the Statute of Frauds.

2

All of the other bases upon which Milagros moves for summary judgment are equally flawed or (at the very least) are pervaded with questions of fact not amenable to resolution by summary judgment. Milagros claims that Progress Vantage did not own the Mark and, therefore, could not agree to license a mark it did not own. At the time of the agreement, Milagros was fully aware that Progress Vantage owned the Mark in China and Hong Kong and intended to use the Mark in the United States. Agreements concerning the respective rights of the parties to ownership of the mark in the United States are not only enforceable, but favored under the law.

Milagros also claims that the oral licensing agreement is unenforceable because the parties did not evince an intent to be bound by its terms and because the terms of the agreement were too indefinite. Neither Progress Vantage nor Milagros ever expressed a desire for a written agreement and neither party made statements concerning a future grant of a license – two hallmarks of unenforceable "agreements to agree" – and Torres' own language demonstrates a present intent to be bound. Moreover, the parties' performance under the oral agreement belies any argument that they did not intend to be bound. Despite Milagros' attempts to obfuscate the oral agreement, it was simple and specific. The parties agreed that Progress Vantage would own the Mark, Milagros would distribute goods bearing the Mark in the United States on behalf of Progress Vantage and, after an initial period, Torres would be relied upon to ensure the quality of goods bearing the Mark. These terms constitute the essential terms of a license and are more than sufficient to identify the object of the contract and to enforce its terms.

Finally, Milagros argues that it is entitled to summary judgment on its declaratory judgment action for ownership over the mark. Even presuming that no contract exists between the parties, in disagreements between manufacturers and distributors a foreign manufacturer is presumed to be the owner of a trademark. Milagros provides no evidentiary support to overcome

3

this presumption. Moreover, significant questions of fact (at the very least) remain concerning Progress Vantage's affirmative defenses of waiver, estoppel and laches. The evidence demonstrates that, after requesting permission to use the Mark and asking about the parameters of the license, Torres never expressed any claim to ownership for three years and only did so when Progress Vantage informed it that the license would be terminated. Even in the face of a direct challenge to the right to use the Mark in the United States (and after viewing Progress Vantage's trademark registration application), Milagros still remained silent and thereby gave every indication to a reasonable person, that it did not, and would not, challenge Progress Vantage's ownership of the Mark. Moreover, Progress Vantage has irremediably altered its position in reliance on Torres' written and oral representations by actually distributing Betta goods through Milagros. The facts of this case provide significant evidence upon which a reasonable jury could rely to find that Milagros is estopped from asserting ownership over the Mark, has waived its alleged right to assert ownership over the Mark and has slept on its (alleged) rights to the irremediable detriment of Progress Vantage. These questions for the fact finder preclude Milagros from obtaining summary judgment.

This case involves ownership of a trademark which Torres explicitly (and in writing) asked permission to use and as to which she made no assertion of ownership for more than three years. Progress Vantage provides sufficient evidence to prove the existence of a definite and enforceable oral licensing agreement. Torres' denial of the licensing agreement ignores her own writings and is flatly incredible. Milagros provides no evidence to overcome the reasonable inference of Torres' writings, to wit, that she agreed to be a licensee. Milagros' motion for summary judgment should be denied. [2]

---

[2] To the extent that Milagros has moved for Summary Judgments as to the Fourth and Fifth Counterclaims, Progress Vantage withdraws those claims.

## STATEMENT OF FACTS

Progress Vantage is a Hong Kong corporation with its principal place of business in Kwai Chung, New Territories, Hong Kong. Defendant and Counterclaim Plaintiff Progress Vantage Limited's Response to Statement of Undisputed Facts ("PV Sep. St.") at ¶30. Since approximately 1994, Progress Vantage, by itself and through affiliated companies, including Goddess Footwear ("Goddess"), manufactures a variety of footwear for distribution in the international market.[3] Id. at ¶31.

Having decided to expand its business to include its own label and having acquired the authorization of Mr. Kim Gray, the Australian owner of the Mark, Progress Vantage registered the Mark in Hong Kong. Id. at 33. Since that time, Progress has been the sole manufacturer and distributor of indoor slippers bearing the Mark in Hong Kong and China. Progress Vantage has also shipped slippers bearing the Mark to Europe, Dubai and Lebanon. Id. at ¶34.

## Relationship Between W. Wong and Irene Louisa Torres.

W. Wong first came to know of Torres when he worked for another slipper manufacturer in China called Splendid. Id. at ¶35. Over the years, W. Wong and his wife (and co-owner of Progress Vantage), Lynn Wong ("L. Wong") became friends with Torres and came to see her as a very experienced person in the United States slipper and footwear business with a great number of contacts and talented at building customer accounts. Id. at ¶36.

In or around mid-2003, Torres told W. Wong that she was unhappy at her job, that she would be leaving to start her own business and she asked the Wongs for help. Id. at ¶37. Progress Vantage had not yet manufactured slippers for distribution in the U.S. under the Mark

---

[3] Progress Vantage was originally called "Goddess Footwear." However, in or around 2001, a feng shui advisor told W. Wong that it should change the company's name. Accordingly, it was renamed Progress Vantage, but retained Goddess as a trading division of Progress Vantage. PV Sep. St. ¶32.

and W. Wong concluded that, due to her skills and contacts in the United States, helping Torres

establish a business that would be the exclusive distributor of Betta goods would be a good way

to promote the Mark in the United States.  Id. at ¶ 38.

**Correspondence Concerning the Betta Mark.**

Prior to learning about it through the Wongs, Torres had never heard of the name "Betta."

Id. at ¶39.  During the initial conversations concerning Torres' new business, she became aware

that Progress Vantage manufactured and distributed Betta slippers in China. Id. at ¶40.  In

August 2003, the parties began exchanging emails specifically concerning the Mark. Id. at ¶41.

