UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|   |   |
|---|---|
| MILAGROS IMPORTS LIMITED, a New York corporation, | ) ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| PROGRESS VANTAGE LIMITED, a foreign corporation, | ) ) ) ) |
| Defendant. | ) ) |

07-CV-3215 (SHS)

**REPLY BRIEF IN SUPPORT OF
<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

LANDMAN CORSI BALLAINE & FORD P.C.
120 Broadway, 27th Floor
New York, New York 10271-0079
(212) 238-4800

STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
(206) 624-0900

*Attorneys for Plaintiff Milagros Imports Limited*

In a vain attempt to avoid summary judgment and recharacterize the basic buyer/seller relationship between the parties, Progress Vantage Limited ("PVL") relies on a handful of disconnected e-mails to patch together an alleged oral license and exclusive distribution contract (the "Agreement"). In essence, PVL has manufactured a controversy over who did what, when, and why. PVL's conclusory allegations, however, are not determinative of the central issue before the Court on summary judgment: namely, whether the alleged oral Agreement ever existed and, if so, whether it is barred by the Statute of Frauds. Even accepting the facts as presented by PVL, summary judgment is proper as a matter of law because the facts show:

(1) No contract existed in light of the parties' failure to agree to essential terms;

(2) Even if a contract existed, it was a distribution agreement for the sale of goods with incidental services and thus barred by the U.C.C. Statute of Frauds; and

(3) Performance of the alleged contract depended on the production of goods in response to third-party customer orders and, as such, was not capable of performance within one year and thus barred by the New York Statute of Frauds.

A. **The U.C.C. Statute of Frauds Applies to Bar the Alleged Agreement.**

1. **The "Sale of Goods" Aspect of the Alleged Agreement Predominates.**

PVL tries to avoid application of the U.C.C. Statute of Frauds by asserting that the alleged Agreement was a "hybrid" contract for goods and services, with services predominating. The argument fails when, as here, the sales aspect of the alleged Agreement clearly controls.[1] Although distributor agreements often involve more than the sale of goods, the majority of courts

---

[1] The application of U.C.C. § 2-201 and New York Gen. Oblig. Law § 5-701 are not mutually exclusive. Several New York courts, both state and federal, have analyzed and applied one or both. *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, No. 6 Civ. 3085 (KMW), 2007 WL 867202 (S.D.N.Y. Mar. 21, 2007) (applying section 2-201 to alleged exclusive distributorship contract); *Multi-Juice, S.A. v. Snapple Beverage Corp.*, No. 02 Civ. 4635, 2006 WL 1519981 at *10 (S.D.N.Y. June 1, 2006) (applying section 2-201 and finding that "[b]ecause the distribution of goods in question here involved the purchase of more than $500 of goods from Snapple, there would have to be a writing for the exclusive distribution agreement to be enforceable."); *Sanyo Elec., Inc. v. Pinros & Gar Corp.*, 571 N.Y.S. 2d 237, 238 (N.Y. App. Div. 1991) (alleged distributorship agreement barred by both U.C.C. § 2-201 and New York G.O.L. § 5-701(a)(1)); *United Magazine Co. v. Murdoch Magazines Distrib., Inc.*, 146 F. Supp. 2d 385, 404 (S.D.N.Y. 2001) (applying section 2-201 in alternative); *United Beer Distrib. Co. v. Hiram Walker (N.Y.), Inc.*, 557 N.Y.S.2d 336 (N.Y. App. Div. 1990) (finding oral distribution agreement unenforceable under both U.C.C. § 2-201 and New York GOL § 5-701(a)(1)).

1

find their predominant purpose to be the sale of goods and treat distributor agreements as governed by Article 2 of the U.C.C. *See* Debra L. Goetz, *et al.*, *Article Two Warranties in Commercial Transactions: An Update*, 72 Cornell L. Rev. 1159, 1329 (1987); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736 (2d Cir. 1998) (UCC applied to distributor contract involving goods and services); *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 134 (5th Cir. 1979); *Sally Beauty Co., Inc. v. Nexxus Prods. Co.*, 801 F.2d 1001, 1005 (7th Cir. 1986) (applying majority rule that distributorship is a contract for "goods" under UCC) (citing cases).

