UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MILAGROS IMPORTS LIMITED, a New York corporation, | 07-CV-3215 (SHS) |
| Plaintiff, | **MILAGROS IMPORTS LIMITED'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| PROGRESS VANTAGE LIMITED, a foreign corporation, | |
| Defendant. | |

This matter came on for trial before the Honorable Sidney H. Stein on June 2, 2008. Plaintiff Milagros Imports Limited ("Plaintiff" or "Milagros") appeared by and through Vanessa Soriano Power of Stoel Rives LLP and Daniel S. Moretti of Landman Corsi Ballaine & Ford PC, and Defendant Progress Vantage Limited ("Defendant" or "PVL") appeared by and through Benjamin Felcher Leavitt of Storch Amini & Munves, P.C. The following witnesses appeared and gave testimony: Irene-Luisa Torres, Raymond Figueroa, William Wong, and Lynn Wong. The Court, being familiar with the record, has considered the testimony of the witnesses and the documentary evidence submitted, and has heard and considered the arguments of counsel. Now, therefore, being fully informed in the premises, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

**THE PARTIES**

1. Milagros Imports Limited ("Milagros") is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York. Since its incorporation on October 1, 2003, Milagros has been in the business of designing, marketing, and selling its footwear and personal care products in the United States and other parts of the world.

1

2.  Milagros is run by its founder, majority shareholder, and President, Irene-Luisa Torres, and Secretary and minority shareholder Raymond Figueroa. Since its inception, Milagros has designed and marketed its footwear and spa products under various marks, including "BETTA," "BETTA Spa," and "I. Luisa Torres" to retailers including Macy's, Filene's Basement, Marshalls, and TJ Maxx.

3.  Milagros is a small company with one full-time employee. The company averages $1 million in gross sales annually, but has yet to become profitable.

4.  Ms. Torres founded Milagros with a vision of her own company based on insight gained from more than 20 years' experience working in the accessories industry. Before forming Milagros, Ms. Torres prepared a business plan articulating her goal of designing and selling her own footwear and personal-care products under marks owned by Milagros.

5.  PVL is a corporation organized and existing under the laws of Hong Kong with its principal place of business in Kwai Chung, New Territories, Hong Kong. PVL is jointly owned by Hong Kong residents William and Lynn Wong, husband and wife.

6.  PVL is a large, profitable company. In fiscal year 2006 (April 1, 2006 – March 31, 2007), PVL's net revenue was $68 million Hong Kong dollars, over $8.7 million in United States dollars at the current exchange rate. All of PVL's revenue is attributable to exports.

7.  Through Mr. Wong, PVL owns three manufacturing companies in China that employ over 700 people.

8.  PVL was originally called "Goddess Footwear," but upon the advice of a feng shui advisor, Mr. Wong changed the name of the company to PVL in approximately 2001. Goddess Company ("Goddess") is now a subsidiary of PVL. Goddess is also jointly owned by Mr. and Mrs. Wong. According to Mr. Wong, Goddess operates as the trading arm of PVL.

9.  PVL did not make its relationship with Goddess clear to Milagros. In business dealings with Milagros, PVL and Goddess often acted interchangeably or simultaneously.

**HISTORY OF THE RELATIONSHIP BETWEEN THE PARTIES**

10. Milagros relies on numerous manufacturers in China and Korea to produce its

footwear and personal care products in sufficient quantities to its exacting specifications. One of those manufacturers is PVL, with which Milagros transacted business between 2004 and 2006.

11. The business relationship between Milagros and PVL grew out of a friendship between Ms. Torres and Mr. Wong. Mr. Wong and Ms. Torres first became acquainted when Mr. Wong worked as a quality control inspector for Splendid Footwear, a slipper manufacturer in China, and Ms. Torres worked for several United States wholesalers, most recently as the vice president of a footwear division.

12. Ms. Torres supported Mr. Wong in getting his manufacturing business up and running by teaching him how to make certain products in demand at that time and working closely with Mr. Wong on production issues in his first factory.

13. Mr. Wong was one of several manufacturers who encouraged Ms. Torres to start her own business.

14. When Ms. Torres founded Milagros in 2003, she called on friendships developed during her years in the accessories industry.

15. Among other things, Mr. Wong loaned Ms. Torres $25,000 to help Milagros begin business operations. That loan has been fully repaid.

16. John Lau, the owner of ARDA Industrial LTD, a packaging, ticket, and label manufacturer also based in Hong Kong, loaned Milagros $50,000. In addition, other manufacturers helped Milagros by extending shipments on extended credit and interest-free. In return, Milagros sent them business.

