not that Milagros had entered into a license agreement, but that Milagros had free reign to adopt the Mark to its own use in the United States.

14. Further, PVL cannot meet its burden of proving that the parties agreed to all essential terms of the alleged oral contract. At a minimum, a license must include a grant of a limited right to use a mark, and must provide for the maintenance of quality standards. *Bunn-O-Matic Corp. v. Bunn Coffee Service, Inc.*, 88 F. Supp. 2d 914, 921 (C.D. Ill. 2000).

15. PVL points to nothing that specifies (1) whether the alleged license applied only to "BETTA" or extended to "BETTA Spa" products developed and produced by Milagros wholly independent of PVL; (2) the parties' respective ownership interests in the Mark; (3) that use of the Mark in the United States would inure to the benefit of any party other than the user; or (4) that Milagros was obligated to maintain the quality of goods and services associated with the Mark in producing goods with other manufacturers. Nor does PVL point to any consideration provided in exchange for the alleged oral license/exclusive distribution contract.

16. Ms. Torres's passing comment that she would "make BETTA proud" does not constitute a written expression of PVL's holdback of its right to assert quality control over the production of all BETTA products. PVL offers nothing beyond a conclusory statement that PVL 'permitted' Ms. Torres to use other manufacturers to produce goods bearing the Mark.

17. Finally, "[l]icensing and distribution agreements are the type of agreements that are usually reduced to writing." *PDL Vitari Corp. v. Olympus Indus., Inc.*, 718 F. Supp. 197, 208 (S.D.N.Y. 1989).

18. The record confirms that Milagros and PVL had an arms-length agreement for the sale of goods, and that Milagros has paid PVL in full for all goods PVL manufactured.

***Rebuttable Presumption of Manufacturer's Ownership of Mark***

19. There is a rebuttable presumption that where a manufacturer and an alleged exclusive distributor contest the ownership of a trademark and no agreement controls, it is the manufacturer who presumptively owns the mark. *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001) (citing *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96

14

F.3d 1217, 1220 (9th Cir.1996)) (other citation omitted). Where the "'goods pass through [the distributor's] hands in the course of trade and [the distributor] gives them the benefit of [its] reputation or of [its] name and business style' the presumption may be rebutted." *Tactica,* 154 F. Supp. 2d at 600 (citing *IMAF, S.P.A. v. J.C. Penney Co., Inc.,* 806 F. Supp. 449, 454 (S.D.N.Y. 1992) (additional internal quotations and citation omitted).

20. To determine superior ownership in a mark, courts consider the following factors: (1) which party invented and first affixed the mark onto the product; (2) which party's name appeared with the trademark; (3) which party maintained the quality and uniformity of the product; (4) with which party the public identified the product and to whom purchasers made complaints; and (5) which party possesses the goodwill associated with the product. *See Tactica,* 154 F. Supp. 2d at 600; *Sengoku,* 96 F.3d at 1220-1221; *Premier Dental Prods. Co. v. Darby Dental Supply Co.,* 794 F.2d 850, 854 (3d Cir. 1986); *Omega Nutrition U.S.A. Inc. v. Spectrum Mktg.,* 756 F. Supp. 435, 438-39 (N.D. Cal. 1991).

21. As applied to this case, an analysis of the factors favors Milagros as owner of the Mark.

22. The first factor arguably favors neither party. The Mark apparently originated in Australia. Each party has adopted the Mark and affixed it to footwear (PVL) and footwear and other personal care products (Milagros) for its own business purposes in China and the United States, respectively. If either party, the first factor favors Milagros, which first affixed the Mark to BETTA products, manufactured by Flicker Footwear, sold in the United States.

23. PVL's claim that it affixed the Mark to footwear offered in China or elsewhere before Milagros has no legal effect. As noted above, foreign use of a trademark cannot form the basis for establishing priority of use in the United States. *Person's Co. v. Christman,* 900 F.2d 1565, 1568-69 (Fed. Cir. 1990); *Buti v. Impressa Perosa, S.R.L.,* 935 F. Supp. 458, 468 (S.D.N.Y. 1996).

