Benjamin L. Felcher Leavitt
Storch Amini & Munves PC
140 E. 45th St., 25th Floor
New York, New York 10017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
MILAGROS IMPORTS LIMITED,                    :
A New York Corporation,                      :
                                             :
            Plaintiff,                       :        07-CV-3215 (SHS)
                                             :
            v.                               :
                                             :        **DEFENDANT- COUNTERCLAIM**
PROGRESS VANTAGE LIMITED,                    :        **PLAINTIFF'S [PROPOSED]**
A Foreign corporation,                       :        **FINDINGS OF FACT AND**
                                             :        **CONCLUSIONS OF LAW**
            Defendant.                       :
-------------------------------------------------------x


        Defendant-Counterclaim Plaintiff, Progress Vantage Limited ("Progress Vantage"), in

accordance with the pretrial procedures of United States District Judge Sidney H. Stein and Fed.

R. Civ. P. 26(a)(3), hereby submits the following:

### **PROGRESS VANTAGE'S PROPOSED FINDINGS OF FACT**

1.      On or about April 20, 2007, Milagros filed a complaint in the United States District Court

for the Southern District of New York to determine the respective rights of the parties regarding

the ownership of the Betta trademark.

2.      On or about July 13, 2007, Progress Vantage answered the Milagros complaint and

asserted counterclaims and requesting that the court provide injunctive and declaratory relief by

determining that Progress Vantage is the owner of the Betta trademark.

1

3.    Progress Vantage is a Hong Kong corporation with its principal place of business in Kwai Chung, New Territories, Hong Kong. Mr. Wai William Wong ("Wong") along with his wife Chuk Hung Lin ("Lynn Wong" or "Lynn") are the owners of Progress Vantage.

4.    Since approximately 1994, Progress Vantage, buy itself and through affiliated companies including Goddess Footwear ("Goddess"), has manufactured a variety of footwear for distribution in the international market. Progress Vantage formerly operated its business as Goddess but in 2001 changed its name to Progress Vantage, retaining Goddess as a trading division of Progress Vantage.

5.    Slippers Unlimited, owned by Kim Gray ("Gray") or a member of his family since the late 1920s, is an Australian company that sold indoor slippers under the trademark Betta in Australia and New Zealand continuously since the company was founded, initially as "Betta," in 1927.

6.    Beginning in or around 1994, Progress Vantage supplied goods bearing the Betta mark to Slippers Unlimited.

7.    In or around November 1997, Progress Vantage sought to expand its business to include its own label and approached Gray about the possible use of the Betta Mark worldwide (except Australia and New Zealand), including the United States. The Betta slipper had an established history which provide advantageous material for marketing. As an established brand, customers are more likely to purchase a slipper associated with the Betta brand than they would a slipper that is wholly new to the market.

8.    Gray gave full support to Progress Vantage's plan to launch Betta worldwide and gave authorization to Progress Vantage to use the Betta brand in writing. The written authorization provides that Gray acting for Betta gives "full support to Goddess for the use of the BETTA

2

label in your [Progress Vantage's] production for China, and indeed, future expansion to the

USA and European markets."

9.　　In or around 2001 or 2002, Progress Vantage became the registered owner of the Betta

trademark in Hong Kong and China.

10.　　Since that time, Progress Vantage has been the sole manufacturer and distributor of

indoor slipper bearing the Betta trademark in Hong Kong and China.

11.　　The Betta mark consists of stylized lettering.

12.　　Also in or around 2001 or 2002, Progress Vantage began to ship slippers bearing the

Betta trademark to Europe, Dubai and Lebanon.  While Progress Vantage did not register Betta

in those markets, no other company or individual manufactured, distributed or sold any products

bearing the Betta mark in those markets.

13.　　Prior to establishing Progress Vantage, Wong was employed by another slipper

manufacturer in China called Splendid.  Splendid manufactured slippers in China and, for the

most part, shipped slippers to the United States through importers and wholesalers in the United

States to sell to their established customers there.

14.　　In his capacities at Splendid, Wong would arrange for orders to be produced in China but

did not directly interact with American purchaser.  However, Wong did become familiar with the

names of some of the American purchasers through his processing of their orders at the factories

in China.

15.　　While at Splendid, Wong became aware that a woman named Irene Torres ("Torres")

was a purchaser for Wiesner Products, Inc. ("Wiesner") but Wong did not interact with Torres

while at Splendid as this was outside the scope of his duties.

16.     When Wong started Goddess in 1994, Wiesner contacted Goddess about manufacturing footwear.  Shortly thereafter, Goddess became a supplier of footwear to Wiesner and in this supplier/purchaser capacity Wong and Torres worked together.

17.     In or around 1999, Torres left Wiesner and began working for another company called Ben Berger and from approximately 2000 to 2003, Progress Vantage supplied slippers and other footwear to Ben Berger, working primarily with Torres.

18.     Through their longstanding business relationship, Torres, Wong and Lynn developed a personal friendship.  Wong also came to see Torres as an experienced businesswoman in the United States slipper and footwear business with a large number of contacts, and her talent for satisfying customers and building accounts for Ben Berger.

19.     In or around April 2003, Torres approached Wong and told him that she was unhappy at her job and wanted to go into business with Progress Vantage.

20.     Because Progress Vantage had not yet manufactured slippers for distribution in the United States under the Betta mark, Wong needed an experienced distributor to establish the Betta brand in the United States market and saw this as good opportunity for both parties.

21.     By working with Torres, Wong could establish Betta as Progress Vantage's own brand in the United States with an experienced wholesaler and Torres would be able to start her own business and develop her own line of goods bearing another mark.