On August 10, 2003, Torres emailed Progress Vantage about her soon to be company, Milagros.

Id. at ¶42.  In the email, she asked L. Wong to "please advise if 'Betta' is useable in the States as

of yet." Id.  On August 11, 2003, W. Wong told Torres that "I am registering this brand in the

US, and [it] can be used very soon." Id. at ¶43.

During August and September, Progress Vantage made other commitments to Torres.

Progress Vantage agreed to provide her with start-up capital and to arrange for another factory

owner, John Lau, to loan her additional money to start the business. Id. at ¶44.  During this same

time period, Progress agreed to essentially extend Milagros credit by extending the period in

which her bills would be due.  Id.

The parties continued to exchange emails specifically addressing ownership of the Mark.

On September 28, 2003, Torres emailed L. Wong and, after discussing developments in the

industry, asked if "the 'Betta' brand can be used in the USA." Id. at ¶45.  She continued, "I

know I emailed [William] a long time ago and it was in the works.  The reason I ask is if it is,

then I would ask you if I can use it for my line" (emphasis added).  Id. at ¶46.  Upon learning

that Progress Vantage was indeed ready to move forward with the United States registration of

Betta, Torres wrote, "This is great news!!!! We now have a license!!!" Id. at ¶47. Torres also wrote Progress Vantage and said that she "really need[s] to know the parameters of the License," asking Progress Vantage to "[p]lease advise if there are royalties we would have to pay to Betta or to Goddess." Id. at ¶48.

In the October 2, 2003 email, Torres also asked if she can use the mark on goods other than Progress Vantage's and reassured Progress Vantage that she would maintain the quality of the goods at all times:

> Betta would be used for my entire line including Spa – slipper socks which David will work with me on etc, etc. I don't see this as a problem, do you???? . . . I know that you will not have a problem with ARDA [another Chinese factory] making all the packaging as I have done in the past – including the printing of ribbons, making woven labels etc???? . . . PLEASE DON'T WORRY! I WILL MAKE THE PACKAGING BEAUTIFUL!!!!!!! YOU KNOW ME!!!!!!  BETTA WILL BE PROUD!!!!!!!!!!!!!!  Exhibit 8 at 01411 (capitals and exclamation marks in the original).  Id. at ¶49.

Torres also told W. Wong that it would be very helpful to establishing the Mark in the United States to have something more than the slippers it produced. Id. at ¶50. Relying on Torres' skills and knowledge of the United States market, Progress Vantage agreed that Milagros could use other manufacturers to produce goods bearing the Mark. Id. at ¶51. All of the factories from whom Milagros obtained goods were fully known to Progress Vantage. Id. at ¶52. Initially Progress Vantage, though W. Wong and L. Wong, reviewed the styles and goods produced by these factories. Id. As the relationship with Torres continued, Progress grew to trust Torres more and more and relied on her to maintain the quality of goods obtained from other factories. Id. at ¶53.

Accordingly, by the beginning of October, 2003, the parties had agreed that Progress Vantage would be the registered owner of the Mark in the United States, that Milagros (which

Progress Vantage would help get on its feet) would develop the customer base for the Betta products, would distribute goods bearing the Mark in the United States on behalf of Progress Vantage (including those made by other manufacturers approved by Progress Vantage) and would and would not have to pay royalties for the Mark (the "Oral Agreement"). [4] Id. at ¶54.

Pursuant to the terms of the Oral Agreement, in or around June 15, 2004, Progress Vantage filed an application for registration of the Mark. Id. at ¶55. As reflected in the emails above, at all times, Milagros was fully aware that Progress Vantage was registering the Mark.

From October 2003 until March 2006, Torres never once asked about the status of the trademark registration.[5] Id. at ¶56.

**The Neet Feet Controversy**

In or around March 2006, Neet Feet Pty Ltd. ("Neet Feet"), an Australian company wrote Milagros demanding that it cease distributing footwear bearing the Mark. Id. at ¶60. On March 29, 2006, Torres emailed L. Wong and W. Wong and informed them of Neet Feet's demand. Id. at ¶ 61. Torres wrote that she had never seen any trademark registration in the United States for Betta by Neet Feet, but that she "found yours [Progress Vantage's] which I am attaching a copy of." Id. at ¶62. The registration application clearly shows Progress Vantage as the applicant for ownership of the Mark (and this section was circled). Id. at ¶63. At no point did Torres ever ask why the registration was in Progress Vantage's name. Id. at¶64.

---

[4] When asked about the Oral Agreement, Torres testified that W. Wong told her that Progress Vantage was not interested in using the Mark in the United States and that it was "available" in the United States. Asked whether W. Wong said she could "have" the mark or if it was a gift, Torres testified that "we didn't talk about in those terms, only that it was available." Given Progress Vantage's ownership of the Mark in China and its intention to expand to the United States, this testimony is flatly incredible. W. Wong unequivocally states that he never said to Torres that he was willing to sell, give away or forgo the chance to use the Mark in the United States and at all times told Torres that Progress Vantage would own the Mark in the United States. PV Sep. St. at ¶ 75.

[5] Progress Vantage expended significant time and effort in pursuit of the trademark registration. In addition to attorney's fees, Progress Vantage undertook a good deal of expense and effort to resolve an initial denial by obtaining a consent letter from the owner of Mo Betta, Maury Tate. At no time did Milagros undertake any efforts at all in connection with this issue. PV Sep. St. at ¶¶57, 58.