Even if the Court deems application of the U.C.C. to the alleged Agreement to be a factual issue, the allegation of PVL that it was a contract for services, standing alone, does not avoid the U.C.C. PVL must "demonstrate more than some metaphysical doubt as to the material facts," and come forward with "specific facts showing there is a genuine issue for trial." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) (internal quotation marks and citation omitted). Those specific facts must be more than "conclusory statements, conjecture, or speculation." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

Here, PVL does not allege the existence of a written contract. PVL simply contends that at some time in 2003, William Wong and Irene Torres made an oral agreement whereby PVL manufactured BETTA footwear and Milagros allegedly became the exclusive distributor of that footwear in the United States. That relationship is described by PVL as follows:

- "The business arrangement agreed to by the parties was that PVL exclusively supply Milagros with footwear bearing the BETTA mark and that Milagros would be the exclusive distributor of the BETTA footwear for PVL in the United States." (Counterclaim, Dkt. # 10, ¶ 62)

- "In order to achieve this goal, I wanted Torres's experience and skill in landing clients so that we would establish a wide distribution of Betta and the mark would become well known and in high demand." (Wong Declaration, Dkt. # 39, ¶ 32)

2

- "Having become friends with Torres and having seen her skills in action at Ben Berger, I believed that she had the skills and contacts I needed in a sales agent who could locate and keep customers for Betta products." (*Id.*, ¶ 33)

PVL's stated goal was to have a "sales agent" in the United States. Ms. Torres's knowledge and experience in the U.S. market were supposedly valuable to PVL to promote the sale of BETTA goods. Any services allegedly provided by Ms. Torres as a sales agent can thus be viewed only as incidental to the ultimate goal – sale of goods. There is no allegation that PVL made payment to Milagros for "services;" indeed, there is no allegation that PVL ever paid Milagros anything.[2] The only evidence of payments between the parties is Milagros's payments to PVL for the goods that Milagros purchased from PVL.[3] Characterizing the business relationship as one in which Milagros would allegedly "develop the customer base for the Betta products on [PVL's] behalf" (Wong Decl. ¶ 61) as a "sales agent" can only be accomplished through the sale of goods.[4]

Calling the alleged Agreement a contract for "services" does not make it so. "It is the essence of the transaction that controls and not the label the parties attach to it." *In re Rednow*

---

[2] It is undisputed that the $25,000 loan from PVL to Milagros was just that-a loan-that has since been repaid. (*See* Paragraph 4 of the Statement of Undisputed Facts (Dkt. #31) and PVL's Response).

[3] (Milagros's Statement of Undisputed Facts and PVL's Response, ¶ 8)

[4] Cases from other jurisdictions analyzing the same issue in related circumstances are informative. *WICO Corp. v. Willis Indus.*, 567 F. Supp. 352 (N.D. Ill. 1983), involved a contract for the exclusive distribution of goods. The contract placed a joint duty on the parties to develop demand for the products and to consult on the design of future products, and imposed "extensive promotional obligations" on the distributor, including "(1) the use of [the other party's] trademarks and logos, (2) extensive advertising including sales displays, mail marketing and sales contests, and (3) the hiring, training and implementation of a sales staff." *Id.* at 353-54. The court found that even though the distributor was not "*simply* a distributor of goods, the Agreements *were* for the sale of goods – [because] without such sale the Agreements were meaningless." *Id.* at 355. (*cont'd*)

(*cont'd*) Likewise, in *Allmand Assocs., Inc. v. Hercules Inc.*, 960 F. Supp. 1216 (E.D. Mich. 1997), the court determined on summary judgment that a license and requirements agreement was a contract for the sale of goods subject to the UCC. In holding that the relationship was one for "goods," the court noted that it was "not blind to all the services involved" but found that the services were "merely incidental to the sale" of goods. Further, the fact that marketing services were not paid for "bolster[ed] [the] court's conclusion that the predominant purpose of the relationship was the sale of a good." *Id.* at 1224-25.

3

*Realty Corp. v. Tully*, 420 N.Y.S.2d 792, 72 A.D.2d 621, 622 (N.Y. App. Div. 1979). As such, the UCC Statute of Frauds should apply to bar enforcement of the alleged Agreement.

### 2. The Merchant Confirmation Exception Cannot Expand a Business Relationship for the Sale of Goods into an Exclusive Distributorship and License Agreement.