**ORIGINATION OF THE "BETTA" MARK IN AUSTRALIA**

17. To the best of the parties' knowledge, the "BETTA" mark ("BETTA" or the "Mark") at issue in this case first originated in Australia in the 1920s. The Mark is represented as the word "BETTA" in a stylized design.

18. Neither party actually designed the Mark. Milagros, however, designed and developed all packaging associated with the marketing and sale of BETTA products in the United States.

Seattle-3421367.1 0074068-00001

19.  Each party has adopted the Mark for use, respectively, in China and in the United States.

**APPROPRIATION OF THE "BETTA" MARK BY PVL IN CHINA**

20.  PVL's first use of the Mark was as a licensed manufacturer of the Mark for the sale of goods in Australia. PVL manufactured BETTA footwear at the direction of Kim Gray, an Australian proprietor.

21.  At some time in the 1990s, PVL appropriated the Mark for its own use in the domestic market in China. Although Mr. and Mrs. Wong admit that Mr. Gray's permission to use the Mark in China was unnecessary because Mr. Gray had no ownership interest in the Mark in China, Mr. and Mrs. Wong stated that they acted with Mr. Gray's approval.

22.  The Mark is not registered to PVL in China.

23.  According to Mr. Wong and Mrs. Wong, they asked a friend and factory owner who is a resident of China to register the Mark in China on PVL's behalf. In return, PVL has sent manufacturing business to that friend's factory.

24.  PVL has manufactured and sold footwear with the BETTA mark in the domestic Chinese market.

**APPROPRIATION OF THE "BETTA" MARK BY MILAGROS IN THE U.S.**

25.  In her business plan prepared in 2003, Ms. Torres recognized that for Milagros to be successful in the competitive marketplace, the company needed to design and market products with its own marks. Ms. Torres planned to design and market products with different marks in at least two price ranges, a mid-level price range, and a high-end price range.

26.  For products in the high-end price range, Ms. Torres chose to design and market products under the "I. Luisa Torres" mark.

27.  Ms. Torres was looking for potential marks under which to design and market products in the mid-level price range when she conferred with Mr. Wong in the Fall of 2003. Ms. Torres informed Mr. Wong of her business plans.

4

28.  Ms. Torres was aware that PVL manufactured footwear for sale in the United States under various learned that PVL manufactured footwear bearing the "BETTA" mark ("BETTA" or the "Mark") for sale in China. Ms. Torres was aware from her prior business dealings with PVL that PVL had manufactured footwear for sale in the United States for many years, but had never manufactured footwear with the BETTA mark.

29.  Mr. Wong claimed that the term "BETTA" was initially used as a mark on footwear in Australia by the family of Kim Gray, and later manufactured for sale by PVL in China.

30.  Milagros conducted a search of trademarks to assure itself that BETTA was available for use in the United States, and, based on PVL's role manufacturing footwear with the BETTA mark for sale in China, also confirmed the same with Mr. Wong.

31.  Because it was a mark that PVL had prior experience manufacturing for sale in China, Milagros believed that PVL could efficiently manufacture footwear designed and marketed by Milagros in the mid-level price range in the United States.

32.  It was Ms. Torres's understanding that Milagros would own BETTA in the United States, and that, based on her friendship with Mr. Wong, PVL would help Milagros register the Mark in the United States.

33.  The evidence submitted at trial demonstrates that Milagros first used the Mark at least as early as February 4, 2004, and first used the Mark in commerce at least as early as April 26, 2004.

34.  Milagros has made continuous and exclusive use of the Mark in the United States since its first use.

**BUSINESS RELATIONSHIP BETWEEN MILAGROS AND PVL**

35.  No written contract exists defining the relationship between Milagros and PVL.

36.  Between approximately August 10, 2003 and October 3, 2003, Mr. Wong and his wife, Lynn, exchanged e-mails with Ms. Torres discussing their prospective business relationship. PVL relies on those e-mails for its claim that a "clear and definite" agreement

5

existed between the parties calling for Milagros to be PVL's licensee and exclusive distributor of the Mark in the United States.