24. The second factor favors Milagros. Every BETTA product ever offered or sold in the United States since the first offering of BETTA products has been by Milagros. The

15

packaging for BETTA products offered in the United States was designed and developed by Milagros. The packaging for BETTA products bears only Milagros's name. In addition to its name, Milagros's federal Registered Identification Number appears on all packaging for BETTA products offered in the United States. Nowhere on the products or packaging of BETTA products is PVL mentioned.

25. PVL contends that, on an unspecified number of slippers that it manufactured, PVL's name appears on the inside of the outsole of the slipper. Such reference, however, if any, was sporadic and unrelated to ownership of the Mark. The evidence shows that PVL has also placed its name on the inside of the outsole of footwear manufactured by PVL for brands such as Laura Ashley, a brand to which PVL can certainly claim no ownership right.

26. The third factor favors Milagros. Milagros was solely responsible for the nature and quality of all BETTA products manufactured by PVL, and other manufacturers, for sale in the United States. Milagros exhaustively designed, developed, and reviewed all BETTA products for uniformity, quality control, and conformance with design specifications. While PVL was involved in following up on quality issues raised by Milagros, it was Milagros who ensured the quality of BETTA products by enforcing strict quality control.

27. The fourth factor favors Milagros. Consumers of BETTA products in the United States look to Milagros, not PVL, as standing behind the goods bearing the Mark. Milagros is the party with whom the public in the United States identified with BETTA and to whom any purchasers made complaints. All packaging identifies only Milagros. All sales documents provided to purchasers identify only Milagros. Any complaints for defects are directed to Milagros, and as required by certain purchasers, Milagros maintains insurance to protect against potential claims.

28. The fifth factor favors Milagros. "[I]f the public believes that the exclusive distributor is responsible for the product, so that the trademark has come, by public understanding, to indicate that the goods bearing the trade-mark come from plaintiff although not made by it, or if the distributor has obtained a valuable reputation for [itself] and [its] wares by

[its] care in selection of [its] precautions as to transit and storage, or because [its] local character is such that the article acquires a value by [its] testimony as to its genuineness, that is proof that [it] possesses the goodwill associated with the product." *Premier Dental,* 794 F.2d at 854 (internal quotations and citations omitted).

29.     The goodwill associated with the BETTA mark in the United States accrues only to Milagros's benefit. The parties do not share profits and have never had any joint business operations. Milagros, on its own, markets and sells its products to major department store retailers across the United States. Milagros alone guarantees the quality of BETTA products to its customers. Because of Milagros's reputation and guarantee, Milagros has steadily increased its business since its inception. Milagros thus possesses the goodwill associated with BETTA products in the United States.

*Fraud in Application for Registration of Mark*

30.     Fraud in procuring a trademark registration occurs when an applicant knowingly makes false, material representations of fact in connection with his application. *See Torres v. Cantine Torresella S.R.L.,* 808 F.2d 46, 48 (Fed. Cir. 1986) (citing *Le Cordon Bleu, S.A. v. BPC Publishing Ltd.,* 451 F. Supp. 63, 72 n. 14 (S.D.N.Y. 1978) (additional citations omitted). "[T]he obligation which the Lanham Act imposes on an applicant is that he will not make *knowingly* inaccurate or *knowingly* misleading statements in the verified declaration forming a part of the application for registration." *Torres,* 808 F.2d at 48 (citing *Bart Schwartz Int'l Textiles, Ltd. v. FTC,* 289 F.2d 665, 669 (CCPA 1961) (emphasis in original).

31.     Section 5 of the Trademark Act, 15 U.S.C. §1055, permits applicants for registration to rely on use of the mark by a related company. Any such use, however, must be disclosed. Pursuant to Section 1201.3(a) the Trademark Manual of Examining Procedures ("TMEP"), if the "mark is not being used by the applicant but is being used by one or more related companies whose use inures to the benefit of the applicant under §5 of the Act, then these facts must be disclosed in the application." 37 C.F.R. §2.38(b); and citing *Pease Woodwork*

*Col., Inc. v. Ready Hung Door Co., Inc.,* 103 USPQ 240 (Comm'r Pats. 1954); *Industrial Abrasives, Inc. v. Strong,* 101 USPQ 420 (Comm'r Pats. 1954).