22.     Initially, Torres wanted Wong to be a full partner in her new entity but Wong declined as he was inexperienced with business law and practice in the United States.  This inexperience was precisely why he needed someone with significant experience, contacts, skill and knowledge to help establish the Betta mark in the United States.

23.     Wong did, however, commit to providing funding to Torres' new business.

24.     Beginning in or about the spring of 2003, Wong began discussing this new business venture with Torres. Even at this early date, Torres made clear that she would only be able to start her new business with the help and support of Progress Vantage.

25.     At all times, Wong made clear that he wanted to establish Betta in the United States as his own brand.

26.     In August 2003, the parties resumed their written discussions about Torres starting a new business. At all times, Wong was very clear that Progress Vantage would be the owner of the Beta mark with Torres acting a distributor on its behalf.

27.     On August 10, 2003, when Torres had left and was ready to start her own business, she emailed Wong about the emerging business of Milagros.

28.     Showing her understanding that Progress Vantage was to own the Betta mark in the United States, Torres asked Wong to "please advise if 'Betta' is useable in the States as of yet."

29.     Confirming their agreement as to ownership in the Betta mark, Wong replied on August 11, 2003 and informed Torres, "I am registering this brand in the US, and [it] can be used very soon."

30.     On September 28, 2003, Torres emailed Lynn and again asked if "the 'Betta' brand can be used in the USA. I know I emailed [Wong] a long time ago and it was in the works. The reason I ask is if it is, then I would ask you if I can use it for my line."

31.     Wong subsequently informed Torres that he was going to begin the process of registering the Betta mark in the United States.

32.     Upon learning that Progress Vantage was prepared to register the Betta mark in the United States, Torres wrote and said "This is great news!!!! We now have a license!!!"

33.     During this time, Wong and Torres had several conversations concerning the Betta mark. At all times, Wong clearly told Torres that Progress Vantage would be the owner of the Betta mark in the United States and that Torres, through her new business entity, would distribute goods bearing the Betta mark.  Torres always agreed to this term.

34.     Showing her explicit understanding of her position as licensee, on October 2, 2003, Torres wrote to Progress Vantage and stated that she "really need[s] to know the parameters of the License" and asked Lynn and Wong to "[p]lease advise if there are royalties we would have to pay to Betta or to Goddess."

35.     In addition to asking if royalties would have to be paid, Torres asked: (i) if the same font used by Progress Vantage had to be used in the United States; (ii) whether the same color had to be used on the Betta font; (iii) whether there was a United States or internationally registered trademark that would have to be affixed to Betta goods she would distribute; and (iv) acknowledged that Wong told her that she could not use "since 1927" on packaging or promotional products in the United States.

36.     In this same written electronic communication, Torres (i) asks permission to use the Betta mark for products other than slippers; (ii) asks permission to use a specific packaging manufacturer; and (iii) assures Progress Vantage that high quality standard will be maintained, and goes on to state that:

> Betta, would be used for my entire line including Spa – slipper socks which David will work with me on etc, etc.  I don't see this as a problem, do you????  I would rather put all my eggs in BETTA and pushing it to take off I don't have a problem sticking with it rather then going after another American brand. . . I know that you will not have a problem with ARDA [another Chinese factory] making all the packaging as I have done in the past – including the printing of ribbons, making woven labels etc???? . . . PLEASE DON'T WORRY! I WILL MAKE THE PACKAGING BEAUTIFUL!!!!!!! YOU KNOW ME!!!!!!  BETTA WILL BE PROUD!!!!!!!!!!!!!!  Exhibit 8 at 01411 (capitals and exclamations points in the original).

6

37.    In the October 2, 2003 email, Torres also stated that she needed information soon because Betta was to be "her main license" and she needed to begin work immediately with the packaging company.

38.    This writing explicitly conveys Torres' understanding that she was entering into a licensing relationship with Progress Vantage.

39.    Based upon this representation, and similar representations made orally to Wong concerning the parties' contract, Progress Vantage continued to develop its business with Milagros.

40.    Had Progress Vantage known at any point, that Milagros would assert ownership over the Betta mark, it would have immediately ceased doing business with Milagros.

41.    On October 3, 2003, Torres again wrote to Lynn and William Wong.  In this writing, Torres confirms many terms of the parties' agreement concerning the Betta mark.

42.    Torres states that she understands she can use different colors for the Betta mark, but that "the 'font' or 'type' of Betta must remain as it is."

43.    Torres also confirms that Progress Vantage will be filing the trademark registration for the Betta mark.

44.    In addition to the above terms, Torres also requested permission to use the Betta mark on goods other than those manufactured by Progress Vantage.

45.    Believing that a wider line of products would help establish the Betta brand more quickly, Progress Vantage agreed to allow Torres to use the Betta mark on products from other manufacturers.

46.    Progress Vantage was fully familiar with all of the factories that manufactured goods bearing the Betta mark and had a high opinion of the products they produced.

47.    Continuing to aid Milagros in setting up its business, Progress Vantage helped establish Milagros with one of these additional manufacturers by providing an initial line of credit.

48.    Initially Progress Vantage would review the styles and goods produced by these other factories.  Early in the relationship, Wong visited Milagros' offices in the Empire State Building and personally reviewed all of the goods that Milagros was distributing.

49.    As the distribution relationship with Torres continued, Progress Vantage began to rely more heavily on Torres to maintain the quality of goods obtained from other factories.

50.    Accordingly, by October 3, 2003, the parties had reached an explicit and enforceable oral contract concerning the parties' respective rights in the Betta mark in the United States.