Torres worked in conjunction with Progress Vantage's US counsel who told her that they would need documentation of what Kim's agreement was or whatever legal documents he has as to the stipulation to the use of "betta." Id. at ¶65. On April 14, 2006, the law firm working on Progress Vantage's trademark application wrote a response to Neet Feet explicitly stating the use of the Betta mark had express authorization from Mr. Gray. Id. at ¶66. Neither Torres nor anyone at Milagros had any interactions with Mr. Gray concerning permission to use the Mark in the United States. Id. at ¶67. All of the references in the in the April 14, 2006 letter to Mr. Gray and his assent to use of the Betta mark refer unequivocally to interactions Progress Vantage had with him. Id. at ¶68.

At no point during these events did Torres, ever assert that she or Milagros owned the Mark or file any type of opposition to Progress Vantage's registration of the Mark. Id. at ¶70. Torres did not assert that it had any ownership interest in the Mark until Progress Vantage informed her that it was terminating the license and Milagros would no longer be able to use the Mark. Id. at ¶

## Milagros' Contentions in This Lawsuit

By contending that the Oral Agreement does not exist, Torres attempts to dismiss away all of her written communications and also makes statements that directly contradict those writings. Id. at ¶¶72-84. For example, Torres testified at her deposition that Progress Vantage told her that it had no plans to use the Betta mark in the United States and that it would register the Betta trademark for her because she had put so much time, money and effort into her new business. Id. at ¶73. W. Wong contradicts this statement and, in fact, Torres sent an email two months after this supposed interaction, complaining that W. Wong did not think she had put enough of her own money into Milagros. Id. at ¶74.

9

## **LEGAL ARGUMENT**

### I.    The Standard On Summary Judgment.

"A court may grant summary judgment 'only if it can be established that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Jordan v. Can You Imagine, Inc., 485 F.Supp.493, 497 (S.D.N.Y. 2007), quoting Opals On Ice Lingerie v. Bodylines, Inc., 320 F.3d 362, 367-68 (2d Cir. 2003). A fact is material when it "might affect the outcome of the suit under governing law" and is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Hertz Corporation, 507 F.Supp.2d 320, 326 (S.D.N.Y.2007), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"When considering a motion for summary judgment, a district court 'must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.'" Can You Imagine, 485 F.Supp. at 49, quoting Heyman v. Commerce & Industry Insurance Co., 524 F.2d 1317, 1320 (2d Cir. 1975). "The nonmovant's allegations are taken as true and it receives the benefit of the doubt when its assertions conflict with those of the movant." Sugerman v. MCY Music World, Inc., 158 F.Supp.2d 316, 321 (S.D.N.Y. 2001), quoting Cruden v. Bank of New York, 957 F.2d 961, 975 (2d Cir. 1992). If there exists "any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." Can You Imagine, 485 F.Supp. at 497, quoting Holt v. KMI-Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996). Summary judgment "is a drastic device since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury." Carofino v.

10

Forester, 450 F.Supp.2d 257, 264 (S.D.N.Y. 2006), quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir.1975).

In this case, there are a variety of material and genuine issues of fact that preclude summary judgment for Milagros.

## II.    Agreements Setting Forth Trademark Rights Are Enforceable

Milagros asserts that because Progress Vantage did not use the Betta mark in commerce in the United States prior to entering into the oral licensing agreement with Milagros, the agreement is, as a matter of law, unenforceable as an attempted transfer of rights Progress Vantage did not possess. This argument fails as a matter of fact and law.

It is accepted that "[t]rademark agreements, in which two parties agree on their respective rights in a mark, 'are favored under the law.'" Fuddruckers, Inc. v. Fudpucker's Inc., 436 F.Supp.2d 1260, 1265 (N.D.Fla. 2006), quoting Times Mirror Magazines, Inc. v. Field & Stream Licenses Co., 294 F.3d 383, 395 (2d Cir. 2002). The Oral Agreement between Progress Vantage and Milagros is enforceable and, to the extent it established the parties' understanding as to their respective rights in the Betta mark, a preferred arrangement. While Progress Vantage had not used the mark in commerce in the United States at the time it reached the agreement with Milagros, it was perfectly able to locate an entity through whom it could effectuate such use.

It is well established that "[u]se of a trademark need not always be made directly by the trademark owner and is often made 'with the permission' of the owner via a licensing agreement. Indeed, sometimes the *only* use of a trademark is through a licensee." Doebler's Pennsylvania Hybrids, Inc. Doebler, 442 F.3d 812, 823 (3d Cir. 2006)(emphasis in original). It has long been recognized that "a person may introduce his trademark and create demand for his variety of goods in a new territory by licensees." Vermont Maple Syrup Co., v. F.N. Johnson Maple Syrup

Co., 272 F. 478, 479-80 (D.C. Vt. 1921). This principle is codified in the Lanham Act[6] and

recognized by trademark authorities.[7]

Progress Vantage owned the Betta mark in Hong Kong and China and had distributed

Betta goods in Europe and the Middle East. W. Wong testified that Progress Vantage was

interested in extending its distribution of Betta goods to the United States and that it engaged

Torres and Milagros to do so on its behalf. It chose a lawful and appropriate vehicle to do so – a

licensee. Far from being "void as a matter of law," this oral licensing agreement is an accepted,

and favored, subject of a contract.[8]

III.   **The Statute of Frauds Does Not Bar Enforcement Of The Oral Agreement**

1.   **As the Oral Agreement Was Predominately One For Services, The UCC Is Inapplicable[9]**

Milagros mistakenly states that the UCC "applies to exclusive distributor agreements."

Mil. Mem. at p. 11. In fact, "New York Courts are split" on issue of the applicability of UCC §2-

201 to distribution contracts. United Magazine Co. v. Murdoch Magazines Distribution, Inc.,

146 F.Supp.2d 385, 404 (S.D.N.Y. 2001); see also Paper Corporation of the United States v.

Schoeller Technical Papers, Inc., 773 F.Supp. 632, 637 (S.D.N.Y. 1991)(holding UCC §2-201

---

[6] 15 U.S.C. §1055 ("If first use of a mark by a person is controlled by the registrant or applicant. . . with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be").