PVL cannot cure its lack of a written contract based on the merchant confirmation exception of UCC § 2-201(2). There is certainly no dispute that the parties exchanged sufficient writings in the form of purchase orders and invoices with respect to the products actually manufactured by PVL and purchased by Milagros to show that Milagros and PVL had an agreement for the manufacture and purchase of products. Those documents, however, do nothing more than establish a basic buyer/seller relationship and have nothing to do with an alleged Agreement providing for an exclusive license and distributorship of footwear products bearing the Mark in the United States. *United Beer Distrib.*, 557 N.Y.S.2d at 337-38. "Performance will remove an alleged contract from the operation of the statute of frauds *only when it is unequivocally referable* to that contract." *Throndson v. Comm'r of Internal Revenue*, 457 F.2d 1022, 1026 (9th Cir. 1972) (emphasis added); *Paper Corp. of the United States v. Schoeller Technical Papers, Inc.*, 724 F. Supp. 110, 115 (S.D.N.Y. 1989) (part performance alleged did not avoid application of Statute of Frauds when performance was not "unequivocally referable to the agreement."). As such, the UCC Statute of Frauds bars application of the alleged Agreement.

### B. The New York Statute of Frauds Bars the Alleged Agreement.

#### 1. PVL Contends Only That the Alleged Agreement Could Be Terminated Within a Year, but Offers No Evidence to Show It Could Be Performed Within a Year.

PVL's contention that the alleged Agreement was an "at-will licensing agreement and, therefore, by its terms fully performable within one year by its permitted termination"

4

(Opposition at 18) concedes the applicability of the New York GOL § 5-701. A contract with an indefinite term, as alleged by PVL here, is capable of performance within a year only if there is an express provision for termination before the end of the year. "[T]ermination is not performance, but rather the destruction of the contract where there is no provision authorizing either of the parties to terminate as a matter of right." *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 456-57 (1984). And "New York cases uniformly hold that implied termination terms are not sufficient to take an oral contract out of the statute [of frauds]." *Burke v. Bevona*, 866 F.2d 532, 538 (2d Cir. 1989). PVL does not argue that the alleged Agreement contained any termination provision, let alone an express termination provision.

Instead, PVL claims that the alleged oral Agreement depended only on the acts of the parties, was terminable at will and, on that basis alone, capable of *performance* within one year.[5] But the record shows that the alleged Agreement was dictated by third-party orders. PVL was not engaged in direct sales to customers in the United States (Wong Decl. ¶¶ 31, 32) and under the alleged Agreement, Milagros procured customer orders as a "sales agent." The evidence reflects that termination of the alleged Agreement depended on the status of third-party orders. Mr. Wong purportedly terminated the alleged Agreement on November 22, 2006. (Statement of Undisputed Facts ¶ 18) He admitted that, at the time of the purported termination, PVL was still manufacturing BETTA footwear for Milagros's customers for the 2007 Fall, Spring, and Summer seasons. (Power Decl., Ex. 1, 141:3-5) To "try not to damage the brand to disappoint a customer," (Power Decl., Ex. 4, 56:11-13), PVL continued to manufacture and ship additional BETTA footwear to Milagros after the alleged November 2006 termination date. (Statement of Undisputed Facts ¶¶18 and 20, PVL's Response) Consistent with this Court's reasoning in

---

[5] To limit redundancy, Milagros incorporates herein by reference its Memorandum and Reply briefs in Support of its Motion to Amend Answer to Counterclaim.

*Paper Corp.*, 724 F. Supp. at 115, the alleged contract could be fully performed within one year only if Milagros's third-party customers, "who themselves are not parties to the contract," stopped ordering footwear produced by PVL. GOL § 5-701(1)(a) thus renders the alleged Agreement unenforceable.

### 2. The E-mails Do Not Set Forth the Essential Terms of the Alleged Agreement.

Under the New York Statute of Frauds, GOL § 5-701, a signed writing must set forth all of the essential terms of an alleged agreement to hold an oral agreement otherwise enforceable. As detailed in Section C, below, the e-mails relied on by PVL here do not suffice.

### C. No Enforceable Contract Ever Existed.

Clinging to Ms. Torres's admittedly lay use of the term "license" in an e-mail as the core of its claim that a license existed, PVL goes on to stretch its argument to contend that the alleged oral Agreement based on a handful of e-mails is "clear and definite." Such a claim ignores the record. Factors involved in assessing whether an oral contract exists include: (1) whether there has been partial performance, accepted by the party disclaiming the contract; (2) whether all of the terms of the alleged contract have been agreed on; and (3) whether the agreement is the type of contract that usually is committed to writing. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984). An analysis of those factors proves that no agreement exists here.[6]

The performance of the parties belies the existence of an Agreement placing ownership of the BETTA mark in the United States in PVL's hands. Contrary to accepting PVL's purported right to the Mark in the United States, upon learning that PVL had applied to register the Mark in the United States, it is undisputed that Milagros timely filed an opposition with the

---

[6] This is the type of contract usually committed to writing. *PDL Vitari Corp. v. Olympus Indus., Inc.*, 718 F. Supp. 197, 208 (S.D.N.Y. 1989) ("licensing and distribution agreements are the type of agreements that are usually reduced to writing").