37. While those e-mails include an exchange of inquiries related to the expected nature of the business relationship, including a discussion of the use of the Mark in the United States, the e-mails do not make clear the parties, the effective date, the scope, the duration, the consideration, or any conditions related to the alleged oral contract. For example:

   a. PVL claims that Mr. Wong and Ms. Torres initially entered into an oral license and exclusive distribution agreement, and that agreement was then extended, on the same undocumented terms, to PVL and Milagros.

   b. PVL can cite to no date on which the alleged license took effect.

   c. PVL claims ownership of the BETTA mark on "house slippers" only. Milagros, however, has made continuous and exclusive use of the BETTA mark on numerous products, including footwear and various personal care products.

   d. PVL was never Milagros's exclusive supplier of BETTA products. The first products on which Milagros affixed the Mark were produced by a different manufacturer.

   e. The duration of the alleged oral license and exclusive distribution contract was not discussed, but Mr. Wong expected that it would last at least two years, and anticipated receiving at least $1 million in U.S. sales during that time.

38. The final e-mail relied upon by PVL includes numerous inquiries from Ms. Torres, to which no response was apparently provided. Those inquiries included, for example, a question about the status of PVL's filing of paperwork to apply for registration of the trademark in the United States. Ms. Torres's belief that the paperwork was being filed on behalf of Milagros's ownership rights in the Mark are confirmed by her statement that, if it had not yet been filed, she would have Mr. Figueroa assist in Milagros getting it filed quicker.

Seattle-3421367.1 0074068-00001

39. Other than Ms. Torres's lay use of the word "license" in one e-mail noting her excitement at Milagros's ability to appropriate the Mark for use in the United States, PVL points to no written documents, or actions, supporting its contention that Milagros acted as PVL's licensee.

40. The documentary evidence demonstrates that the parties' business relationship was an arms-length contract manufacturing arrangement. The parties exchanged numerous transactional documents during their business relationship that confirm the standard commercial nature of the relationship, including (1) development documents relating to Milagros's design and development of BETTA footwear for manufacture by PVL; (2) production documents relating to Milagros's enforcement of strict standards to ensure uniform and high-quality products; and (3) transactional documents including purchase orders, invoices, and shipping documents related to Milagros's purchase of footwear manufactured by PVL.

41. Milagros often designed and developed BETTA products up to a year in advance. In light of customer demands, it was common for Milagros to place purchase orders with PVL for products to be produced and delivered six months to a year in the future.

42. The parties have never shared profits or had a joint business operation. PVL made no payments to Milagros for any services related to Milagros's sale of BETTA products.

43. PVL was unaware of the majority of Milagros's actions taken to market and promote BETTA products in the United States. All such efforts were supported and funded solely by Milagros.

**MILAGROS'S USE OF THE MARK AND DEVELOPMENT OF PRODUCTS**

44. In 2006, approximately 85% of Milagros's gross revenue was attributable to sales from its line of slippers and spa products marketed and sold under the BETTA mark.

45. Milagros has never been PVL's "exclusive distributor" of BETTA products in the United States. As PVL was aware, Milagros used a number of different manufacturers in China and Korea to produce BETTA products to Milagros's specifications. Since 2003, Milagros has purchased goods and packaging bearing the BETTA mark from numerous other Chinese and

Korean manufacturers.

46. Milagros designed and developed all packaging associated with the BETTA Mark in the United States. Milagros's federal Registered Identification Number appears on the packaging, designed by Milagros, for all BETTA products marketed in the United States.

47. Since its first use of the BETTA Mark, Milagros has provided for the maintenance of quality standards for all BETTA products offered for sale in the United States. Milagros enforces quality and uniformity among BETTA products by working closely with various Chinese and Korean manufacturers.

48. Milagros monitors the quality of BETTA products on a daily basis.

49. Milagros has never had an agreement with PVL regarding its control over the quality of BETTA products manufactured by companies other than PVL. In fact, PVL has never been aware of all of the manufacturers that produce BETTA products for Milagros.

**TERMINATION OF BUSINESS RELATIONSHIP BETWEEN PARTIES**

50. Over the course of the parties' business relationship, Milagros experienced increasing production problems with PVL, including poor quality and late shipments, while at the same time Mr. Wong became less and less available and started to raise minimum order quantities to unrealistic amounts.

51. As a result, Milagros decreased its business with PVL in 2006.

52. Shortly thereafter, PVL sent an e-mail to Milagros in November 2006 demanding that Milagros cease using the BETTA mark, asserting that it wished to sell the mark to another company in the United States.

53. PVL claims that the e-mail constituted "termination" of the alleged license agreement.

54. Despite its alleged termination of the purported license and exclusive distribution agreement, PVL continued to ship Milagros's orders, including orders for BETTA products.