32. In its application to register the Mark (U.S. Application Serial No. 76598013), PVL stated "Applicant is using the mark in commerce on or in connection with the above-identified goods (15 U.S.C. § 1051(a), as amended)." PVL intentionally failed to disclose that its alleged use of the Mark in the United States was in fact Milagros's use of the Mark.

33. The Trademark Act provides that an application for registration under Section 1(a) must include a specimen showing use of the mark as used on or in connection with the goods, or in the sale or advertising of the services in commerce. 15 U.S.C. §1051(a)(1). "Use in commerce" is defined as the "bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." TMEP 901.01.

34. In its application to register the Mark, PVL stated "A specimen/facsimile showing the mark as used in commerce is submitted with this application." The specimen submitted with PVL's application, however, was never used in commerce in the United States.

35. PVL's use of the specimen in a foreign market has no effect on its attempt to establish priority of use in the United States. It is well settled that foreign use of a trademark cannot form the basis for establishing priority of use in the United States. *Person's Co. v. Christman,* 900 F.2d 1565, 1568-69 (Fed. Cir. 1990); *Buti v. Impressa Perosa, S.R.L.,* 935 F. Supp. 458, 468 (S.D.N.Y. 1996).

36. The record establishes that PVL committed fraud in its application for registration of the Mark.

### *First Use in Commerce*

37. In its application to register the Mark in the United States, PVL claimed that the date of first use of the Mark anywhere was "at least as early as March 21, 2003." Such use was not in the United States, and thus not relevant to determining priority of use.

Seattle-3421367.1 0074068-00001

38. PVL further claimed in its application to register the Mark in the United States that the date of its first use of the Mark in commerce "which the U.S. Congress may regulate" was "at least as early as January 15, 2004."

39. A putative trademark owner uses a mark in commerce if he uses it in a matter "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind." *Blue Bell, Inc. v. Farah Mfg. Co.,* 508 F.2d 1260, 1267 (5th Cir. 1975) (quoting *New England Duplicating Co. v. Mendes,* 190 F.2d 415, 418 (1st Cir. 1951).

40. PVL contends that its first use of the Mark in commerce was based on the shipment of slipper samples to Milagros. PVL fails to show (1) that those samples included products with the BETTA mark; (2) that those samples were ever delivered to purchasers; or (3) that any purchasers ever ordered BETTA products based on those samples.

41. Regardless, a shipment of samples is not sufficiently public to constitute use in commerce unless it is delivered to the relevant class of purchasers. *Zazu Designs v. L'Orea, S.A.,* 979 F.2d 499, 503, 505 (7th Cir. 1992) (dispensing a few sample products is a "pre-marketing maneuver" that is insufficient to confer trademark rights). As such, PVL has failed to present evidence establishing its use of the Mark in commerce on or before January 15, 2004.

42. Even assuming, *arguendo,* that Milagros's use of the Mark in commerce on BETTA products manufactured by PVL inured to PVL's benefit, the earliest date of such use would be on or about June 14, 2004.

43. Several months before June 14, 2004, Milagros had already begun its continuous and exclusive use of the Mark on products manufactured by Flicker Footwear.

44. Based on the evidence presented, Milagros has established priority in its continuous and exclusive use of the Mark in the United States.

**STATUTE OF FRAUDS**

45. Even if an oral license and exclusive distributorship contract existed, that contract is barred by the Statute of Frauds.

19

46.     The application of U.C.C. § 2-201 and New York Gen. Oblig. Law § 5-701 are not mutually exclusive. New York courts have analyzed and applied one or both. *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, No. 6 Civ. 3085 (KMW), 2007 WL 867202 (S.D.N.Y. Mar. 21, 2007) (applying section 2-201 to alleged exclusive distributorship contract); *Multi-Juice, S.A. v. Snapple Beverage Corp.*, No. 02 Civ. 4635, 2006 WL 1519981 at *10 (S.D.N.Y. June 1, 2006) (applying section 2-201 and finding that "[b]ecause the distribution of goods in question here involved the purchase of more than $500 of goods from Snapple, there would have to be a writing for the exclusive distribution agreement to be enforceable."); *United Magazine Co. v. Murdoch Magazines Distrib., Inc.*, 146 F. Supp. 2d 385, 404 (S.D.N.Y. 2001) (applying section 2-201 in alternative); *United Beer Distrib. Co. v. Hiram Walker (N.Y.), Inc.*, 557 N.Y.S.2d 336 (N.Y. App. Div. 1990) (finding oral distribution agreement unenforceable under both U.C.C. § 2-201 and New York GOL § 5-701(a)(1)).