51.    Under the contract, Progress Vantage (i) supplied an interest free loan in the amount of $25,000 to Milagros (which was not paid back until July 2007 after Progress Vantage filed its Answer and Counterclaims), (ii) supplied a guarantee letter to help secure office space for Milagros; (iii) extended very favorable purchase terms that were not extended to any other entities with whom Progress Vantage did business; (iv) stopped doing business with its previous American customers who provided approximately $1 million in business annually; (v) permitted Milagros to affix the Betta mark to goods produced by other manufacturers.  In exchange, Torres agreed that (i) she would not have any ownership interest in the Betta mark (in her own words, that she would have a license); and (ii) she would use her skill, knowledge and experience to promote and establish the Betta brand in the United States.

52.    At all times under this agreement, the Betta logo that appeared on goods distributed by Milagros was identical to the one used by Progress Vantage in other territories.

53.     The agreement that Milagros would have no ownership interest in the Betta mark is evidenced in several writings originating from an email account maintained by Torres and which she admits to sending.

54.     In or around June 15, 2004, Progress Vantage filed an application for registration of the Betta trademark with the United States Patent and Trademark Office ("USPTO"). The trademark included in the application is the same trademark Progress Vantage used on all of its Betta products worldwide.

55.     From August 2003, Torres was fully aware that Progress Vantage was going to register the Betta trademark and from October 2003 to March 2006, Torres did not request any information about the Betta trademark registration.

56.     Progress Vantage expended a great deal of time, effort and money to get the trademark filed with the USPTO. The USPTO initially denied Progress Vantages' application, finding that the Betta mark would cause confusion with the registered mark "Mo Betta." Progress Vantage eventually resolved this denial by obtaining a consent letter from the owner of Mo Betta.

57.     In or around March 2006, Neat Feet Pty Ltd. ("Neet Feet") an Australian company claiming to own the Betta mark in the United States and wrote Milagros demanding that Milagros cease distributing footwear bearing the Betta mark.

58.     By an email dated March 29, 2006, Torres contacted Wong and Lynn to inform them of the demand. Torres attached Progress Vantage's trademark application to the email and informed Wong and Lynn that she could not find any Betta mark held by Neet Feet but that she "did find yours."

59.     At no point during this time did Torres ever question or object to the trademark application being in the name of Progress Vantage.

60.     Torres also asked for help from Wong and Lynn to provide documentation as to what agreements there were between Gray and Progress Vantage.

61.     Progress Vantage supplied Torres with the 1997 letter from Mr. Gray which gave his authorization to use the Betta mark worldwide.

62.     Torres forwarded this information to the counsel who was prosecuting the trademark application for Progress Vantage (with who she had consulted concerning Neet Feet's allegations after being directed there by Wong).

63.     On April 14, 2006, Progress Vantage's counsel wrote a response to Neet Feet stating, among other things, that the use of the Betta mark in the United States had the express authorization of Gray.

64.     Neither Torres nor Milagros ever received any sort of authorization from Gray concerning use of the Betta mark.

65.     By relying on this authorization in its representations to Neet Feet, Milagros was made affirmative use of its status as licensee.

66.     The letter to Neet Feet did not effectuate a complete resolution of the allegations raised by Neet Feet and it was only through the efforts of Progress Vantage by having Mr. Gray conduct direct negotiations with Neet Feet in Australia, that Neet Feet withdrew its complaint.

67.     At no point during these events, or at any other time prior to the disagreement underlying this lawsuit, did Torres or Milagros ever assert that any entity other than Progress Vantage owned the Betta mark.

68.     At no point during these events, or at any other time prior to the disagreement underlying this lawsuit, did Torres or Milagros file any type of opposition to Progress Vantage's registration of the Betta Mark with the USPTO.

## PROPOSED CONCLUSIONS OF LAW

**Progress Vantage Established Ownership Rights In the Betta Mark Through Milagros**

69.    It is accepted that "[t]rademark agreements, in which two parties agree on their respective rights in a mark, 'are favored under the law.'" Fuddruckers, Inc. v. Fudpucker's Inc., 436 F.Supp.2d 1260, 1265 (N.D.Fla. 2006), quoting Times Mirror Magazines, Inc. v. Field & Stream Licenses Co., 294 F.3d 383, 395 (2d Cir. 2002).

70.    The oral agreement between Progress Vantage and Milagros is enforceable and, to the extent it established the parties' understanding as to their respective rights in the Betta mark, a preferred arrangement.

71.    Progress Vantage had not used the mark in commerce in the United States in 2003 and it was perfectly able to contract with Milagros to effectuate such use.

72.    It is well established that "[u]se of a trademark need not always be made directly by the trademark owner and is often made 'with the permission' of the owner via a licensing agreement. Indeed, sometimes the *only* use of a trademark is through a licensee." Doebler's Pennsylvania Hybrids, Inc. v. Doebler, 442 F.3d 812, 823 (3d Cir. 2006)(emphasis in original). It has long been recognized that "a person may introduce his trademark and create demand for his variety of goods in a new territory by licensees." Vermont Maple Syrup Co., v. F.N. Johnson Maple Syrup Co., 272 F. 478, 479-80 (D.C. Vt. 1921).

73.    This principle is codified in the Lanham Act, 15 U.S.C. §1055 ("If first use of a mark by a person is controlled by the registrant or applicant. . . with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be") and recognized by trademark authorities.  MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, 4TH ED. (1996) ("MCCARTHY"), §18:46 ("[o]wnership rights in a

trademark or service mark can be acquired and maintained through the use of the mark by a controlled licensee even when the first and only use of the mark was made, and is being made, by the licensee").

74.    Progress Vantage owned the Betta mark in Hong Kong and China and had distributed Betta goods in Europe and the Middle East.  Progress Vantage sought to extend its distribution of Betta goods to the United States and contracted with Milagros to do so.  In moving to extend its trademark rights in the Betta mark to territories outside Hong Kong and China, Progress Vantage chose a lawful and appropriate vehicle to do so – a licensee.