[7] MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, 4TH ED. (1996) ("MCCARTHY"), §18:46 ("[o]wnership rights in a trademark or service mark can be acquired and maintained through the use of the mark by a controlled licensee even when the first and only use of the mark was made, and is being made, by the licensee").

[8] The cases cited by Milagros are utterly inapposite to the facts before the Court. Mil. Mem. at pp. 9-10.  Two of the cases involve copyrights, two involve "ideas" found to be not novel and, therefore, unprotected under law, while the remaining two either do not stand for the proposition cited (Lucent Technologies Inc., v. Gateway, Inc., 2007 WL925364 (S.D.Cal. March 19, 2007) involves a motion for summary judgment as to enforceability of a patent and nowhere mentions a transfer, attempted or otherwise) or do not contained the quoted passage (Manis v. CSX Transportation, Inc., 806 F.Supp.177 (N.D. Ohio 1992) (does not contain the words "tired," "maxim" or "property law." Mil. Mem. Law at pp. 9-10).

[9] While it filed a formal Motion to Amend Its Answer to the Counterclaim, Milagros did so only on the basis of New York General Obligations Law §5-701(1) and did not so much as mention the UCC. To the extent that it was only upon reply that Milagros argued for the applicability of the UCC, this type of gamesmanship should not be rewarded and should result in denial of the Motion to Amend in and of itself.

inapplicable to exclusive distribution contract as services predominated); <u>Satterwhite v. The Image Bank, Inc.</u>, 2002 WL 31098496 (S.D.N.Y. Sept. 19, 2002)(holding where defendant was the "exclusive agent for the marketing and sale or lease" of Plaintiff's photographs, contract was one for services and the UCC did not apply); <u>Zimmer-Masiello, Inc. v. Zimmer, Inc.</u>, 159 A.D.2d 363, 367 (1st Dep't 1990) (applying GOL §5-701 to distribution contract); <u>Alesayi Beverage Corp. v. Canada Dry Corp.</u>, 947F.Supp.658, 667 (S.D.N.Y. 1996)(finding applicable statute of limitations for breach of distribution contract was six years under New York Civil Practice Law and Rules § 213 and not three years under the UCC).

Determining whether the UCC applies to a particular contract involves the "test [of] whether the contract is 'predominately' one for goods or for the providing of services." <u>Alesayi</u>, 947F.Supp.at 667 (citations omitted). "If the provision of services or rendering of other performance predominates and is not merely incidental or collateral to the sale of goods, then the UCC does not apply." <u>Id</u>. "In applying this test, the transaction must be examined in its entirety to determine its essential nature." <u>Levin v. Hoffman Fuel Corp.</u>, 94 A.D.2d 640, 641 (1st Dep't 1983)(Asch, J. dissenting). "Whether a contract is for the sale of goods or for services provided is a question of fact." <u>Id</u>. at 666, <u>citing</u> <u>Farm Automation Corp. v. Senter</u>, 84 A.D.2d 757 (2d Dep't 1981), <u>see</u> <u>also</u>, <u>Marbelite Co. v. National Sign and Signal Co., Inc.</u>, 2 Fed.Appx.118, 120 (2d Cir. 2001)(Summary Order)(holding that question of whether contract one for goods or services "could not be resolved as a matter of law").

In this case, Progress Vantage entered into an agreement with Torres because of her knowledge and experience in the United States market with regard to slippers and footwear. Mr. Wong testified that the purpose of the contract was to "sell and promote" the Betta brand. The prime purpose of the contract was to develop a customer base for Betta in the United States. In

order to accomplish this goal, Progress Vantage, *inter alia*, agreed to allow Milagros to use other manufacturers. Had Progress Vantage been solely, or even primarily, focused on Milagros as a vehicle for its sales, a reasonable juror could find that it would not have permitted this activity. A reasonable juror could find that the predominate aspect of the oral agreement between Milagros and Progress Vantage was the promotion of the Betta brand and that Progress Vantage was contracting for the services of Torres as a promoter with extensive contacts in the U.S.

Citing not a single fact concerning the contract other than the amount of sales,[10] Milagros baldly asserts that the UCC applies. The blanket statement that any contract involving the sale of over $500 of goods calls for the automatic application of the UCC is simply wrong. The four cases cited by Milagros, moreover, are all inapposite. In Hiram Walker, the court provided no analysis of the Statute of Frauds, but rather applied both the UCC and New York General Obligations Law §5-701 and, therefore, "did not directly address the question of which of which Statute of Frauds should apply." Paper Corporation of the United States v. Schoeller Technical Papers, Inc., 773 F.Supp. 632, 637 (S.D.N.Y. 1991), analyzing United Beer Distributing Co. v. Hiram Walker (N.Y.), Inc., 163 A.D.2d 79 (1st Dep't 1990). Milagros also cites to two cases cited by Hiram Walker. The cases involve franchises for enormous multi-national corporations with "exclusive" distributors all across the world. See Crabtree Automotive, Inc. v. BMW of North America, 105 A.D.2d 825 (2d Dep't 1984); Swerdloff v. Mobil Oil Corp., 74 A.D.2d 258 (2d Dep't 1980). In contrast, the Oral Agreement relates to the establishment of a single distributor for a brand new business in the United States. Finally, in Alan Skop, Inc. v. Benjamin Moore, Inc., the Court admitted that UCC §2-201 might not be applicable, stating that "one could conceptualize the purported agreement as a dealership contract, instead of one for the sale

_____

[10] Oddly, Milagros cites to Williston on Contracts for the proposition that the contract in this case was "expected to involve, and in fact did involve, the purchase of more than $500 of goods." Def. Mem. at p. 11. The third edition cited by Milagros was printed in 1961, a year before New York's adoption of the UCC.