Trademark Trial and Appeal Board and filed its own application to register the Mark. (Statement of Undisputed Facts ¶ 22)

The e-mails confirm that the parties did not agree on the terms of the alleged Agreement. For starters, in her e-mail of October 3, 2003, Ms. Torres noted that the Mark was not registered "as the process is not complete in the USA." (Torres Decl. Ex. 9) In furtherance of her belief that Milagros would own the Mark, Ms. Torres asked if PVL had filed the paperwork yet because she was having her colleague "help me to see if it can be done quicker[.]" (*Id.*) It was perfectly reasonable for Ms. Torres to rely on PVL to register the Mark in the United States on Milagros's behalf. In fact, PVL concedes that it did precisely the same in having an associate register a mark on PVL's behalf in mainland China. (Wong Decl. ¶ 13)

PVL has not met its burden of proving that the parties agreed to all essential terms of the alleged Agreement. PVL cites *Bunn-O-Matic Corp. v. Bunn Coffee Service, Inc.*, 88 F. Supp. 2d 914, 921 (C.D. Ill. 2000), for the proposition that the only essential terms to a license are the grant of a limited right to use the mark and the maintenance of quality standards. *Bunn-O-Matic*, however, involved a written agreement that expressly provided, in relevant part:

> '[Bunn-IL] grants to [Bunn-NY] the continued right to use the name BUNN COFFEE SERVICE in connection with its existing business . . .' The Agreement further states that Bunn-IL owns its registered BUNN trademarks and that Bunn-NY gains no ownership by reason of the Agreement. The Agreement also states that, 'all uses of the Marks will continue to enure to the benefit of [Bunn-IL].' Finally, the Agreement obligates Bunn-NY to maintain the quality of its goods and services and that maintenance of quality standards 'is a material obligation of this Agreement.'

*Bunn-O-Matic*, 88 F. Supp. 2d at 921 (ellipsis in original). There are no such express written provisions here. PVL points to no writings that specify (1) whether the alleged license applied only to "BETTA" or extended to "BETTA Spa" products developed and produced by Milagros wholly independent of PVL; (2) the parties' respective ownership interests in the Mark; (3) that

7

use of the Mark in the United States would inure to the benefit of any party other than the user; or (4) that Milagros was obligated to maintain the quality of goods and services associated with the Mark.[7]

At the most, the alleged Agreement provided that PVL would manufacture BETTA footwear for Milagros to sell in the United States and nothing more. Ms. Torres's unanswered questions about the potential scope of the parties' business relationship were just that, unanswered questions. "Absent a mutual intention to be bound, there can be no contract." *Advanced Marine Tech., Inc. v. Burnham Sec., Inc.*, 16 F. Supp.2d 375, 380 (S.D.N.Y. 1998).

### D.   PVL's Alleged License Cannot Convey More Than It Owns.

PVL contorts the alleged Agreement to be, on the one hand, a license and exclusive distribution agreement providing Milagros with a license to use the Mark in the United States and act as PVL's exclusive distributor, and, on the other hand, a contract whereby the parties simply agreed to their respective rights in the Mark going forward. As set forth in Milagros's opening brief, PVL cannot license what it does not own. PVL offers no case providing otherwise.

Regardless, even if the alleged Agreement set forth the parties' respective rights in the Mark, at the very most, PVL cannot license use beyond that to which it allegedly has a right. Here, PVL has applied to register the Mark for use on "house slippers" only. (Statement of Undisputed Facts ¶ 21) As such, any use of the Mark allegedly licensed by PVL could only extend to use on house slippers. By contrast, Milagros has consistently and exclusively used

---

[7] PVL does not contend that it had agreements with any of the other manufacturers that Milagros used to produce BETTA and BETTA Spa products. It offers no evidence that it had any control over products produced by Milagros's other manufacturers. PVL's purported "permission" to let Milagros pay other manufacturers to produce BETTA products for Milagros is void of legal import in determining quality control. Mr. Wong's hollow statement that he knew that the other factories "made products of good quality, matching our own" and Ms. Torres's passing comment that she would "make BETTA proud" are far from a written expression of PVL's holdback of its right to assert quality control over the production of all BETTA products.