55. Since that time, Milagros stopped using PVL as a manufacturer.

56. Between February 2004 and December 2006, PVL invoiced Milagros for the sale

of over $850,000 in footwear with various marks, including BETTA, "I. Luisa Torres," and others. Milagros has paid all invoices in full.

57.   Since Milagros stopped using PVL as a manufacturer, no BETTA footwear produced by PVL have been marketed or sold in the United States.

**MILAGROS'S ACTIONS TO PROTECT ITS RIGHT TO THE MARK IN THE U.S.**

58.   In March 2006, Milagros received a letter from an Australian company, Neet Feet, claiming an interest in the Mark in the United States. Because PVL had referenced a relationship with a company that used the Mark in Australia when Milagros and PVL first entered into a business relationship, Ms. Torres sought insight from Mr. Wong. Mr. Wong referred Ms. Torres to an attorney at the firm of Christensen O'Connor Johnson and Kindness.

59.   Milagros engaged Christensen O'Connor to defend its right to the Mark in the United States. Milagros was billed for counsel's work on the matter, and Milagros paid all fees and costs incurred.

60.   In the process of defending against Neet Feet's claim, Milagros became aware that PVL had applied to register the Mark in the United States on its own behalf.

61.   Both Milagros and PVL submitted applications to the United States Patent and Trademark Office to register the Mark.

62.   PVL applied to register the term "BETTA" as a trademark in the United States (U.S. Application Serial No. 76598013) for use on "house slippers" only.

63.   PVL has not made any direct sales of products with the BETTA mark in the United States on any products, including house slippers. Instead, PVL claims that its use of the BETTA mark in commerce was through Milagros as its licensee.

64.   In its application to register the Mark, however, PVL stated "***Applicant*** is using the mark in commerce on or in connection with the above-identified goods (15 U.S.C. § 1051(a), as amended)." (Emphasis added).

65.   PVL did not disclose in its application to register the Mark that its use of the Mark was allegedly through a related company.

9

66. In its application to register the Mark in the United States, PVL claimed that the date of first use of the Mark in commerce "in which the U.S. Congress may regulate" was "at least as early as January 15, 2004."

67. PVL's claim that it shipped slipper samples with the BETTA mark to Milagros at that time, and that those samples were delivered to a purchaser, is without factual support. Further, PVL's documentary evidence demonstrates that PVL surreptitiously changed the related shipping documents after-the-fact to make it appear that BETTA footwear had been shipped.

68. Milagros timely opposed PVL's U.S. trademark application, asserting fraud on the United States Patent and Trademark Office, among other grounds. Grounds cited for opposition included deceptiveness, false suggestion of a connection, and priority and likelihood of confusion.

69. Milagros simultaneously filed its own application to register the Mark (U.S. Application Serial No. 77170813) for use on "footwear, slippers, socks, sandals, booties, gloves, robes; shower wrap sets comprised of shower wraps, slippers, and head wraps; slipper sets comprised primarily of slippers and one or more of socks, pumice stones, toe separators, therapeutic eye masks, and head wraps" in Class 25 as shown in.

70. All proceedings before the Trademark Trial and Appeal Board were suspended pending resolution of this case.

**PVL'S INTERFERENCE WITH MILAGROS'S BUSINESS RELATIONSHIPS**

71. In approximately November 2006, PVL used Milagros's confidential business information, including the identity of and contact information of Milagros's customers, to attempt to divert sales from Milagros's customers in the United States to PVL.

72. PVL's actions caused confusion in the market and resulted in the loss of one of Milagros's major customer accounts, Belk, a retailer with 319 stores in 19 states.

73. On March 2, 2007, Milagros sent PVL a cease and desist letter. Milagros demanded, among other things, that PVL cease contacting Milagros's customers and that PVL either assign the published application to register the BETTA mark to Milagros or abandon the

application; as well as agree not to begin use of the BETTA mark for any purpose in the United States. On March 9, 2007, Milagros sent a cease and desist letter to Lisa Napolitano, a PVL agent located in the United States who had contacted Milagros's customers.

74. Neither PVL nor Ms. Napolitano responded.

75. PVL threatened to file an action against Milagros. Milagros was forced to file this action for declaratory judgment action seeking to confirm its rights in and to its Mark in the United States.

76. Since filing the action, PVL has repeatedly attempted to interfere with Milagros's relationships with manufacturers in China.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331; 1338(a); 2201; and 2202. Venue is proper in the United States District Court for the Southern District of New York.