47.     Section 2-201(1) of the U.C.C. provides:

> (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

48.     The U.C.C. Statute of Frauds applies to exclusive distributorship agreements, such as the agreement alleged here as a license for the exclusive distribution of products bearing the Mark, which necessarily involve the purchase of more than $500 of goods.

49.     The court must determine whether the alleged oral contract was for the sales of goods with incidental services, or vice versa. "It is the essence of the transaction that controls and not the label the parties attach to it." *In re Rednow Realty Corp. v. Tully*, 420 N.Y.S.2d 792, 72 A.D.2d 621, 622 (N.Y. App. Div. 1979).

Seattle-3421367.1 0074068-00001

50. The majority of courts find the predominant purpose of exclusive distributorship agreements, like that alleged here, to be the sale of goods and treat distributor agreements as governed by Article 2 of the U.C.C. *See* Debra L. Goetz, *et al.*, *Article Two Warranties in Commercial Transactions: An Update*, 72 Cornell L. Rev. 1159, 1329 (1987); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736 (2d Cir. 1998) (UCC applied to distributor contract involving goods and services); *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 134 (5th Cir. 1979); *Sally Beauty Co., Inc. v. Nexxus Prods. Co.*, 801 F.2d 1001, 1005 (7th Cir. 1986) (applying majority rule that distributorship is a contract for "goods" under UCC) (citing cases).

51. PVL's stated goal was to have a "sales agent" in the United States. Any services allegedly provided by Ms. Torres as a sales agent can thus be viewed only as incidental to the ultimate goal – sale of goods.

52. Further, PVL never paid Milagros for "services;" indeed, PVL never paid Milagros for anything. The only evidence of payment between the parties was Milagros's payment to PVL for the goods that Milagros purchased from PVL.

53. New York's Statute of Frauds, § 5-701(a)(1) of the General Obligations Law, provides:

> (a) Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> (1) By its terms is not to be performed within one year from the making thereof . . .

54. The alleged agreement is an oral contract of indefinite duration that includes no provision for termination. PVL claims that the alleged Agreement was terminable at will and without notice, and could thus be performed within a year. "New York cases uniformly hold, [however,] that implied termination terms are not sufficient to take an oral contract out of the statute [of frauds]." *Burke v. Bevona*, 866 F.2d 532, 538 (2d Cir. 1989).

55. "[T]ermination [of a contract] is not performance, but rather the destruction of the contract where there is no provision authorizing either of the parties to terminate as a matter of right." *D & N Boening, Inc. v. Kirsch Beverages, Inc.,* 63 N.Y.2d 449, 456-57 (1984).

56. The alleged oral agreement was dictated by and dependent upon third-party orders, which were often made 6 months to a year in advance. Consistent with the court's reasoning in *Paper Corp. of the U.S. v. Schoeller Technical Papers, Inc.,* 724 F. Supp. 110, 115 (S.D.N.Y. 1989), the alleged contract could be fully performed within one year only if Milagros's third-party customers, "who themselves are not parties to the contract," stopped ordering footwear produced by PVL.

57. As set forth above, the writings relied upon by PVL are insufficient to create an oral license and exclusive distribution contract, and thus insufficient to fulfill the writings requirement under the Statute of Frauds.

**EQUITABLE DOCTRINES (LACHES, WAIVER, UNCLEAN HANDS, ESTOPPEL)**

58. PVL claims that Milagros is guilty of laches because it did not institute this action for . Mere delay, however, does not constitute laches. *See Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1040 (2d Cir. 1980). Laches is applied to bar trademark infringement claims "only where the trademark holder knowingly allowed the infringing mark to be used without objection for a lengthy period of time." *See GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1209 (9th Cir. 2000).

59. To be protected by laches, PVL must "possess a right which is firmly planted in good faith" and must establish that (1) Milagros had knowledge of PVL's *use* of the Mark; (2) Milagros inexcusably delayed in taking action with respect to that use; and (3) PVL will be prejudiced by permitting Milagros to assert its rights now. *Saratoga,* 625 F.2d at 1040.