**The Agreement Between Progress Vantage and Milagros is an Enforceable Contract**

75.    "Under New York Law, the general requisites for formation of a contract include offer, acceptance and consideration.  Oscar Productions, Inc. v. Zacharius, 893 F.Supp. 250, 255 (S.D.N.Y. 1995), citing RESTATEMENT (SECOND) OF CONTRACTS §§ 24, 50, 71 (1981).

76.    Progress Vantage has demonstrated by a preponderance of the evidence that the parties entered into a contract whereby Progress Vantage would own the rights to the Betta mark in the United States.

77.    Progress Vantage owned the rights to the Betta mark in Hong Kong and China and offered to provide tremendous financial support to Milagros if Milagros would be the exclusive distributor of goods bearing the Betta mark.  Milagros, for its part, was enthusiastic in its acceptance when Torres stated, in writing, "This is great news!!!! We now have a license!!!" There was also sufficient consideration on both sides: Progress Vantage, among other things, expended significant sums to establish Milagros and also forewent established and lucrative business opportunities in order to supply Betta goods exclusively to Milagros and Milagros, among other things, undertook to coordinate distribution of goods bearing the Betta mark.

78.    In order to demonstrate ownership of the Mark under the oral agreement, Progress

Vantage also must be able to point to contract terms that are "sufficiently definite so that a court

can ascertain its terms" for enforcement.  Allied Sheet Metal Works, Inc. v. Kerby Saunders,

Inc., 206 A.D.2d 166, 169 (1st Dep't 1994).  The doctrine of definiteness "means that a court

cannot enforce a contract unless it is able to determine what in fact the parties have agreed to."

Korff v. Corbett, 18 A.D.3d 248, 250 (1st Dep't 2005)(citations omitted).

79.    New York Courts, however, "do not apply the doctrine rigidly" and the "conclusion that a

party's promise should be ignored as meaningless 'is at best a last resort.'"  166 Mamoroneck

Ave. Corp. v. 151 East Post Road Corp., 78 N.Y.2d 88, 91 (N.Y.1991), quoting Cobble Hill

Nursing Home v. Henry & Warren Corp., 74 N.Y.2d 475, 483 (N.Y. 1989).

80.    Moreover, the fact that the parties intended to be bound "may be established through the

conduct of the parties recognizing the contract" in which case "the totality of all acts of the

parties, their relationship and their objectives [may] be considered."  Tractebel Energy

marketing, Inc. v. AEP Power marketing, Inc., 487 F.3d 89, 97 (2d Cir. 2007).

81.    Progress Vantage has proved by a preponderance of the evidence that it and Milagros had

a clear understanding of the essential terms of their contract and that both parties possessed a

present intent to be bound by those terms.

82.    Upon hearing that Progress Vantage was fully prepared to register the Betta mark in the

United States, Torres wrote "This is great news!!! We now have a license!!"  Torres' language –

"now" – evidences a clear intention to be bound under the terms of a licensing agreement.  While

she inquired about the "parameters" of the license to which she was agreeing, her intent to be

presently bound to the essential terms of the oral agreement, to wit, that she would not own the

mark and that she would maintain the quality standards of goods bearing the Betta mark, cannot

be contested.

**Licenses can be Oral**

83.    All authority holds that oral licensing agreements are enforceable.  McCarthy §18:43;

Fusco Group, Inc. v. Loss Consultants Int'l., Inc., 462 F.Supp.2d 321, 330 (N.D.N.Y. 2006);

Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 847 F.Supp. 18, 20 fn.1 (E.D.N.Y.

1994);  Department of Parks and Recreation for the State of California v. Bazaar Del Mundo,

Inc., 448 F.3d 1118, 1129 (9th Cir. 2006), citing DeForest Radio Tel. & Tel. Co. v. U.S., 274

U.S.236, 241 (1927)(license can arise without a formal agreement).

84.    While some authorities say that a durational term "should" be stated, this is only because

of "the danger" that a license without a duration would be construed as terminable at will.  See

e.g., Liberto v. D.F. Stauffer Biscuit Co., 441 F.3d 318, 324 (5th Cir. 2006), citing McCarthy

§18:43.

**Essential Elements of a Licensing Agreement**

85.    The "essential" terms to a license are (1) the grant of a limited right to use the trademark

and (2) the maintenance of quality standards.  Id. (citations omitted).  Bunn –O-Matic Corp. v.

Bunn Coffee Service, Inc., 88 F.Supp.2d 914, 921 (C.D.Ill. 2000) (holding that retention of

ownership, having use inure to benefit of licensor and requiring licensee to maintain quality of

goods "constitute the essential terms of a trademark license agreement"), citing McCarthy

§18:43.

86.    While a licensor must ensure that the quality of goods is maintained, there is no

requirement that a formal mechanism be instituted for this purpose.  Bunn-O-Matic, 88 F.Supp.

at 921, citing TMT North America v. Magic Touch GmbH, 124 F.3d 876, 885 (7th Cir. 1997);

Fusco Group, 462 F.Supp.2d at 330 (holding licensor is entitled to rely upon the licensee to uphold the quality of the goods).

87.    In fact, given a long standing relationship, a licensor can entirely rely on its licensee to maintain quality. McCarthy §18:57 (noting that many courts hold that even a "licensor's complete failure to control quality does not mean that the license arrangement is invalid if the licensor reasonably relies upon the licensee's own quality control effort); Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017-18 (9th Cir. 1985)(holding long association where licensor respected licensee's "ability and expertise," it was justifiable for licensor to "rely on [licensee] to maintain high standards by performing his own quality control") quoted in Doebler's Pennsylvania Hybrids, Inc. Doebler, 442 F.3d 812, 823 (3d Cir. 2006).