14

of goods." 909 F.2d59, 60 (2d Cir. 1990). Thus, the cases relied upon by Milagros either do not

address the instant issue, are inapplicable because they involved contracts unlike the one at issue

in this case or affirmatively support Progress Vantage's position that the oral licensing

agreement was one for services. At the very least, a genuine issue of fact exists as to the

applicability of the UCC.

**2. <u>Even If the UCC Applies, the Oral Agreement Was Sufficiently Confirmed in Writing</u>**

Even if the UCC is held to apply, the standard for confirmatory writings under UCC §2-

201(2) is satisfied in this case. It cannot be contested that both parties are "merchants" for the

purposes of UCC §2-201(2). Torres states that she started Milagros based upon "more than 20

years of experience" in the industry. Progress Vantage is a manufacturer of footwear. Both

parties posses "knowledge or skill" particular to footwear. UCC §2-104(1).

Under UCC §2-201(2), "[t]here are no rigid requirements as to the form or content of a

confirmatory writing." <u>Hilord Chemical Corp. v. Ricoh Electronics, Inc.</u>, 875 F.2d 32, 37 (2d

Cir. 1989). As the New York Court of Appeals has held: "neither explicit words of confirmation

nor express references to the prior agreement are required, and the writings are sufficient so long

as they afford a basis for believing that they reflect a real transaction between the parties."

<u>Bazak International Corp. v. Mast Industries, Inc.</u>, 73 N.Y.2d 113, 123 (1989). Electronic mails

can satisfy both the writing and signature requirements of UCC §2-201(2). <u>Bazak International

Group v. Tarrant Apparel Group</u>, 378 F.Supp2d 377, 383-387 (S.D.N.Y. 2005)(finding

confirmatory email sufficient as, *inter alia*, a writing and a signature).

The cases cited by Milagros are utterly inapplicable to this analysis as they all concern

GOL §5-701 and not the UCC.

In this case, there are two emails that Torres has admitted sending, that came from her email account with her name indicated at the bottom of the email. These circumstances are sufficiently reliable to qualify the emails as signed writings under UCC §2-201(2). Moreover, the emails are explicitly confirmatory. In the September 30, 2003 email, Torres states, "This is great news!!!! We now have a license!!!" She has confirmed receipt of information concerning her permitted use of the Mark and unequivocally states that she has a license. In the October 2, 2003 email, Torres again confirms the fact that a license has been granted and seeks only to "know about the parameters of the License." She proceeds to ask questions dealing with the font and color of the Betta mark, the availability of history about Betta, whether she would have to pay royalties and offers emphatic assurance (in all capital letters) that the quality of the goods would be maintained. While not containing every term of the Oral Agreement, the emails explicitly and undeniably refer to the license and to Torres' acceptance of it. These writings do more than "afford a basis for believing that they reflect a real transaction between the parties" and are more than sufficient to remove the Oral Agreement from the UCC's Statute of Frauds.

**3.    The Oral Agreement Was Terminable At Will and Not Within The Ambit of New York General Obligations Law § 5-701(1).[11]**

New York General Obligations Law ("GOL") § 5-701(1) provides that an agreement will be unenforceable if not in writing and "By its terms is not to be performed within one year of its making. . ." New York Courts have strictly construed this section and have "limited it to those contracts only which by their very terms have absolutely no possibility in fact and law of full performance within one year." D&N Boeing, Inc. v. Kirsch Beverages, Inc., 63 N.Y.2d 449, 454 (1984), see also Cron v. Hargro Fabrics, Inc., 91 N.Y.2d 362 (1998)(denying motion to dismiss

---

[11] Progress Vantage previously filed an Opposition to Milagros' Motion to Amend Its Response to the Counterclaim (the "Opposition"). For the sake of efficiency, Progress Vantage will attempt to forgo a complete reiteration of its position and respectfully refers the Court to the Opposition to Milagros' Motion to Amend.

oral employment contract for commissions).  As the Oral Agreement was terminable at will,

Milagros' attempt to bring the Oral Agreement within GOL §5-701(1) must fail.  As they cannot

argue that GOL §5-701(1) bars enforcement of an at-will license, Milagros attempts to alter the

terms of the Oral Agreement by interposing the unexpressed expectations of Progress Vantage.

Such uncommunicated expectations are not, however, legally sufficient to impose the GOL §5-

701(1).

An "agreement conferring a license to use a trademark for an indefinite time, whether

oral, written or by implication, is terminable-at-will by the licensor."  See e.g., Dial-A-Mattress

Operating Corp. v. Mattress Madness, Inc., 847 F.Supp. 18, 20 fn.1 (E.D.N.Y. 1994); Fusco

Group, Inc. v. Loss Consultants Intern., Inc., 462 F.Supp.2d 321, 330 (N.D.N.Y. 2006), citing

Dial-A-Mattress;  Bunn-O-Matic Corp. v. Bunn Coffee Service, Inc., 88 F.Supp.2d 914, 922

(C.D.Ill. 2000); Trace Minerals Research , L.C. v. Mineral Resources International, Inc., 505

F.Supp.2d 1233, 1241 (D. Utah 2007), citing Bunn-O-Matic.  Where termination occurs pursuant

to an at-will contract, the contract is not terminated due to a breach, but is ended pursuant to the

terms of the contract.  See e.g., Jilcy Film Enterprises, Inc. v. Home Box Office, Inc., 593