8

both the Mark and the "BETTA Spa" mark, as well as applied to register for use of the Mark and the "BETTA Spa" mark, on numerous other products, including, but not limited to, footwear, slippers, socks, sandals, booties, gloves, robes, shower wrap sets, and slipper sets. *Id.* ¶ 22. PVL's contention that it licensed use of the Mark to Milagros cannot, in any event, extend beyond its own alleged right that, at most, is limited to house slippers.

E.  **Milagros Is Not Barred from Claiming Its Ownership of the Mark Under the Doctrines of Estoppel, Waiver, or Laches.**

Milagros is not estopped from asserting the Statute of Frauds defense or from claiming its affirmative right to use of the Mark. PVL cannot seriously claim that it did not have knowledge of the fact that Milagros contested its application for registration of the Mark when, after learning that PVL surreptitiously applied for registration of the Mark for its own benefit, Milagros timely filed an opposition with the Trademark Trial and Appeal Board. Nor can PVL establish a prejudicial change in its position as it offers no evidence that it has relied to its detriment on Milagros's failure to assert its right earlier.[8]

Nor can PVL prevail on a defense of waiver or laches. Ownership of a trademark is based on use. *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 118 (2d Cir. 1999) (registration does not create trademark right; it only recognizes right acquired through use). Although PVL contends that Milagros's use of the Mark in the United States inured to its benefit, it is

---

[8] PVL's repeated reference to the so-called "Neet Feet Controversy" to support its equitable arguments misses the mark. That matter involved a letter to Milagros from an Australian company asserting its right to the Mark in the United States. Milagros engaged counsel, who responded by letter confirming Milagros's right to use of the Mark in the United States. (Wong Decl., Ex. 14) In part, Milagros's counsel stated that Milagros "has established common law trademark rights in the name and mark BETTA in the United States by virtue of its use in commerce." *Id.*

The reference in that letter to "express authorization" to use the Mark from Kim Gray, the purported former owner of the Mark in Australia, and PVL's repeated references to its own purported rights outside the U.S. are inapplicable. They have no legal bearing on this matter. *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974) (noting "well-settled" view that "foreign use is ineffectual to create trademark rights in the United States."); *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 599 (S.D.N.Y. 2001).

9

undisputed that Milagros has exclusively and consistently been the only user of the Mark in the United States. Milagros did not delay in asserting its rights when it exclusively used the Mark – the very basis for ownership – consistently since its first use in the United States in 2004.

**F.      Ownership of the Mark**

If the Court finds that no valid or enforceable agreement existed, PVL contends that fact finding is needed for Milagros to rebut the presumption that as a foreign manufacturer, PVL is presumptively deemed to own the Mark. Such a presumption is inapplicable when, as here, the goods passed through Milagros's hands in the course of trade and were imbued with the benefit of Milagros's name, reputation, and business style. *See IMAF, S.P.A. v. J.C. Penney, Inc.*, 806 F. Supp. 449, 454 (S.D.N.Y. 1992).

## CONCLUSION

For all the foregoing reasons, Milagros's motion for summary judgment should be granted finding the alleged oral Agreement nonexistent or unenforceable, dismissing PVL's first, second, and third counterclaims as a matter of law, and declaring Milagros the owner of the Mark in the United States. PVL has withdrawn its fourth and fifth counterclaims.

Dated: New York, New York
April 7, 2008

Respectfully submitted,

LANDMAN CORSI BALLAINE & FORD P.C.

By: _____
Daniel S. Moretti (DM 6630)
Attorneys for Plaintiff
Milagros Imports Limited
120 Broadway, 27th Floor
New York, New York 10271-0079
(212) 238-4800

Seattle-3414672.1 0074068-00001

STOEL RIVES LLP

By: _/s/ Vanessa Soriano Power_
Vanessa Soriano Power (WSBA 30777)
*Admitted pro hac vice*
Attorneys for Plaintiff
Milagros Imports Limited
600 University Street, Suite 3600
Seattle, WA 98101
(206) 624-0900

To: Storch, Amini & Munues, P.C.
Attorneys for Defendant
140 E 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100

11

Seattle-3414672.1 0074068-00001