**OWNERSHIP**

2. Where a mark is entitled to protection, "[s]o long as a person is the first to use a particular mark to identify his goods or services in a given market, and so long as that owner continues to make use of the mark, he is entitled to prevent others from using the mark to describe their own goods in that market." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007). In this case, there is no suggestion that the BETTA mark is not protectable.

3. "When two companies adopt the same mark, basic rules of trademark priority determine use and ownership of the mark." *Buti v. Impressa Perosa, S.R.L.*, 935 F. Supp. 458, 468 (S.D.N.Y. 1996). It is well established that the standard test of ownership is priority of use. *See* 2 McCarthy on Trademarks and Unfair Competition §16.1 (4th ed. 2000) ("[O]wnership of trademark . . . rights in the United States is obtained by actual use of a symbol to identify the goods or service of one seller and distinguish them from those offered by others.") "The user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially." *H.W. Carter & Sons v. William Carter Co.*, 913 F. Supp. 796, 802

11

(S.D.N.Y. 1996) (quoting *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir.).

4. Here, both Milagros and PVL claim ownership of the BETTA mark. Milagros claims priority of use based on its first use in commerce in the United States and offers evidence showing continuous and exclusive use of the Mark. PVL claims priority of use *via* Milagros's use of the Mark based on an alleged oral license and exclusive distribution contract. An analysis of the facts establish that no such oral contract existed.

### *Oral License and Exclusive Distribution Agreement*

5. PVL, the party seeking to enforce the alleged oral contract, bears the burden of establishing that a binding agreement was made and proving the terms of the contract. *Paz v. Singer Co.*, 542 N.Y.S.2d 10, 11 (N.Y.A.D. 1989).

6. To create a binding contract, "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *In re Express Indus. & Terminal Corp. v. N. Y. State Dep. of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999). A contract must be "sufficiently definite so that a court can ascertain its terms for the purpose of determining whether it has been breached and avoid[] imposition of contractual obligation[s] under circumstances where intent to conclude a binding agreement is not present." *Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.*, 619 N.Y.S.2d 260, 265 (N.Y.A.D. 1994) (citing *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 205, 209 (N.Y.), *cert denied*, 498 U.S. 816 (1990).)

7. Factors involved in assessing whether an oral contract exists include: (1) whether there has been partial performance, accepted by the party disclaiming the contract; (2) whether all of the terms of the alleged contract have been agreed on; and (3) whether the agreement is the type of contract that usually is committed to writing. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984).

8. PVL fails to meet its burden of establishing that an oral license and exclusive distributorship agreement existed between the parties.

Seattle-3421367.1 0074068-00001

9. First, there was no mutual assent to the oral license and distributorship contract alleged by PVL. Ms. Torres and Mr. Wong offer diametrically opposed testimony regarding the nature and scope of the parties' business relationship. Ms. Torres claims that no license agreement ever existed, and that Milagros never served as PVL's distributor, let alone exclusive distributor. Mr. Wong claims that, on some unspecified date, the parties verbally agreed to a license and exclusive distribution contract with no articulated duration, scope, or measure of quality control.

10. Given Ms. Torres's business goals in founding Milagros and the utter lack of advantage Milagros would have received by entering into the alleged license and exclusive distribution agreement for an unknown and unused mark, without consideration, Ms. Torres's testimony that Milagros never agreed to be a licensee and exclusive distributor is credible.

11. Second, the e-mails upon which PVL relies to purportedly memorialize the terms of the alleged license and oral distribution contract confirm that the parties did not reach agreement on any suggested terms. In her e-mail of October 3, 2003, for example, Ms. Torres noted that the Mark was not registered "as the process is not complete in the USA." Ms. Torres asked if PVL had filed the paperwork yet because she was having her colleague "help me to see if it can be done quicker[.]" Ms. Torres plainly contemplated ownership of the Mark from the start.

12. It was reasonable for Ms. Torres to rely on her understanding that PVL would register the Mark in the United States on Milagros's behalf. In fact, PVL took the same action in another country. PVL relied on another business owner, a factory owner in China who was not a partner of PVL, to help register the Mark on PVL's behalf in mainland China. In return, PVL has sent business to that factory.

13. Ms. Torres's statement in an e-mail expressing excitement about receipt of a "license" to the BETTA mark did not in fact create a license. The record reflects that Milagros conducted its own search regarding available marks in the United States, and was simply glad to receive confirmation from Mr. Wong regarding the Mark's availability. Ms. Torres's belief was

13