60. PVL fails to meet its burden. First, PVL itself has made no separate and continuous use of the Mark in the United States beyond the alleged use through Milagros as a purported licensee. Second, Milagros did not actually become aware that PVL had applied to register the Mark on PVL's own behalf (and not on behalf of Milagros) until 2006. Within six

22

months, Milagros sent PVL a cease and desist letter. When PVL did not heed Milagros's warning and threatened action, Milagros filed this action in 2007.

61. Waiver is an intentional and voluntary relinquishment of a known right. *See Nassau Trust Co. v. Montrose Concrete Prods. Corp.,* 56 N.Y.2d 175, 436 N.E.2d 1265 (1982). A waiver of rights is not inferred absent a clear intent to waive. *See Seven-Up Bottling Co. v. Pepsico, Inc.,* 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988).

62. "Waiver may be established by affirmative conduct or by a failure to act that evinces the intent to abandon the right." *Jordan v. Can You Imagine,* 485 F.Supp.2d 493, 499 (S.D.N.Y. 2007).

63. As set forth above, Milagros has never evinced any clear intent to waive its right to the Mark, and has never acted in a manner establishing waiver. Upon receiving a cease and desist notice from Neet Feet in March 2006, a foreign company claiming a right in the Mark, Milagros immediately engaged counsel and defended against the claim. Upon learning that PVL had applied to register the Mark on its own behalf, Milagros took affirmative action to protect its own rights in the Mark by timely opposing PVL's application and simultaneously filing its own application to register the Mark. PVL can make no showing of waiver.

64. Both PVL and Milagros assert unclean hands as an equitable defense to equitable claims. *See In re Gulf Oil/Cities Service Tender Litigation,* 725 F. Supp. 712, 742 (S.D.N.Y. 1989). The doctrine of unclean hands "is based on the principle that since equity tries to enforce good faith in defendants, it no less stringently demands the same good faith from the plaintiff." *Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC,* 149 F.3d 85, 90 (2d Cir. 1998) (citation omitted).

65. Courts require clean hands where "the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the doctrine." *PenneCom, B.V. v. Merrill Lynch & Co.,* 372 F.3d 488, 493 (2d Cir. 2004 (citation omitted).

23

66.     As applied here, PVL points to no "unconscionable act" committed by Milagros that constitutes unclean hands. PVL, however, knowingly committed fraud in its application to register the Mark in the United States. In light of PVL's improper conduct, PVL's unclean hands constitute an affirmative defense in Milagros's favor.

67.     PVL also fails in its estoppel defense. The elements of estoppel with respect to the party estopped include "(1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts. PVL must show with respect to itself (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position." *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 430 N.Y.S.2d 179, 187 (4th Dep't. 1980).

68.     Equitable estoppel is "imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought. *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 301 (2d Cir. 1996 (quoting *Nassau Trust Co.,* 56 N.Y.2d at 175).

69.     Contrary to PVL's position, the doctrine of equitable estoppel applies here in Milagros's favor. Milagros was not aware of PVL's true motives until they came to light in 2006. At that time, Milagros became aware that PVL had applied to register the Mark on its own behalf in the United States by virtue of Milagros's hard work, despite the fact that Milagros had relied on Mr. Wong's representation that PVL would register the Mark on Milagros's behalf.

70.     Laboring under the belief that Milagros owned the Mark in the United States, Milagros devoted substantial efforts to designing packaging and promotional materials related to the Mark, designing and developing additional products that would bear the Mark, and enforcing exacting quality control specifications to ensure uniform and high quality standards for products bearing the Mark in the United States.

71.  Milagros's annual sales of BETTA products constitute approximately 85 percent of its business. A finding that PVL held an ownership interest in the Mark based on an unsupported oral license and exclusive distribution contract would be inequitable. The equities favor Milagros. PVL is thus equitably estopped from claiming an ownership interest in the Mark in the United States.

**TRADEMARK INFRINGEMENT**

72.  The owner of a trademark cannot be sued for infringement of its own mark. *Silverstar Enters. v. Aday,* 537 F. Supp. 236, 240-41 (S.D.N.Y. 1982). As such, because it has been established that Milagros owns the BETTA mark and that PVL has made no use of the Mark in the United States, PVL's claim of trademark infringement fails.