88.    Progress Vantage has proved by a preponderance of the evidence that it and Milagros entered into an oral contract concerning the rights to the Betta mark in the United States whereby Progress Vantage was to own the mark.

89.    All the essential terms of the oral contract were explicitly agreed upon by the parties. These terms were set out and confirmed in writing and the parties' conduct for three years without discussion, much less argument, as to the use of the Mark demonstrates this agreement. The parties agreed that Progress Vantage would be the owner of the mark, i.e., that the agreement would not transfer any rights to Milagros other than the permitted use of the Mark and that all use of the goods would inure to the benefit of Progress Vantage.

90.    The parties also agreed that Progress Vantage would have the right to inspect goods upon which the Mark was placed and Wong indeed did so until it was satisfied that it could rely on Milagros to uphold the quality standards of the Betta goods.

91.     Even in the absence of this formal quality control, the licensing agreement would still be enforceable.

92.     Wong and Torres had a long standing relationship and Wong had personally seen Torres' experience and skill in pleasing customers. Having contracted with her for this very experience, it was reasonable for Progress Vantage to rely on Torres to maintain the quality standards of goods bearing the Betta mark.

**The New York Statute of Frauds Does Not Bar Enforcement of the Agreement**

93.     New York General Obligations Law ("GOL") § 5-701(1) provides that an agreement will be unenforceable if not in writing and "By its terms is not to be performed within one year of its making. . ."

94.     New York Courts have strictly construed this section and have "limited it to those contracts only which by their very terms have absolutely no possibility in fact and law of full performance within one year." D&N Boeing, Inc. v. Kirsch Beverages, Inc., 63 N.Y.2d 449, 454 (1984), see also Cron v. Hargro Fabrics, Inc., 91 N.Y.2d 362 (1998)(denying motion to dismiss oral employment contract for commissions).

95.     Under well-established New York Law, the Statute of Frauds does not apply to contracts that can be terminated by either party at any time. See e.g., Majestic Farms Supply, Ltd. V. Service Riding Apparel, Ltd., 137 A.D.2d 501 (2d Dep't. 1988)(holding that alleged oral licensing agreement was terminable at will and, therefore, not within the ambit of the Statute of Frauds); North Shore Bottling Co., Inc. v. Schmidt and Sons, Inc., 22 N.Y.2d 171, 176 (1968).

96.     GOL §5-701(1), therefore, does not apply to an at-will contract because the termination of such a contract is not a breach, but rather a fulfillment of the contract pursuant to the contract's terms. See e.g., Jilcy Film Enterprises, Inc. v. Home Box Office, Inc., 593 F.Supp.

16

515, 518-519 (S.D.N.Y. 1984)(noting that exercise of absolute right to early termination does "not *defeat* the contract, but simply advanced the period of fulfillment")(emphasis added by original), quoting Blake v. Voight, 134 N.Y.69 (1892); Berardi v. Fundamental Brokers, Inc., 1992 WL 27169 at *2 (S.D.N.Y. Febr. 5, 1992)(employment context); Davis & Davis v. S&T World Products, 154 A.D.2d 330, 331 (2d Dep't 1989)(holding that if licensing agreement was proved to be terminable at will, New York Statute of Frauds would not apply to agreement).

97.    The oral agreement between Progress Vantage and Milagros contained no explicit term of duration and was, therefore, terminable at will.  As such, it was wholly without the ambit of GOL §5-701(1).

98.    An "agreement conferring a license to use a trademark for an indefinite time, whether oral, written or by implication, is terminable-at-will by the licensor."  See e.g., Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 847 F.Supp. 18, 20 fn.1 (E.D.N.Y. 1994); Fusco Group, Inc. v. Loss Consultants Intern., Inc., 462 F.Supp.2d 321, 330 (N.D.N.Y. 2006), citing Dial-A-Mattress;  Bunn-O-Matic Corp. v. Bunn Coffee Service, Inc., 88 F.Supp.2d 914, 922 (C.D.Ill. 2000); Trace Minerals Research , L.C. v. Mineral Resources International, Inc., 505 F.Supp.2d 1233, 1241 (D. Utah 2007), citing Bunn-O-Matic; MCCARTHY §18:43 (stating that parties should agree to a duration because of the danger that that a license without a duration would be construed as terminable at will), cited in Liberto v. D.F. Stauffer Biscuit Co., 441 F.3d 318, 324 (5th Cir. 2006).

99.    Progress Vantage has demonstrated by a preponderance of the evidence that the agreement between it and Milagros was terminable at will.

100.    There is no evidence that the parties discussed the duration of their licensing arrangement and, therefore, there could not be an agreement about the duration.  As there was no agreed upon

17

duration, the oral contract was an at-will licensing agreement and, therefore, terminable by either party as a matter of right.

101.    As such, it was fully performable within one year by its permitted termination and GOL §5-701(1) will not bar its enforcement.

**As Contract was one for Services, the UCC Statute of Frauds Does Not Apply**

102.    If a contract is one for services, the UCC does not apply to that contract. "New York Courts are split" on issue of the applicability of UCC §2-201 to distribution contracts. United Magazine Co. v. Murdoch Magazines Distribution, Inc., 146 F.Supp.2d 385, 404 (S.D.N.Y. 2001); see also Paper Corporation of the United States v. Schoeller Technical Papers, Inc., 773 F.Supp. 632, 637 (S.D.N.Y. 1991)(holding UCC §2-201 inapplicable to exclusive distribution contract as services predominated); Satterwhite v. The Image Bank, Inc., 2002 WL 31098496 (S.D.N.Y. Sept. 19, 2002)(holding where defendant was the "exclusive agent for the marketing and sale or lease" of Plaintiff's photographs, contract was one for services and the UCC did not apply); Zimmer-Masiello, Inc. v. Zimmer, Inc., 159 A.D.2d 363, 367 (1st Dep't 1990) (applying GOL §5-701 to distribution contract); Alesayi Beverage Corp. v. Canada Dry Corp., 947F.Supp.658, 667 (S.D.N.Y. 1996)(finding applicable statute of limitations for breach of distribution contract was six years under New York Civil Practice Law and Rules § 213 and not three years under the UCC).