F.Supp. 515, 518-519 (S.D.N.Y. 1984)(noting that exercise of absolute right to early termination

does "not *defeat* the contract, but simply advanced the period of fulfillment")(emphasis added by

original), quoting Blake v. Voight, 134 N.Y.69 (1892); Berardi v. Fundamental Brokers, Inc.,

1992 WL 27169 at *2 (S.D.N.Y. Febr. 5, 1992)(employment context).

While conceding that the Oral Agreement is terminable at-will,[12] Milagros nevertheless

seeks to bar enforcement of the Oral Agreement by relying on a line of cases applying GOL §5-

701(1) to contracts of indefinite duration that can only be terminated for cause or are dependent

---

[12] In its Reply Memorandum of Law in Support of its Motion to Amend its Answer to the Counterclaim, Milagros states that the "fact" that the Oral Agreement was terminable at will does not avoid the application of the Statute of Frauds.  At p. 3.

upon third parties for their fulfillment. [13]   The Oral Agreement was not a requirements contract and it was not a contract for the payment of commissions.  Performance, therefore, depended solely upon the acts of the parties.  The Oral Agreement was an at-will licensing agreement and, therefore, by its terms fully performable within one year by its permitted termination.  GOL §5-701(1) is inapplicable to the Oral Agreement.

### 4.  Milagros Is Estopped From Asserting the Statute Of Frauds Defense

Even if the Court finds that either Statute of Frauds applies to the Oral Agreement, a genuine issue of fact exists as to whether Milagros is estopped from asserting it.  A party will be estopped from relying on the defense of the Statute of Frauds where that party, by their representations, has led another to "'irremediably alter his situation' such that the interposition of the statute against performance [would constitute] a fraud.  Grappo v. Alitalia Linee Aeree Italiane, 56 F.3d 427, 432 (2d Cir. 1995), quoting, Woolley v. Stewart, 222 N.Y. 347, 350-51 (1918).  "[I]t is universally conceded that the doctrine of equitable estoppel may be invoked to preclude attack upon a voidable agreement when to permit the same would open the door to unjust enrichment or irreparable injury. . ."  Brockport Developers, Inc. v. 47 Ely Corporation, 82 Misc. 2d 310, 314 (Monroe Co. 1975)(citations omitted)(in context of GOL§ 5-703).  "Suffice to say that equity will not countenance a ritualistic invocation of the Statute of Frauds, especially where the party claiming its protection had acquiesced in and profited from the very agreement it now seeks to abjure."  Id. at 315.  In order to be estopped from asserting the Statute of Frauds, the circumstances should be such that it would be unconscionable to deny the oral

---

[13] Zimmer-Masiello v. Zimmer, Inc., 552 N.Y.S.2d 935, 939 (1st Dep't 1990)(holding contract within Statute of Frauds because contract would be in force "for so long as plaintiff continued to increase its annual volume of sales satisfactorily" and could, therefore, only be terminated for cause, not by performance); Paper Corp. of the United States v. Schoeller Technical Papers, Inc. , 724 F.Supp. 110 (S.D.N.Y. 1989) (holding contract within statute where parties agreed that contract was to be in force for "so long as" the distributor's customers bought products and, therefore, performance was not completely within domain of the parties to the contract).

agreement.  Ginsberg v. Fairfield-Noble Corp., 81 A.D.2d 318, 320-21, citing Swerdloff, 74 A.D.2d at 263.

In this case, Torres represented in writing that she believed she required Progress Vantage's permission to use the Mark in the United States and was fully aware or that Progress Vantage was registering the Mark.  There is written evidence pointing directly to her acceptance and a licensor/licensee relationship.  She now claims that her use of the word "license" was a mistake and that W. Wong orally promised to register the mark on her behalf.  By never once inquiring as to the status of the trademark application, even in the face of a direct challenge to ownership by Neet Feet, Torres filled Progress Vantage with the confidence that the Oral Agreement was being honored.  In responding to the Neet Feet allegations with a letter reciting Progress Vantage's authorization from Kim Gray to use the Mark, Torres even made affirmative use of her status as licensee.  Progress Vantage was the owner and manufacturer of Betta goods in China and, based upon Torres' representations, believed it was taking steps to expand its ownership to the United States.  If Torres is permitted to hide behind the Statute of Frauds, Progress Vantage would be forever deprived of the United States trademark rights which it retained Milagros to establish.  This deprivation would be irreparable and, in light of Torres' flatly incredible testimony, an unconscionable result.

## IV.    The Oral Agreement Is Clear, Definite and Enforceable

In order to demonstrate ownership of the Mark under the Oral Agreement, Progress Vantage must be able to point to contract terms that are "sufficiently definite so that a court can ascertain its terms" for enforcement.  Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc., 206 A.D.2d 166, 169 (1st Dep't 1994).  The doctrine of definiteness "means that a court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to." Korff v.

Corbett, 18 A.D.3d 248, 250 (1st Dep't 2005)(citations omitted).  New York Courts, however, "do not apply the doctrine rigidly" and the "conclusion that a party's promise should be ignored as meaningless 'is at best a last resort.'"  166 Mamoroneck Ave. Corp. v. 151 East Post Road Corp., 78 N.Y.2d 88, 91 (N.Y.1991), quoting Cobble Hill Nursing Home v. Henry & Warren Corp., 74 N.Y.2d 475, 483 (N.Y. 1989).  Moreover, the fact that the parties intended to be bound "may be established through the conduct of the parties recognizing the contract" in which case "the totality of all acts of the parties, their relationship and their objectives [may] be considered."  Tractebel Energy marketing, Inc. v. AEP Power marketing, Inc., 487 F.3d 89, 97 (2d Cir. 2007).