73.  To prevail on a claim of trademark infringement, PVL must not only demonstrate prior use and ownership of the Mark, but also that Milagros's use of the Mark is likely to cause confusion. *See Virginia Enters v. Nawab,* 335 F.3d 141, 146 (2d Cir. 2003). Absent a finding by the Court that an oral license agreement existed between the parties providing that Milagros's use of the Mark in the United States inured to PVL's benefit, the Court need not reach this claim.

**PERMANENT INJUNCTION**

74.  To obtain a permanent injunction, Milagros must "demonstrate (1) actual success on the merits and (2) irreparable harm." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.,* 286 F. Supp. 2d 284, 289 (2d Cir. 2003) (citing *Wojnarowicz v. Am. Family Ass'n,* 745 F. Supp. 130, 148 n. 13 (S.D.N.Y. 1990).

75.  As demonstrated above, Milagros has proven success on the merits.

76.  Milagros has also demonstrated that it will be irreparably harmed absent entry of a permanent injunction.

77.  Injunctive relief for irreparable harm is appropriate where "damages are difficult to establish and measure," such as the loss of a potential relationship with a customer that "would produce an indeterminate amount of business in years to come." *Register.com, Inc. v.*

25

*Verio, Inc.,* 356 F.3d 393, 404 (2d Cir. 2004) (citing *Ticor Title Ins. Co. v. Cohen,* 173 F.3d 62, 69 (2d Cir. 1999)).

78. Here, Milagros's damages are difficult to quantify in dollar terms, but may include the loss of future business. PVL has interfered with Milagros's relationships with both its customers in the United States and manufacturers in China. PVL's interference cost Milagros the loss of a major customer and has sparked confusion with its manufacturers regarding Milagros's ownership of the Mark in the United States.

79. Accordingly, Milagros has met its burden for a permanent injunction. Entry of a permanent injunction is warranted to (1) prohibit PVL from contacting or soliciting Milagros's customers and interfering with its manufacturing relationships; (b) prohibit PVL from making further representations regarding its ownership rights in the Mark in the United States; and (c) prohibit PVL or its agents or representatives from using the Mark in the United States.

**ATTORNEYS' FEES AND COSTS**

80. Milagros seeks recovery of its fees and costs incurred in bringing this action for declaratory relief and in defending against PVL's counterclaims. Section 35(a) of the Lanham Act permits the court to award reasonable attorney's fees to the prevailing party in "exceptional cases." *See* 15 U.S.C. §1117(a).

81. The Second Circuit has recognized the award of fees in cases involving fraud, bad faith, or willful infringement. *See Gordon and Breach Sci. Publishers S.A. v. Am. Inst. of Physics,* 166 F.3d 438, 439 (2d Cir. 1999) (citing *Twin Peaks Prods, Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1383 (2d Cir. 1993). The decision to award attorney's fees remains within the sound discretion of the court. *See Gidatex v. Campaiello Imports, Ltd.,* 82 F. Supp.2d 136, 147 (S.D.N.Y. 2000).

82. As set forth above, PVL knowingly committed fraud in its application to register the Mark in the United States. Fraud constitutes sufficient basis for a finding of exceptional circumstances warranting recovery of fees and costs. Based on the foregoing finding, Milagros is entitled to its attorney's fees and costs incurred in this action pursuant to 15 U.S.C. §1117(a).

26

Dated: New York, New York
May 23, 2008

        Respectfully submitted,

        LANDMAN CORSI BALLAINE & FORD P.C.

By: *[signature]*
        Daniel S. Moretti (DM 6630)
        Attorneys for Plaintiff
        Milagros Imports Limited
        120 Broadway, 27th Floor
        New York, New York 10271-0079
        (212) 238-4800

        STOEL RIVES LLP

By: *[signature]*
        Vanessa Soriano Power (WSBA 30777)
        *Admitted pro hac vice*
        Attorneys for Plaintiff
        Milagros Imports Limited
        600 University Street, Suite 3600
        Seattle, WA 98101
        (206) 624-0900

To: Storch, Amini & Munves, P.C.
     Attorneys for Defendant
     140 E 45th Street, 25th Floor
     New York, New York 10017
     (212) 490-4100