103.    Determining whether the UCC applies to a particular contract involves the "test [of] whether the contract is 'predominately' one for goods or for the providing of services." Alesayi, 947F.Supp.at 667 (citations omitted). "If the provision of services or rendering of other performance predominates and is not merely incidental or collateral to the sale of goods, then the UCC does not apply." Id.

104.    "In applying this test, the transaction must be examined in its entirety to determine its essential nature." Levin v. Hoffman Fuel Corp., 94 A.D.2d 640, 641 (1st Dep't 1983)(Asch, J. dissenting).  "Whether a contract is for the sale of goods or for services provided is a question of fact." Id. at 666, citing Farm Automation Corp. v. Senter, 84 A.D.2d 757 (2d Dep't 1981).

105.    Progress Vantage has shown by a preponderance of the evidence that the services were the predominant feature of its agreement with Milagros.

106.    Progress Vantage entered into an agreement with Torres because of her knowledge and experience in the United States market with regard to slippers and footwear.  Wong understood that he was contracting to "sell and promote" the Betta brand.  The prime purpose of the contract was to develop a customer base for Betta in the United States.

107.    As a contract predominantly for the provision of services, the UCC's Statute of Fraud provisions will not bar enforcement of the parties' agreement.

**[If the Court Determines That the UCC Is Applicable] The Correspondence between the Parties Satisfies the Writing Requirement of UCC §§2-201(1) and 2-201(2)**

108.    Even if the UCC is held to apply, the standard for writings under UCC §2-201(1) and confirmatory writings under UCC §2-201(2) is satisfied in this case.

109.    "There are no rigid requirements as to the form or content of a confirmatory writing." Hilord Chemical Corp. v. Ricoh Electronics, Inc., 875 F.2d 32, 37 (2d Cir. 1989).  As the New York Court of Appeals has held: "neither explicit words of confirmation nor express references to the prior agreement are required, and the writings are sufficient so long as they afford a basis for believing that they reflect a real transaction between the parties." Bazak International Corp. v. Mast Industries, Inc., 73 N.Y.2d 113, 123 (1989).

110.    Electronic mails can satisfy both the writing and signature requirements of UCC §2-201(2).  Bazak International Group v. Tarrant Apparel Group, 378 F.Supp2d 377, 383-387 (S.D.N.Y. 2005)(finding confirmatory email sufficient as, *inter alia*, a writing and a signature).

111.    The New York Court of Appeals has held that the standard for satisfactory writings is identical under §§2-201(1) and 2-201(2).  Mast Industries, 73 N.Y.2d at 120-121.

112.    Torres states that she started Milagros based upon "more than 20 years of experience" in the industry.  Progress Vantage is a manufacturer of footwear.  Both parties posses "knowledge or skill" particular to footwear.  UCC §2-104(1).  It cannot be contested that both parties are "merchants" for the purposes of UCC §2-201(2).

113.    Progress Vantage has demonstrated by a preponderance of the evidence that the writings contain sufficient detail, admissions and other statements to prove that relate to a real transaction between the parties.

114.    First, the signing requirement is satisfied by the emails that Torres has admitted sending (and that came from her email account) with her name indicated at the bottom of the email.  These circumstances are sufficiently reliable to qualify the emails as signed writings under the UCC.

115.    Second, the emails reflect a real transaction between the parties.  In the emails, Torres asks questions relating to the Betta mark such as what font can be used, what colors may be used, what history can be shown and whether royalties would have to be paid.  These are precisely the questions that a person who entered into a licensing agreement would ask.  Her own emails provide undeniable evidence of a "real transaction between the parties."

116.    Third, the emails are explicitly confirmatory.  In the September 30, 2003 email, Torres states, "This is great news!!!!  We now have a license!!!"  She has confirmed receipt of

information concerning her permitted use of the Mark (the "news") and unequivocally states that

she will not be the owner of the Betta mark ("we now have a license!!!").  In the October 2, 2003

email, Torres again confirms the fact that a license has been granted and seeks only to "know

about the parameters of the License."  She proceeds to ask questions dealing with the font and

color of the Betta mark, the availability of history about Betta, whether she would have to pay

royalties and offers emphatic assurance (in all capital letters) that the quality of the goods would

be maintained.

117.    While not containing every term of the oral agreement, the emails explicitly and

unequivocally refer to the license and to Torres' acceptance of it.  These writings do more than

"afford a basis for believing that they reflect a real transaction between the parties" and are more

than sufficient to remove the Oral Agreement from the UCC's Statute of Frauds.

**[If the Court Determines That Either Statute of Frauds Applies to the Contract and the
Writing Requirement of the UCC is Not Satisfied] Milagros Is Estopped From Asserting
the Statute Of Frauds Defense**

118.    A party will be estopped from relying on the defense of the Statute of Frauds where that

party, by their representations, has led another to "'irremediably alter his situation' such that the

interposition of the statute against performance [would constitute] a fraud.  Grappo v. Alitalia

Linee Aeree Italiane, 56 F.3d 427, 432 (2d Cir. 1995), quoting, Woolley v. Stewart, 222 N.Y.