Upon hearing that Progress Vantage was fully prepared to register the Betta mark in the United States, Torres wrote "This is great news!!! We now have a license!!"  Torres' language – "now" – evidences a clear intention to be bound under the terms of a licensing agreement.  While she went on to ask the "parameters" of the license to which she was agreeing, her intent to be presently bound to the essential terms of the Oral Agreement, to wit, that she would not own the mark and that she would maintain the quality standards of goods bearing the Betta mark, cannot be contested.  Progress Vantage does not seek enforcement of these "parameters," but only its ownership rights.  With all reasonable inferences taken against Milagros, the evidence presented shows that the issue of ownership was neither unclear nor left open for future negotiation.

Contrary to Milagros' unsupported assertions, the only "essential" terms to a license are (1) the grant of a limited right to use the trademark and (2) the maintenance of quality standards.  Id. (citations omitted).  Bunn –O-Matic Corp. v. Bunn Coffee Service, Inc., 88 F.Supp.2d 914, 921 (C.D.Ill. 2000) (holding that retention of ownership, having use inure to benefit of licensor and requiring licensee to maintain quality of goods "constitute the essential terms of a trademark license agreement"), citing MCCARTHY §18:43.  While a licensor must ensure that the quality of

goods is maintained, there is no requirement that a formal mechanism be instituted for this purpose. Bunn-O-Matic, 88 F.Supp. at 921, citing TMT North America v. Magic Touch GmbH, 124 F.3d 876, 885 (7th Cir. 1997).

All the essential terms of the Oral Agreement were agreed upon and the parties' conduct for three years without discussion, much less argument, as to the use of the Mark demonstrates this agreement. The parties agreed that Progress Vantage would be the owner of the Mark, i.e., that the Oral Agreement would not transfer any rights to Milagros other than the permitted use of the Mark and that all use of the goods would inure to the benefit of Progress Vantage. The parties agreed that Progress Vantage would have the right to inspect goods upon which the Mark was placed and W. Wong states that Progress Vantage indeed did so until it was satisfied that it could rely on Milagros to uphold the quality standards of the Betta goods.

In essence, Milagros does claim that the terms of the contract are too ambiguous to enforce, but rather only that there is no writing concerning some of the terms. While Milagros alleges that these unwritten terms are "essential" and "material," it does not offer a shred of evidence to support the proposition that the terms it refers to are either essential or material to a licensing agreement.

There is no authority that a licensing agreement has to be in writing and all authority holds that oral licensing agreements are enforceable. McCarthy §18:43; Fusco Group, Inc. v. Loss Consultants Int'l., Inc., 462 F.Supp.2d 321, 330 (N.D.N.Y. 2006); Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 847 F.Supp. 18, 20 fn.1 (E.D.N.Y. 1994); Department of Parks and Recreation for the State of California v. Bazaar Del Mundo, Inc., 448 F.3d 1118, 1129 (9th Cir. 2006), citing DeForest Radio Tel. & Tel. Co. v. U.S., 274 U.S.236, 241 (1927)(license can arise without a formal agreement).

Milagros cites to no authority for the proposition that a licensing agreement is required to have a duration or term to be enforceable. All of the authorities, including those cited by Milagros, cite to McCarthy's statement that a term "should" be stated because of the danger that a license without a duration would be construed as terminable at will. See e.g., Liberto v. D.F. Stauffer Biscuit Co., 441 F.3d 318, 324 (5th Cir. 2006), citing MCCARTHY §18:43.

Milagros also cites to no authority that a licensing agreement must have a formal quality control mechanism to be enforceable and, in fact, significant authority holds otherwise. Fusco Group, 462 F.Supp.2d at 330 (holding licensor is entitled to rely upon the licensee to uphold the quality of the goods); MCCARTHY §18:57 (noting that many courts hold that even a "licensor's complete failure to control quality does not mean that the license arrangement is invalid if the licensor reasonably relies upon the licensee's own quality control effort); Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017-18 (9th Cir. 1985)(holding long association where licensor respected licensee's "ability and expertise," it was justifiable for licensor to "rely on [licensee] to maintain high standards by performing his own quality control") quoted in Doebler's Pennsylvania Hybrids, Inc. Doebler, 442 F.3d 812, 823 (3d Cir. 2006).

The two cases Milagros cites to support a finding that the Oral Agreement is unenforceable are utterly distinct from this case. Liberto, decided under Texas contract law, involved a settlement agreement in which the parties explicitly agreed to negotiate a license. Liberto, 441 F.3d at 322 (quoting contract). The parties there did not agree to any terms, but rather agreed only that terms would result from future negotiations. Id. at 324 (noting that contract was an "agreement to make a contract at a future time"). Liberto was decided upon express written contract language in which the parties promised solely that they would negotiate.

22

There is no evidence that Milagros or Progress Vantage discussed, much less required, such negotiations to take place in the future.

Gander Mountain also involved an agreement that explicitly provided for a future written agreement to be executed upon terms that would be agreed to. Gander Mountain Co. v. Cabela's, 2007 WL 2026751 at *2 (D. Minn. July 10, 2007) (interpreting contract that provided for license "to be 'evidenced by a separate written agreement in form and content customary to licenses of the type described above"). In that case, the expressed written contract language provided no "guidance on what terms are customary." Id. at *4. Gander Mountain was decided, therefore, on the basis that the parties had not agreed to a single term of the proposed license. Id. at *5 (stating that there was no evidence that "the parties reached an agreement on the form and content that is customary. . .").

In this case, there is no executed written contract that states the parties "will agree in the future as to the specific terms." Milagros does not say that the parties explicitly left items open for negotiation, but rather only that these items were not discussed. There is no evidence, in other words, of any "agreement to agree."