347, 350-51 (1918).

119.    "[I]t is universally conceded that the doctrine of equitable estoppel may be invoked to

preclude attack upon a voidable agreement when to permit the same would open the door to

unjust enrichment or irreparable injury. . ."  Brockport Developers, Inc. v. 47 Ely Corporation,

82 Misc. 2d 310, 314 (Monroe Co. 1975)(citations omitted)(in context of GOL§ 5-703).

"Suffice to say that equity will not countenance a ritualistic invocation of the Statute of Frauds,

21

especially where the party claiming its protection had acquiesced in and profited from the very agreement it now seeks to abjure." Id. at 315.

120.    In order to be estopped from asserting the Statute of Frauds, the circumstances should be such that it would be unconscionable to deny the oral agreement.  Ginsberg v. Fairfield-Noble Corp., 81 A.D.2d 318, 320-21 (1st Dep't 1981).

121.    Progress Vantage has adequately demonstrated that it would be inequitable to permit Milagros' invocation of the Statute of Frauds to bar enforcement of the oral agreements.

122.    Torres represented in writing that she believed she required Progress Vantage's permission to use the Betta mark in the United States and was fully aware or that Progress Vantage was registering the Betta mark.  There is written evidence pointing directly to her acceptance and a licensor/licensee relationship.

123.    To the extent that Torres now claims that her use of the word "license" was not a true characterization of what she was agreeing to, her repeated use of the word "license" amounts to a material misrepresentation.

124.    By never once inquiring as to the status of the trademark application, even in the face of a direct challenge to ownership by Neet Feet, Torres filled Progress Vantage with the confidence that the licensing agreement was being honored.

125.    Progress Vantage has also shown that, in responding to the Neet Feet allegations with a letter reciting Progress Vantage's authorization from Kim Gray to use the Betta mark, Torres even made affirmative use of her status as licensee.

126.    Progress Vantage reasonably relied on this failure to act by Milagros as a representation that it did not challenge Progress Vantage's ownership of the Betta mark.

127.    Permitting Torres to exploit her relationship with Progress Vantage but disclaim the agreement that established that relationship would be inequitable and uncoinscionable.

128.    Progress Vantage was the owner and manufacturer of Betta goods in China.  Torres' oral and written representations (and failures to act) reasonably led Progress Vantage to believe it was taking steps to expand its ownership to the United States through a licensee.  If Torres is permitted to hide behind the Statute of Frauds, she would not only profit by her misrepresentations, Progress Vantage would be divested of the very property it sought to develop.  Progress Vantage would be forever deprived of the United States trademark rights and would suffer the complete destruction of its United States business for Betta.

129.    This deprivation would be irreparable and, in light of Torres' flatly incredible attempts to alter the meaning of her written words, an unconscionable result.

**Milagros is Estopped From Asserting Ownership Over the Betta Mark**

130.    In order to prevail on its affirmative defense that Milagros is estopped from asserting ownership over the Betta mark, Progress Vantage must show that (1) Milagros had knowledge of Progress Vantage's conduct; (2) Milagros either (a) intended that Progress Vantage rely on Milagros' acts or omissions or (b) acted or failed to act in such a manner that Progress Vantage had a right to believe it was intended to rely on Milagros' conduct; (3) Progress Vantage was ignorant of the true facts; and (4) Progress Vantage relied on Milagros' conduct to its detriment. Fitzpatrick v. Sony-BMG Music Entertainment, Inc., 2007 WL 4358471 at *3 (S.D.N.Y. December 12, 2007)(setting forth elements of estoppel).

131.    Progress Vantage has adequately shown that the evidence supports the application of the affirmative defense of estoppel.

132.    The evidence shows that (1) Milagros was fully aware of Progress Vantages trademark application for three years; (2) Progress Vantage was justified in relying on Milagros' failure to assert ownership over the Betta mark; (3) Progress Vantage had no knowledge that Milagros would ever assert ownership over the Betta mark, and (4) that Progress Vantage is threatened with irreparable harm (i.e., the loss of its trademark) as a result of Milagros' conduct.

133.    Based on this evidence, Milagros is estopped from asserting ownership over the Betta mark.

## Milagros Has Waived Its Right To Assert Ownership Over the Betta Mark

134.    In order to prevail on its affirmative defense of waiver, Progress Vantage must demonstrate that Milagros engaged in a "voluntary and intentional abandonment of a known right, which, but for the waiver, would have been enforceable." Jordan v. Can You Imagine, Inc., 485 F.Supp.2d 493, 499 (S.D.N.Y. 2007)(citations omitted).  "Waiver may be established by affirmative conduct or by a failure to act that evinces the intent to abandon the right." Id.

135.    Milagros asserts that Progress Vantage promised to register the trademark on its behalf. To the extent that Milagros may have been able to enforce this alleged promise, the doctrine of waiver would apply and Progress Vantage has adequately demonstrated that Milagros' failure to act establishes a waiver.

136.    Milagros was aware that Progress Vantage was registering the Betta mark.  Yet for three years, Milagros made no inquiry whatsoever about the status of the Mark.  This "failure to act" demonstrates an intent to give up ownership of the Mark.

137.    In addition, confronted by an explicit challenge to the ownership rights in the Betta mark by Neet Feet, Torres located Progress Vantage's registration application, saw that Progress Vantage was to be the registered owner and made no protest whatsoever.

24

138.    This affirmative act unequivocally evidences a relinquishment of any claim to ownership in the Mark such that Milagros should be precluded from asserting any ownership over the Betta mark now.