Rather, with no evidentiary basis, Milagros argues that there are not enough "essential terms" to make the Oral Agreement enforceable. This argument completely ignores that (i) Torres expressed her present assent to be bound by a licensing agreement; (ii) the parties agreed that Progress Vantage would own the mark, that Milagros would distribute Betta goods on behalf of Progress Vantage; (iii) that there would be no royalty payments and (iv) that Progress Vantage had the right to inspect goods. At all times, Progress Vantage maintained the quality of goods produced at its own factories. The subsequent conduct of the parties fully comports with these

terms and a reasonably fact finder could (and should) conclude that the parties had a present intention to be bound by these clear contract terms.

**Milagros Cannot Establish Its Ownership of the Betta Mark.**

**1. Disputes between Manufacturers and Distributors.**

There is a presumption that the manufacturer of goods is the trademark owner. MCCARTHY §29:8. Where ownership is between foreign manufacturer and exclusive U.S. distributor is at issue "absent an agreement to the contrary, the rights remain with the foreign manufacturer." MCCARTHY §16:49. To acquire ownership, "most courts have held that the U.S. exclusive distributor must have some form of express or implied assignment of rights from the foreign manufacturer." MCCARTHY §29:8.

In this case, there is no doubt that Progress Vantage was the manufacturer of the majority of goods sold by Milagros bearing the Betta mark. At the time the Milagros began distributing goods bearing the Betta mark, it was fully aware that Progress Vantage was the only entity outside of Australia and New Zealand producing and distributing Betta goods. In the event that the Court finds that the Oral Agreement is unenforceable, there is at the very least an issue of material fact as to whether Milagros can overcome the presumption that, as the foreign manufacturer of Betta goods, Progress Vantage owns the Betta trademark.

**2. Milagros is Estopped From Asserting Ownership Over the Betta Mark**

In order to prevail on its affirmative defense that Milagros is estopped from asserting ownership over the Betta mark, Progress Vantage must show that (1) Milagros had knowledge of Progress Vantage's conduct; (2) Milagros either (a) intended that Progress Vantage rely on Milagros' acts or omissions or (b) acted or failed to act in such a manner that Progress Vantage had a right to believe it was intended to rely on Milagros' conduct; (3) Progress Vantage was

ignorant of the true facts; and (4) Progress Vantage relied on Milagros' conduct to its detriment.
Fitzpatrick v. Sony-BMG Music Entertainment, Inc., 2007 WL 4358471 at *3 (S.D.N.Y.
December 12, 2007)(setting forth elements of estoppel).

    In this case, there is competent evidence to show that (1) Milagros was fully aware of
Progress Vantages trademark application for three years; (2) Progress Vantage was justified in
relying on Milagros' failure to assert ownership over the Betta mark; (3) Progress Vantage had
no knowledge that Milagros would ever assert ownership over the Betta mark, and (4) that
Progress Vantage is threatened with irreparable harm (i.e., the loss of its trademark) as a result of
Milagros' conduct.  At the very least, sufficient evidence exists to create an issue of material fact
as to whether Milagros is estopped from asserting ownership over the Betta mark.

### 3.    Milagros Has Waived Its Right To Assert Ownership Over the Betta Mark

    In order to prevail on its affirmative defense that Milagros of waiver, Progress Vantage
must demonstrate that Milagros engaged in a "voluntary and intentional abandonment of a
known right, which, but for the waiver, would have been enforceable."  Jordan v. Can You
Imagine, Inc., 485 F.Supp.2d 493, 499 (S.D.N.Y. 2007)(citations omitted).  "Waiver may be
established by affirmative conduct or by a failure to act that evinces the intent to abandon the
right."  Id.

    While Progress Vantage denies the contention, Milagros asserts that Progress Vantage
promised to register the trademark on its behalf.  Yet for three years, Milagros made no inquiry
whatsoever about the status of the Mark.  A reasonable juror could find that this "failure to act"
demonstrates an intent to give up ownership of the Mark.  In addition, confronted by an explicit
challenge to the ownership rights in the Betta mark by Neet Feet, Torres located Progress
Vantage's registration application, saw that Progress Vantage was to be the registered owner and

made no protest whatsoever. A reasonable juror could (and Progress Vantage believes should) find that this affirmative act unequivocally evidences a relinquishment of any claim to ownership in the Mark. At the very least, Progress Vantage has provided enough evidence to create an issue of material fact as to its affirmative defense of waiver.

**4. Milagros' Claim to Ownership of the Betta Mark Is Barred by Laches**

In order to prevail on its affirmative defense of laches, Progress Vantage "must establish that both [Milagros'] lack of diligence under the circumstances in initiating an action, as well as prejudice from the delay." <u>Baron Phillipe de Rothschild v. Paramount Distillers, Inc.</u>, 923 F.Supp. 433, 438 (S.D.N.Y. 1996). This determination "requires a fact intensive inquiry." <u>Id</u>.

In this case, despite claiming that Progress Vantage would register the Betta mark for it, Milagros never inquired as to the application status for three years. Also, by failing to make any statement as to its belief about ownership of the Betta mark in the specific context of (1) a challenge to the ownership of the Betta mark and (2) actually seeing the USPTO application listing Progress Vantage as owner of the Betta mark, Milagros displayed a lack of diligence upon which Progress Vantage relied to its detriment. At the very least, there is an issue of fact as to the affirmative defense of laches.

## CONCLUSION

For all of the reasons stated herein, Milagros' Motion for Summary Judgment should be denied in its entirety and all such alternative relief as the Court deems fair and just should be accorded to Progress Vantage.


Dated: New York, New York           STORCH AMINI & MUNVES, P.C.
March 31, 2008


By: _____
Benjamin L. Felcher Leavitt (BL 7363)
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
(212) 490-4100
*Attorneys for Defendant and Counterclaim
Plaintiff*