## Milagros' Claim to Ownership of the Betta Mark Is Barred by Laches

139.    In order to prevail on its affirmative defense of laches, Progress Vantage "must establish that both [Milagros'] lack of diligence under the circumstances in initiating an action, as well as prejudice from the delay." Baron Phillipe de Rothschild v. Paramount Distillers, Inc., 923 F.Supp. 433, 438 (S.D.N.Y. 1996). This determination "requires a fact intensive inquiry." Id.

140.    Progress Vantage has adequately demonstrated that the balance of the equities counsels for the application of its affirmative defense of laches.

141.    Despite claiming that Progress Vantage would register the Betta mark for it, Milagros never inquired as to the application status for three years. Also, by failing to make any statement as to its belief about ownership of the Betta mark in the specific context of (1) a challenge to the ownership of the Betta mark and (2) actually seeing the USPTO application listing Progress Vantage as owner of the Betta mark, Milagros displayed a lack of diligence upon which Progress Vantage relied to its detriment.

## Milagros Cannot Establish Its Ownership of the Betta Mark

142.    There is a presumption that the manufacturer of goods is the trademark owner. MCCARTHY §29:8. Where ownership between a foreign manufacturer and exclusive U.S. distributor is at issue "absent an agreement to the contrary, the rights remain with the foreign manufacturer." MCCARTHY §16:49. To acquire ownership, "most courts have held that the U.S. exclusive distributor must have some form of express or implied assignment of rights from the foreign manufacturer." MCCARTHY §29:8.

143.   In the absence of clear ownership, courts will sometimes engage in weighing factors such as: Which party invented or created the mark; which party first affixed the mark to goods; which party's name appears on packaging and promotional material in conjunction with the mark; which party exercised control over nature and quality of goods on which the mark appeared; to which party did customers look; and which party paid for advertising. MCCARTHY §16:49. This test is the same no matter if the manufacturer is foreign or domestic. <u>Sengoku Works</u>, 96 F.3d at 1221; MCCARTHY §29:8.

144.   The test, however, is "only used to establish initial ownership" and "should not be used to divest one party of ownership because the weight of the factors has changed." MCCARTHY §16:48.

145.   Milagros has not provided sufficient evidence to overcome this presumption and has not shown that it owns the Betta mark under the balancing test.

146.   Progress Vantage was the manufacturer of the majority of goods sold by Milagros bearing the Betta mark. At the time the Milagros began distributing goods bearing the Betta mark, it was fully aware that Progress Vantage was the only entity outside of Australia and New Zealand producing and distributing Betta goods.

147.   In this case, Milagros simply cannot argue that it initially owned the Betta mark: Torres' own statements are far too indicative of a licensee (e.g., asking for permission and if she has to pay royalties).

148.   Even applying the balancing test, Progress Vantage has established ownership of the Betta mark.

149.   Progress Vantage designed the mark; it affixed the mark to goods; the Betta name appears on the goods, and Milagros' name appears explicitly identified as a distributor; as the

manufacturer, Progress Vantage exercised control over the nature of the goods (or justifiably relied upon Milagros to do so, see supra); no advertising appears to have been undertaken and only minimal promotional funds were spent; and, while customers may have called Milagros with complaints, this sole factor cannot result in Milagros establishing ownership.

**Milagros' Affirmative Defensive of Fraud Fails**

150.    Milagros asserted a claim that Progress Vantage had committed fraud on the USPTO in its trademark application. 15 U.S.C §115(b)(1).

151.    In order to prevail on a claim that a party has fraudulently obtained a trademark, a party must demonstrate the alleged fraud by "clear and convincing evidence." DeBeers LV Trademark Ltd. V. DeBeers Diamond Syndicate, Inc. 440 F.Supp. 249, 266-67 (S.D.N.Y.) 2006, citing Orient Exp. Trading Co., Ltd. v. Federated Dept. Stores, Inc., 842 F.2d 650, 653 (2d Cir.1988).

152.    "Allegedly fraudulent statements must show a deliberate attempt to mislead the Patent and Trademark Office and may not be the product of mere inadvertence." Martha Graham School and Dance Foundation Inc. v. Martha Graham Center of Contemporary Dance, Inc., 153 F.Supp.2d 512, 524 (S.D.N.Y. 2001).

153.    "Moreover, the knowing misstatements must have been made with respect to a material fact – one that would have affected the PTO's action on the applications." Pilates, Inc. v. Current Concepts, Inc., 120 F.Supp.2d 286, 312 (S.D.N.Y. 2000), citing Orient Express Trading Co. v. Federated Department Stores, Inc., 842 F.2d 650, 653 (2d Cir. 1988).

154.    "The Trademark Trial and Appeal Board of the PTO has held that this is a 'heavy burden' that requires the opposing party to present proof that leaves 'nothing to speculation, conjecture, or surmise. Should there be any doubt, it must be resolved against the party making the claim.'"

27

<u>DeBeers Diamond Syndicate, Inc</u>. 440 F.Supp. at 267, <u>quoting</u> <u>Marshall Field and Co. v. Mrs.</u>

<u>Fields Cookies</u>, 1992 WL 421449, 25 U.S.P.Q.2d 1321, 1328 (Trademark Tr. & App. Bd.1992).

155.    Milagros has presented no evidence, much less clear and convincing evidence, that

Progress Vantage ever committed any type of materially false information with the intention of

misleading the USPTO.

156.    Moreover, even if there were any such fraud, as the application process is suspended

during the pendency of this case, none of the representations in Progress Vantage's trademark

application can be said to have influenced the decision of the USPTO.

157.    There is no basis for finding that Progress Vantage has committed fraud on the USPTO.


Dated: May 23, 2008
New York, New York


By: _____
Benjamin L. Felcher Leavitt (BL 7363)
Two Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
(212) 490-4100
*Attorneys for Defendant*